1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| AFMS, LLC, | ) CASE NO. CV 10-05830 MMM (RCx) |
| Plaintiff, | ) |
| | ) |
| vs. | ) ORDER GRANTING IN PART, DENYING |
| | ) IN PART DEFENDANTS' MOTION TO |
| UNITED PARCEL SERVICE CO.; FEDEX | ) DISMISS |
| CO., | ) |
| Defendants. | ) |
| | ) |

13

14

15

16

17

18

19

20

On August 5, 2010, plaintiff AFMS, LLC ("AFMS") filed this action against United Parcel

Service Co. ("UPS") and FedEx Co. ("FedEx").[1]  AFMS filed a first amended complaint on October 14,

2010.[2]  The amended complaint states two claims: (1) violation of § 1 of the Sherman Act, 15 U.S.C.

§ 1, and (2) violation of  § 2 of the Sherman Act, 15 U.S.C. § 2.[3]  AFMS seeks actual damages, treble

21

22

23

24

25

26

[1]Complaint, Docket No. 1 (Aug. 5, 2010).

27

[2]First Amended Complaint ("FAC"), Docket No. 31 (Oct. 14, 2010).

28

[3]*Id.*, ¶¶ 17-25.

1    damages, attorneys' fees, and costs of suit.[4]

2         On November 1, 2010, defendants filed separate motions to dismiss AFMS's complaint under

3    Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[5]  AFMS opposes defendants'

4    motions.[6]

5

6                            **I.  FACTUAL BACKGROUND**

7         **A.    Factual Allegations in the Complaint**

8         AFMS is the industry leader in providing small parcel and freight consulting services.[7]  Its

9    consultants – called managing directors – assist shippers in negotiating competitive small parcel and

10   freight contracts.[8]  Prior to the events alleged in the complaint, AFMS generated approximately fifty

11   percent of its consulting revenue in Southern California, through relationships with large shipping clients

12   such as Sony, Toyota, Honda, Quiksilver, Guess, Applied Bio-Systems, and St. John Knits.[9]

13        UPS is the world's largest package delivery company, delivering more than fifteen million

14   packages a day to more than six million customers in over two hundred countries.[10]  FedEx is the world's

15

16

17        [4]*Id.* at 10.

18        [5]Motion to Dismiss Case filed by defendant United Parcel Service Co. ("UPS Motion"), Docket

19   No. 40 (Nov. 1, 2010); Motion to Dismiss Case filed by defendant FedEx Co. ("FedEx Motion"), Docket
     No. 41 (Nov. 1, 2010).  See also Reply in Support of Motion to Dismiss Case filed by defendant United

20   Parcel Service Co. ("UPS Reply"), Docket No. 48 (Dec. 20, 2010); Reply in Support of Motion to
     Dismiss Case filed by defendant FedEx Co. ("FedEx Reply"). Docket No. 49 (Dec. 20, 2010).

21

22        [6]Opposition to Motion to Dismiss Case ("Opposition"), Docket No. 47 (Dec. 13, 2010).  Due to

23   the similarities in defendants' arguments, plaintiff filed a single "omnibus opposition" to defendants'
     motions. (Opposition at 1.)  The court likewise addresses UPS and FedEx's arguments in combination

24   where appropriate, and notes relevant differences where applicable.

25        [7]FAC, ¶ 3.

26        [8]*Id.*

27        [9]*Id.*

28        [10]*Id.*, ¶ 4.

                                                    2

second largest package delivery and express shipping company.[11]  Both UPS and FedEx are engaged in the delivery, by ground and air, of time-sensitive letters, documents and packages.[12]       In fact, UPS and FedEx have emerged in recent years as the only two commercial entities engaged in the business of delivering time sensitive letters, documents, and packages.  They are in direct and substantial competition with one another.[13]  The United States Postal Service delivers letters, documents, and packages; allegedly, however, its service offerings are not time sensitive or guaranteed and most shippers do not consider U.S. mail a reasonable substitute for, nor interchangeable with, UPS or FedEx.[14]  For this reason, AFMS alleges that the USPS does not operate as a serious competitive constraint on either UPS or FedEx.[15]  At one time, "DHL" was a significant competitor of UPS and FedEx; AFMS alleges, however, that it has been forced to curtail its activity in the United States, and provides shipping and time sensitive delivery services only to and from foreign countries.[16]

In 2009, FedEx had a larger market share of air shipments of time sensitive letters, documents, and packages than UPS.[17]  UPS had the largest share of the ground shipment market.[18]  The companies had an equal market share of international shipments – UPS had 58.8% of the international market while FedEx had 41.2%.[19]  The combined domestic and international shipping markets together generated sixty billion dollars in revenue in 2009.[20]

---

[11]*Id.*, ¶ 5.

[12]*Id.*, ¶ 6.

[13]*Id.*

[14]*Id.*

[15]*Id.*

[16]*Id.*

[17]*Id.*, ¶ 7.

[18]*Id.*

[19]*Id.*

[20]*Id.*

AFMS alleges that both UPS and FedEx use complex customer contracts that shippers, even those with professional shipping departments, find difficult to understand.[21] The companies' respective rates depend on a variety of factors, such as delivery time (next day, second day, or extended delivery time), volume of weekly or monthly shipments, weight, and distance.[22] The companies also include a variety of additional charges, such as surcharges for fuel, delivery to remote zip code areas, commercial (versus residential) delivery, Saturday delivery, additional handling, address correction for air or ground, pick-up, hazardous materials, large packages, C.O.D., declared value, and delivery confirmation.[23] AFMS contends that UPS and FedEx have created a rating and fee matrix so complex that many, if not most, shippers must employ specialists to help them understand the nuances of the agreements and how they pertain to particular shipments.[24]

Parcel consultants such as AFMS gather and analyze data, including shippers' past transactions, to develop strategies to save the shippers money.[25] Consultants then implement their recommended strategy by helping shippers negotiate with UPS and FedEx to achieve maximum savings.[26] The consultants also provide logistical support for shippers regarding such things as the selection of warehouse sites and technology solutions.[27] Consultants provide these services primarily "by highlighting the hard and soft issues inherent in a very complex contractual and rating environment."[28] In the past, the revenue generated by many or most consultants, including AFMS, was largely dependent

---

[21] *Id.*, ¶ 8.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*, ¶ 9.

[26] *Id.*

[27] *Id.*

[28] *Id.*

on the savings achieved for each client.[29]  Consultants were therefore highly motivated to achieve additional discounts, leading to savings for their clients.[30]

A 2007 Morgan Stanley Transportation Industry Report allegedly reported that more than 11% of all shippers used a consultant; that 12% of all shippers switched carriers, purportedly showing that savings can be achieved through negotiation and bargaining; and that 49% of all shippers using consultants enjoyed a discount in the range of 15-30%, as compared with shippers that negotiated on their own behalf.[31]  Based on these statistics, AFMS alleges that third party consultants have had an actual or potential impact on UPS's and FedEx's profits of some two billion dollars annually.[32]  It asserts that eliminating such savings would significantly reduce discounted shipments and substantially increase the companies' profits.[33]

In addition to their direct impact on UPS and FedEx pricing, AFMS alleges that consultants have stimulated competition between the two companies that would not otherwise have existed.[34]  It asserts that there is little, if any, "published price competition" between UPS and FedEx, and that the companies have announced lock-step price increases annually for many years.[35]  The use of "consultant generated discounts" has purportedly reinvigorated price competition; indeed, between 2007 and  2009, AFMS alleges that it alone achieved more than one hundred million dollars of customer savings on UPS and FedEx shipments.[36]

AFMS asserts that UPS and FedEx determined that serious losses of revenues and profits would

---

[29]*Id.*

[30]*Id.*

[31]*Id.*, ¶ 10.

[32]*Id.*

[33]*Id.*, ¶ 11.

[34]*Id.*, ¶ 12.

[35]*Id.*

[36]*Id.*

5

result from the increasing use of third party consultants.  As a consequence, it contends, they decided to discontinue dealing with third party consultants.[37]  At an industry event in Chicago in October 2009, with more than two hundred "industry people" in attendance, executives from both UPS and FedEx purportedly appeared on a panel and announced the "no third-party consultant policy."[38]  Allegedly, the executives "did not deny collusion between the companies in reaching this decision when confronted with and questioned about the[ir] new[ ] . . . policies."[39]

The no third-party consultant policies were allegedly confirmed in subsequent writings.  On April 23, 2010, UPS published an internal memorandum titled "Procedures for Interacting with Third Party Negotiators and UPS Customers – Read Only."[40]  The same day, FedEx published an internal memorandum titled "Third Party Consultant Rules of Engagement for Field Sales."[41]  In another incident, at or outside the premises of a customer that had traditionally done business with a third party consultant in Louisiana, UPS and FedEx representatives purportedly met and conferred with each other before separately telling the customer that neither company would deal with the customer if a third party consultant was involved.[42]

AFMS contends that "the competitive impact of either FedEx or UPS unilaterally terminating its dealings with third party consultants was so significant that neither company would have dared to give the other such a huge potential competitive advantage/opportunity without an understanding that both would terminate dealings with third party consultants at or about the same time – as they did."[43] It further contends that after the policies were announced, UPS and FedEx ceased dealing with AFMS

---

[37]*Id.*, ¶ 13.

[38]*Id.*

[39]*Id.*

[40]*Id.*

[41]*Id.*

[42]*Id.*

[43]*Id.*, ¶ 14.

6

following seventeen years of amicable and mutually profitable business dealings.[44]

AFMS states that UPS and FedEx enforce their respective policies by informing shippers that if they (1) share contract data with third party consultants in violation of non-disclosure agreements with UPS and FedEx, or (2) engage third party consultants, regardless of the sharing of data, the carriers will refuse to discuss rates and terms, will refuse to negotiate price changes, and will raise rates.[45]  A UPS representative purportedly told an AFMS managing director that UPS "would not offer any different pricing [for an AFMS customer] because they knew FedEx was not going to be pursuing the business."[46] AFMS also alleges that FedEx told an AFMS customer that it was not working with third party consultants, and that "UPS [was] going to be doing the same thing soon."[47] AFMS contends that UPS and FedEx could have known each other's plans "only if there [had been] collusion between the two companies."[48]

AFMS asserts that the antitrust violations alleged in its amended complaint have had the effect of substantially lessening, suppressing, eliminating, and interfering with competition in the business of delivering time sensitive letters, documents, and packages within the United States, and to and from foreign countries.[49]  It further asserts that UPS's and FedEx's "no third party consultants" policies have the purpose and effect of stabilizing and raising prices, and that each defendant acted with the intent to achieve or maintain monopoly power.[50]

---

[44]*Id.*

[45]*Id.*, ¶ 15.

[46]*Id.*

[47]*Id.*

[48]*Id.*

[49]*Id.*, ¶ 16.

[50]*Id.*, ¶¶ 18, 23.

B.   **UPS's Internal Memorandum**[51]

As noted, UPS's internal memorandum is titled "Procedures for Interacting with Third Party Negotiators and UPS Customers – Read Only."[52]   The memorandum states:

> "Third Party Negotiators (3PNs) are individuals or companies that intervene between two other parties (in this context, UPS and our customer).  Often, a 3PN will tell a UPS customer that it can more successfully represent the interests of the customer than the customer is able to represent themselves.  3PNs have varying degrees of experience, knowledge, and acumen.  Some UPS customers consider, or use, 3PNs because of their PERCEIVED expertise in our industry.   This communication provides updated procedures to the UPS sales force for interaction with 3PNs retained by our customers.  . . .  UPS has a legitimate business interest in avoiding improper interference with our customer relationships.  Additionally, UPS must protect proprietary information from improper use and disclosure."[53]

The memorandum sets forth the following procedures for working with customers who indicate that they are contemplating use of a third party negotiator:

> "Emphasize to the customer that UPS will continue to provide a competitive value proposition and UPS is best positioned to directly address the customer's issues.  This will be done through a direct relationship with the customer.  Remind the customer of the underlying cost potentially associated with using a 3PN (usually requiring upwards

---

[51]UPS's and FedEx's April 23, 2010 internal memoranda are attached as Exhibits 1 and 2 to plaintiff's complaint.  Under Rule 10(c), the court may properly consider these documents in deciding the present motion.  See, e.g., *Haskell v. Time, Inc.*, 857 F.Supp. 1392, 1396 (E.D. Cal. 1994) ("Under FED.R.CIV.P. 10(c), the complaint is deemed to include any documents attached to it as exhibits as well as any documents incorporated into the complaint by reference"); see also *DeMarco v. DepoTech Corp.*, 149 F.Supp.2d 1212, 1217 (S.D. Cal. 2001) ("A district court reviewing a motion to dismiss may consider the facts alleged in the complaint, documents properly attached to the complaint, and matters over which the Court may take judicial notice," citing *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1989)).

[52]FAC, Exh. 1 (UPS memo) at 1.

[53]*Id*.

of 50% or more of any savings that might be negotiated), thereby dramatically reducing their direct savings that might be negotiated.  UPS will not provide lower rates simply because a 3PN is involved.  Reinforce the existing value proposition and partnership with UPS."[54]

The memorandum sets forth the following procedures for working with customers that have engaged with a third party negotiator:

"If the customer is still going to use a 3PN in any capacity, you MUST notify your Director of Sales and contact the Corporate Sales Team . . . to discuss next steps before taking any other action with the customer related to the 3PN.  At a minimum be prepared to discuss [1]  The type and size of the risk or opportunity for UPS[;] [2] The specific reason(s) the customer is going to use the 3PN[;] [3] The customer's expected timeframe for 3PN engagement."[55]

The memorandum prohibits sales representatives from "providing any information to a 3PN or having any discussions with a 3PN about a UPS customer or our relationship with a UPS customer . . . .unless the customer and the 3PN have signed a Third Party Confidentiality and Non-Disclosure Agreement (NDA) with UPS that has been approved by the Corporate Sales Team and by the Corporate Legal Department for that disclosure or series of disclosures."[56]

### C.   FedEx's Internal Memorandum

FedEx's April 23, 2010 internal memorandum – titled "Third Party Consultant Rules of Engagement for Field Sales"[57] – describes FedEx's position in dealing with third party consultants:

"[T]he message to the market place is 'no' for direct engagement with consultants providing . . . services where the only value is price negotiation.  Fed Ex's policy is to negotiate business relationships directly and exclusively with our customers, not

---

[54]*Id.* at 2.

[55]*Id.*

[56]*Id.*

[57]*Id.*, Exh. 2 (FedEx memo) at 1.

through a third party consultant.  It is up to Sales to be able to sell the 'value' to the customer of dealing directly with FedEx.   Field Sales is in agreement with adopting a 'Say No' strategy but wants the ability to exercise limited exceptions based on the metrics outlined in this document.  Field Sales feels that having this exception process is vital to maintaining their business."[58]

The memorandum describes the manner in which FedEx wishes to have negotiations with a customer proceed as follows:

"If FedEx has previously done business directly with the customer, advise that we believe our sales team members are the most qualified experts in discussing and providing information about our diverse shipping services, solutions and rate structures and, therefore, do not negotiate with third parties on their behalf.  Offer to set up a meeting to explain the value of dealing directly with FedEx.  If FedEx has previously negotiated business for the customer through this consultant, advise !he customer that we no longer negotiate with third parties but as a courtesy to the customer, we will request an exception to bid on the business.  Ask what functions the third party will handle for the customer to determine whether or not an exception is warranted."[59]

For new customers using a third party consultant, the memorandum instructs FedEx agents to "[advise the customer that we do not negotiate with third parties," and to "[offer to set up a meeting to explain the value derived from dealing directly with FedEx. . . ."[60]   The document contains additional instructions regarding "suggested phraseology for selling customers on the value of doing business directly with FedEx," "recognizing] whether a third party consultant is bringing value," and "steps to request the exception process."[61]

---

[58]*Id.* at 2.

[59]*Id.* at 4.

[60]*Id.*

[61]*Id.* at 5-7.

## II.  DISCUSSION

### A.      Standard Governing Motions To Dismiss Under 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

1

**B.      Whether AFMS Has Alleged Antitrust Standing**

2      Defendants argue that, as a threshold matter, AFMS lacks standing to bring antitrust claims.[62]

3 The factors relevant in determining whether a plaintiff has standing to sue for violation of the antitrust

4 laws are:

5      "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the

6      antitrust laws were intended to forestall;

7      (2) the directness of the injury;

8      (3) the speculative measure of the harm;

9      (4) the risk of duplicative recovery; and

10      (5) the complexity in apportioning damages."

11 *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (citing *Assoc. Gen. Contractors of Calif., Inc.*

12 *v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 (1983)); see also *Handgards, Inc. v. Ethicon,*

13 *Inc. (Handgards II)*, 743 F.2d 1282, 1295 (9th Cir. 1984) (listing these factors). "To conclude that there

14 is antitrust standing, a court need not find in favor of the plaintiff on each factor." *American Ad*

15 *Management, Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Moreover, "no single factor

16 is decisive." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (en

17 banc). The greatest weight, however, is given to the first factor, the nature of plaintiff's injury.

18 *American Ad Management.*, 190 F.3d at 1055 ("we give great weight to the nature of the plaintiff's

19 alleged injury").

20      **1.      Nature of Plaintiff's Injury**

21      "The antitrust laws do not provide a remedy to every party injured by unlawful economic

22 conduct. It is well established that the antitrust laws are only intended to preserve competition for the

23 benefit of consumers." *American Ad Management.*, 190 F.3d at 1055. Defendants contend that AFMS

24

25

26      [62]UPS Motion at 6; FedEx Motion at 2. Defendants do not dispute that plaintiff has Article III

27 standing. This, however, is not co-extensive with antitrust standing. See *Datagate, Inc. v.*

*Hewlett-Packard Co.*, 60 F.3d 1421, 1425 n. 1 (9th Cir. 1995) ("Unlike Article III standing, the question

28 of standing to sue under the antitrust laws does not go to subject matter jurisdiction").

does not allege injury "of the type the antitrust laws were intended to prevent."[63]  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); see also *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1009 (9th Cir. 2003) (noting that the primary issue on appeal involved "whether [the] injury is 'of the type the antitrust laws were intended to prevent'"); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) ("the 'nature of the plaintiff's alleged injury' [factor] requires a showing of 'antitrust injury,' i.e., 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful'").

"[T]he mere fact of . . . reduced profits resulting from an agreement between other parties does not constitute an antitrust injury to a plaintiff."  *Juster Assoc. v. Rutland*, 901 F.2d 266, 269 (2d Cir. 1989) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1990)).  To demonstrate that it has suffered an antitrust injury, a plaintiff must allege that defendants' unlawful actions have caused "anticompetitive effects."  *Brunswick*, 429 U.S. at 487.  This is because the antitrust laws were "enacted for 'the protection of *competition*, not *competitors*."  *Id.* at 488 (emphasis original, quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).        "The Supreme Court's cases have also 'emphasized the central interest [of the Sherman Act] in protecting the economic freedom of participants in the relevant market.'  We have derived from this principle the 'corollary' that the 'injured party be a participant in the same market as the alleged malefactors.'  Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *American Ad Management.*, 190 F.3d at 1057 (citing *Assoc. Gen. Contractors*, 459 U.S. at 538; *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)).  See also *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704-05 (9th Cir. 2001) ("[A]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.'  Although the Hospital Districts allege that they are potential participants in the nicotine delivery market, and this is the market

---

[63]UPS Motion at 6; FedEx Motion at 2.

where competition allegedly has been restrained, the district court ruled that they nonetheless failed to state an antitrust injury.  The court reasoned that the Hospital Districts' injuries were not experienced in the nicotine delivery market, but rather in the health care market.  We agree," citing, *inter alia*, *American Ad Management*, 190 F.3d at 1057); *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 578-79 (9th Cir. 1986) ("[E]xamining the nature of ESI's injury, we find it was not of 'the type the antitrust laws were intended to forestall.'  As with the union in *Associated General Contractors*, ESI is neither a consumer of defendants' goods or services nor a competitor of the defendants in the *restrained* market. . . .  Here, it is undisputed that the restraint is in the market for first-run film exhibition in the MetroCenter area of Phoenix.  As a licensing agent, ESI is quite clearly neither a competitor of these exhibitors nor a consumer of goods or services in this market," citing *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 449 (9th Cir. 1985) and *Assoc. Gen. Contractors*, 459 U.S. at 538-39 (emphasis original));[64] *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158, 1161-62 (9th Cir. 1991) ("[W]e disagree with the district court's contention that a trier of fact could not find that GTE and Consultants compete in the market for yellow pages' advice. . . .  The district court implicitly defined the scope of the market for yellow pages consulting according to the content of the recommendations offered. . . .  As we have noted before, the 'field of competition [includes] . . . the group or groups of sellers who have actual or potential ability to deprive each other of significant levels of business,'" citing *Thurman Industries, Inc. v. Pay N' Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (declining to recognize "home center stores" as a distinct market when other retail stores sold some similar goods, even if not the full range of goods and services available at home center stores), cert. denied, 504 U.S. 913 (1992)).

Defendants argue that AFMS lacks antitrust standing because it has not suffered harm in the relevant market, namely, the market for time-sensitive package shipping and delivery.[65]   Rather,

---

[64]The Ninth Circuit in *American Ad Management* commented that the holding in *Exhibitors' Serv., Inc.* was "properly analyzed . . . under *Brunswick*" as a case in which "plaintiff suffered no antitrust injury because its injury was not necessary to the unlawfulness of the defendants' conduct." *American Ad Management*, 190 F.3d at 1058 n. 8.

[65]UPS Motion at 6; FedEx Motion at 3.

1   defendants contend, AFMS has suffered injury, if at all, in the market for consulting services.[66]

2   Defendants argue that *Legal Economic Evaluations v. Metropolitan Life Ins. Co.*, 39 F.3d 951 (9th Cir.

3   1994), compels this conclusion.  There, the court considered whether "consultants who advise[d] tort

4   plaintiffs on structured settlements . . . suffered antitrust injury when they [could not] get information

5   about premiums and rating practices from, or serve as brokers to arrange annuities to fund structured

6   settlements with, life insurance carriers because of an alleged boycott by life insurance carriers and

7   brokers who specialize[d] in arranging annuities [on] behalf of tort defendants."  *Id.* at 952.  The

8   plaintiff-consultants argued that they had suffered antitrust injury "because [defendants] acted with the

9   purpose and effect of denying access to competition in the structured settlement brokerage and

10  consulting market as well as access to the relationships with life insurers necessary to compete in those

11  markets."  *Id.* at 954.  The court opined:

12      "The difficulty with [the consultants'] case is that its injury does not match either the

13      mischief about which it complains or the markets in which it occurred.  [The consultants]

14      argue[ ] that the defense-only policy has produced a market for brokering and consulting

15      services in which there is no competition 'at the point of sale.'  This comes about

16      because [the consultants] believe[ ] there is little incentive on the defense-only broker's

17      part to achieve a more favorable rate for the liability carrier by shopping among Life

18      Carriers who charge different rates for comparable annuities, or to obtain a more

19      favorable payout for the tort plaintiff.  Assuming this to be true, the alleged harm to

20      competition – decreased annuity benefits to tort plaintiffs and increased annuity costs to

21      liability carriers – nevertheless occurs in markets in which [the consultants] do[ ] not

22      compete.  [The consultants are] neither a liability carrier nor a tort plaintiff.  Thus, even

23      if price fixing of structured settlements injures tort plaintiffs, and restriction on output

24      increases the cost of annuities and thereby injures Life Carriers, [the consultants']

25      injur[ies] do[ ] not flow from these competitive harms. . . .  In any event, to the extent

26      that tort plaintiffs are harmed, that harm arises in the market for settling litigation."  *Id.*

27  ─────────────────────

28  [66]*Id.*

15

1 | at 955-56.

2 | Defendants assert that like the consultants in *Legal Economic Evaluations*,  AFMS lacks antitrust

3 | standing because the injury alleged in the complaint arises in the market for shipping consultants'

4 | services, not in the market for time-sensitive package shipping and delivery.

5 | AFMS counters that two cases, *American Ad Management*, 190 F.3d 1051, and *Yellow Pages*

6 | *Cost Consultants*, 951 F.2d 1158, compel the opposite result.[67]  In *American Ad Management*, the court

7 | considered whether a Yellow Pages "Authorized Selling Representative (ASR)" had suffered antitrust

8 | injury when the Yellow Pages' publisher, GTE, refused to sell advertising space to ASRs.  190 F.3d at

9 | 1053.  The court described the ASR business model as follows: "[a]dvertisers may purchase advertising

10 | space in the directories either directly from GTE or through . . . an ASR.  Once an ASR receives an order

11 | for advertising space, the ASR purchases the space from the publisher.  The publisher sells the space to

12 | the ASR at a lower price than that given to the public, thereby providing the ASR with a commission.

13 | By charging customers a price lower than the publicly available price, the ASR passes some of the

14 | commission on to the customers."  *Id.*  The court noted that the relationship between the ASRs and the

15 | Yellow Pages publishers was "one of agency," such that they were participants in the market.  *Id.* at

16 | 1054.

17 | The court emphasized that an antitrust plaintiff need not be a consumer or competitor to suffer

18 | antitrust injury; indeed, it opined that "[w]hile consumers and competitors are most likely to suffer

19 | antitrust injury, there are situations in which other market participants can suffer antitrust injury."  *Id.*

20 | at 1057 (citations omitted).  It explained that although "[a] number of [its] opinions . . . [had] use[d] the

21 | phrase 'competitor or consumer' as a rough gloss on the . . . 'market participant' test," the cases that

22 | have done so "usually concern[ed] parties who [were] clearly not participants of any kind in the

23 | restrained market."  The court noted that it had "not found any Ninth Circuit case rejecting a claim of

24 | antitrust injury by a market participant simply because the plaintiff was not a 'consumer or competitor'

25 | of the defendant. . . ," and commented that "it [was] not [a plaintiff's] status as a consumer or competitor

26 | that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct

27 |

28 | [67]Opposition at 4-6.

1   and the resulting harm to the plaintiff." *Id.* at 1057-58.  The court held that, "[a]s a broker for the

2   advertisements whose prices are allegedly restrained, American [was] a participant in the relevant market

3   and . . . suffered an injury in that market, the loss of commissions on advertisement purchases." *Id.* at

4   1057.[68]

5

6         Key to the *American Ad Management* court's conclusion that the ASRs were market participants

7   was the fact that the ASRs were agents for the publishers, who sold advertising space in the Yellow

8   Pages to companies that desired it.  The ASRs purchased the advertising space from the publishers and

9   in turn sold it to advertisers.  The publishers sold the advertising space to the ASRs at a lower price than

10  they charged advertisers purchasing space directly, in order to provide the ASRs with a commission.

11  The ASRs charged advertisers a lower price than they would otherwise have been able to obtain, passing

12  on some of the discount to their customers.  *American Ad Management*, 190 F.3d at 1053.

13        AFMS does not allege that it was "in the chain of distribution" for shipping and delivery services

14  in the same way that the ASRs in *American Ad Management* were.  Although AFMS effectively alleges

15  that it acted as its clients' agent in negotiating shipping contracts with defendants,[69] it does not allege

16  facts suggesting that it purchased or paid for shipping services in the way the ASRs in *American Ad*

17  *Management* did, i.e., that it entered and became a participant in the market for shipping services.

18  Although AFMS alleges that customers compensated it for its consulting services by paying it a portion

19

20        [68]Although AFMS relies on *Yellow Pages Cost Consultants*, the case concerned a market defined

21  as "the service market of advising advertisers regarding the form, cost, content and location of yellow
    pages advertisements and . . . placing the ads in yellow pages publications."  *Yellow Pages Cost*

22  *Consultants*, 951 F.2d at 1161.  It is thus less relevant to AFMS's allegation that it competes in the
    market for time-sensitive package shipping and delivery than it would be had AFMS alleged that it

23  competes in the market for shipping consultation services.  As respects AFMS's assertion that it

24  competes in the market for time-sensitive package shipping and delivery, the court believes the relevant
    cases are *American Ad Management* and *Legal Economic Evaluations.*

25

26        [69]See, e.g., FAC, ¶ 9 (alleging that after AFMS develops a strategy to save shippers money, it
    "implements that strategy by helping shippers negotiate with UPS/FedEx to achieve the maximum

27  savings for the shipper").  That it was directly involved in negotiations between its clients and FedEx
    and UPS is made clear by the allegation that defendants "decided to discontinue dealing with third party

28  consultants."  (*Id.*, ¶ 13.)

17

1    of the savings it was able to help them clients achieve, it was not a "broker" in the sense that the

2    *American Ad Management* court used the term. Specifically, it did not arrange transactions or act as an

3    intermediary between sellers and purchasers of shipping services; rather, it offered advice and assistance

4    to one side of the purchase/sale transaction.  Nor did it purchase and then resell shipping services.

5    Although purchasers of shipping services paid AFMS a fee that represented a percentage of the savings

6    it had achieved for them, AFMS was not "in the chain of distribution" for the sale of shipping and

7    delivery services in the way that the ASRs were in *American Ad Management*.  Since it is the price of

8    the shipping and delivery services that is "allegedly [being] restrained," *American Ad Management*, 190

9    F.3d at 1057, and since AFMS is not a participant in that market, it cannot have suffered antitrust

10   injury.[70]

11

12

13

_____

14   [70]In its opposition, AFMS alleges that it is a participant in a separate market as well – i.e., the

15   market for shipping consultation services – and that its allegations regarding the internal memoranda
     UPS and FedEx sent to their sales personnel show that the companies compete, or intend to compete,

16   with it in that market.  In *Yellow Pages Consultants*, the court considered whether Yellow Pages cost
     consultants had suffered antitrust injury when GTE "announce[d] that it would end its decades-old

17   practice of letting consultants order, place, and process yellow page advertisements on behalf of
     advertisers." 951 F.2d 1160.  Plaintiffs were "several distinct consulting firms that offer[ed] advice to

18   businesses on advertising effectively and efficiently in yellow pages directories." *Id.* at 1159.  GTE
     salespersons also offered "advertisers advice on the form and content of their advertisements," and aided

19   advertisers in "plac[ing] such advertisements with relevant GTE directories." *Id.*  The court cautioned
     that "the 'field of competition [includes] . . . the group or groups of sellers who have actual or potential

20   ability to deprive each other of significant levels of business,'" *id.* at 1162 (quoting *Thurman Industries,
     Inc.*, 875 F.2d at 1374 (alterations original), and concluded that, because the plaintiff-consultants and

21   GTE salespersons were in direct competition in the relevant market, plaintiffs had suffered antitrust

22   injury. *Id.* at 161-62.

23       Like GTE, which offered "advertisers advice on the form and content of their advertisements,"
     and aided them in "plac[ing] such advertisements with relevant GTE directories," 951 F.2d at 1161,

24   FedEx's and UPS's statements in the memoranda could be interpreted as indicating an intent to compete
     with AFMS in the market for shipping consultation services.  The problem, however, is that, while it might

25   be able to do so, AFMS does not allege a separate market for shipping consultation services in its
     complaint.  (See, e.g., FAC, ¶ 18 (alleging that defendants combined and conspired to unreasonably

26   restrain trade and commerce in the delivery of time sensitive letters, documents and packages. . .").)

27       Should plaintiff wish to attempt to allege such a market, the court will afford it leave to do so.

28   The court cannot consider that market, however in deciding the pending motion.

1    This conclusion is supported by *Legal Economic Evaluations*, 39 F.3d 951.[71]  There, the court

2    noted that a "private [antitrust] plaintiff must link its own injury to the *anticompetitive* aspect of the

3    defendants' conduct."  39 F.3d at 954 (emphasis original).  The court rejected plaintiff's argument that

4    it had satisfied this requirement by alleging a group boycott that had persuaded or coerced suppliers of

5    annuities to deny relationships that benefitted tort plaintiffs and liability carriers/tort defendants.  See

6    *id.* at 954.  Rather, the court held, plaintiff's injury did "not flow from the[ ] competitive harms" it had

7    identified – decreasing the annuity benefits tort plaintiffs received, and increasing the cost liability

8    carriers paid to purchase the annuities.   *Id.* at 953, 955.  The court noted that these injuries – if they

9    occurred as a result of anticompetitive conduct rather than legal market incentives –[72] did not occur in

10   the market in which plaintiff operated, i.e., the "structured settlement brokerage and consulting market,"

11   *id.* at 954, but instead in the market for settling litigation and the market for selling annuities, *id.* at 956.

12   Here the same is true.  The competitive harm AFMS identifies – the lessening of competition and the

13

14   _____

15       [71]AFMS argues that *Legal Economic Evaluations* is not controlling, since it did not address
     antitrust standing, but only whether the plaintiff had suffered antitrust injury.  The factor given the most

16   weight in determining whether a plaintiff has antitrust standing, however, is the nature of the injury it
     allegedly suffered, i.e., whether it was the type of injury the antitrust laws were intended to prevent.

17   *Amarel*, 102 F.3d at 1507; see also *American Ad Management*, 190 F.3d at 1055.  Thus, to the extent
     *Legal Economic Evaluations* is relevant in assessing whether plaintiff was a participant in the market

18   in which competition was allegedly injured, and thus whether it suffered antitrust injury, it is relevant
     to the standing inquiry here.

19

20       [72]The court in fact dismissed the notion that the higher costs liability carriers were allegedly
     paying was an injury of "concern to the antitrust laws."  It noted that there was no evidence that there

21   were only a limited number of brokers available to assist liability carriers or that the carriers themselves
     were unable to comparison-shop, and observed that the antitrust laws were not designed "to protect [the

22   liability carriers] from themselves." *Id.* at 955.  As respects the fact that plaintiffs might be able to locate
     an annuity with a higher payout for the same price if they were able to work with a broker, the court

23   stated that this harm "flow[ed] from what [made] a structured settlement economically attractive, not
     from anticompetitive conduct."  *Id.*  It noted that, even if a tort plaintiff were able to identify a more

24   favorable annuity with the help of a broker, the plaintiff would not buy it because he or she would lose
     the tax advantages of a structured settlement that arise from the liability carrier's purchase of the annuity.

25   The court contrasted that reality with the situation in *Yellow Pages Cost Consultants*, where the ASRs'
     clients purchased advertising from GTE themselves.  *Id.* (citing *Yellow Pages Cost Consultants* with an

26   introductory cf. signal and explaining that the different result in that case was due to the fact that the
     "client [of the ASR] placed the business with [the] consultant's help").  Consequently, the court

27   concluded, anticompetitive conduct was not the cause of the market harms plaintiff alleged.

28

raising of prices in the market for time-sensitive package shipping and delivery – occurs in a market in which AFMS does not participate.

Consequently, the court concludes that AFMS has failed adequately to allege antitrust injury in the relevant market.  To afford AFMS the opportunity to allege that it competed with defendants in the market for shipping consultation services and/or to allege additional facts showing that it was a participant in the market for time-sensitive package shipping and delivery, the court grants AFMS leave to amend.

### 2. Directness of the Injury

Defendants also argue that AFMS's alleged injury is too indirect and derivative to confer standing.[73]  They maintain that, if any parties have suffered direct injuries as a result of their conduct, it is AFMS's customers, who allegedly must now pay higher rates for UPS and FedEx package shipping and delivery services.[74]  "[A] plaintiff normally lacks standing where that plaintiff's customer is the immediate victim of the defendant's conduct. . . ."  *Amarel*, 102 F.3d at 1510 (citing *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 294 (1985)).  See also *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541-42 (9th Cir. 1987) ("The chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust violation. . .  The question then is whether the injuries in the present case (lost wages, lost business opportunities, and lost union dues) are direct injuries suffered by the class members or are derivative of the injuries suffered by the vessel owners. . .  The vessel owners have complete control over negotiations [for] the sale of the fish.  Once a sale has been completed, the crewmembers are paid their wages (after deducting expenses) either on a 'share of the catch' or 'per-ton' basis.  Then, and only then, are the union dues calculated.  Thus, any injury suffered by the class members is derived from any injury suffered by the vessel owners during the sale of the fish"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F.Supp.2d 1213, 1222 (C.D. Cal. 2003) ("Any injury suffered by Sharman is entirely derivative of Altnet's alleged injuries, even if harm to Sharman is a foreseeable consequence of the

---

[73]UPS Motion at 10; FedEx Motion at 7.

[74]*Id.*

1   conduct alleged.  Indeed, it is specifically not the design of [federal antitrust laws] to provide recourse

2   to every party arguably injured by antitrust violations"), citing *Eagle*, 812 F.2d at 542.

3        AFMS argues that it has suffered direct injury because, like the plaintiffs in *American Ad*

4   *Management* and *Yellow Pages Cost Consultants*, "AFMS is a market participant, not merely a

5   secondary supplier or purchaser of an actual market participant."  As a consequence, it asserts, its injury

6   is direct, rather than derivative of the injury to its customers in the market for package shipping and

7   delivery.  See *Amarel*, 102 F.3d at 1510-11 ("[S]tanding is appropriate in certain cases where the

8   plaintiff is 'a supplier of goods or services who can prove that he suffered lower selling prices or

9   diminished volume or other profit reduction as a result of illegal conduct by the defendant(s),'" quoting

10  Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 335d. (2d ed. 2000)).

11       The court, however, has concluded that AFMS has not adequately alleged that it suffered injury

12  in the market for time-sensitive package shipping and delivery.  Given this determination, the court must

13  conclude that, as presently alleged, AFMS's injury is necessarily derivative of its customers' injury.  See

14  *Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 290-91 (6th Cir. 1992) (holding that there was an

15  "attenuated" causal nexus between a broker's loss of commissions on Mar's candy and snack lines and

16  injury to Mars' competitors in the pet food and rice markets and consumers of those products as a result

17  of reorganization of Mars' broker arrangements, allegedly to disrupt competitors' broker networks and

18  achieve greater market power in the pet food and rice markets); cf. *Serfecz v. Jewel Food Stores*, 67 F.3d

19  591, 597 (7th Cir. 1995) ("Suppliers to direct market participants typically cannot seek recovery under

20  the antitrust laws because their injuries are too secondary and indirect to be considered 'antitrust

21  injuries,'" citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d

22  1374, 1379 (7th Cir. 1987)).

23       The court thus concludes that, as presently alleged, AFMS's injury is derivative, rather than

24  direct.

25            **3.    The Risk of Duplicative Recovery**

26       FedEx argues that "AFMS's claims create the obvious risk of duplicative recovery, if the

27  customers themselves sued, just like in the more typical indirect purchaser context. . . .  If AFMS and

28  [its] customers were both permitted to bring these claims, [d]efendants would face the prospect of paying

1  customers 100 percent of their losses, and then paying AFMS some additional percentage of those losses

2  (AFMS's contingency fee)."[75]

3       "The risk to be avoided under [the duplicative recovery factor] is that potential plaintiffs may be

4  in a 'position to assert conflicting claims . . . thereby creating the danger of multiple liability.' "

5  *American Ad Management*, 190 F.3d at 1059 (quoting *Eagle*, 812 F.2d at 542).  The key inquiry,

6  therefore, is whether AFMS and its customers could each "recover their lost profits without claiming

7  overlapping damages."  *Id.* at 1060 (citing *Yellow Pages Cost Consultants*, 951 F.2d at 1163).  See also

8  *Ass'n of Washington Pub. Hosp. Districts v. Philip Morris, Inc.*, 241 F.3d 696, 703 (9th Cir. 2001)

9  (concluding that there was a risk of duplicative recovery where hospital districts sued tobacco companies

10  to recover unreimbursed costs incurred treating patients suffering from tobacco-related diseases because

11  " the . . . potential for duplicative recovery [was] present given the possibility that smokers themselves

12  could bring state law claims against the Tobacco Firms to recover for their personal injuries," citing

13  *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 964 (9th

14  Cir. 1999)).

15       As the court in *American Ad Management* explained, the "'risk to be avoided under [the

16  duplicative recovery factor] is that potential plaintiffs may be in a 'position to assert conflicting claims

17  to a common fund . . . thereby creating the danger of multiple liability for the fund.'"  190 F.3d at 1059

18  (citing *Eagle*, 812 F.2d at 542, in turn quoting *Associated General*, 459 U.S. at 544 (alterations

19  original)).  The *American Ad Management* court held that "the damages suffered by the ASRs and the

20  advertisers [were] distinct despite their resulting from the same anticompetitive conduct. . . ."  *Id.* at

21  1059.  It noted that, unlike damages claimed by indirect purchasers who have had higher costs passed

22  on to them by suppliers, the ASRs' "loss of business flowed directly from the advertisers[ ] having to

23  pay higher prices," and " there was no opportunity for American to pass on part of its damages to the

24  advertisers, and no corresponding danger of duplicative recoveries under a pass-on theory."  *Id.* at 1059-

25  60.  The court provided an example to elucidate this conclusion:

26       "An advertiser with a yellow pages advertising budget of $1,000 might pay that entire

27

28      [75]FedEx Motion at 7-8.

sum to GTE rather than use Consultants because of the inconvenience caused by GTE's refusal to let Consultants place ads with them on its behalf.  Had GTE allowed Consultants to place the ads, causing the advertiser to use Consultants, it might have paid only $500 to GTE and $200 to Consultants and retained $300 itself.  The Consultants would recover the $200 in the instant suit; the advertiser might recover $300 in a subsequent suit.  Applied to the case at bench, this calculation would result in American's receiving a $500 commission and passing $300 of it on to the advertiser in the form of discounting.  American could recover the amount of its commission minus the discount ($200), and the advertiser could recover the discount ($300), without subjecting GTE to double recovery for the same injury." *Id.* at 1060 (citing *Yellow Pages Cost Consultants*, 951 F.2d at 1163)).

Because this case is at the pleadings stage, AFMS has not had an opportunity to adduce evidence of the type proffered in *American Ad Management*.  Given AFMS's allegations that it was paid a portion of the savings achieved by its customers, however, the Ninth Circuit's opinion in *American Ad Management* demonstrates that a non-duplicative recovery is possible, and the court thus cannot say as a matter of law that this factor weighs against a finding of antitrust standing.

### 4.    The Remaining Factors

Defendants make no argument regarding the remaining factors – i.e., the speculative measure of the harm and the complexity of apportioning damages.  The court therefore accords them no weight in its standing analysis.

### 5.    Weighing The Factors

Viewing the allegations of the complaint in the light most favorable to AFMS, the court concludes that AFMS has failed to plead sufficient facts to show that it has antitrust standing.  AFMS has not adequately alleged that it is a participant in the market for time-sensitive package shipping and delivery.  As a consequence, it has not adequately alleged that it suffered antitrust injury or that its injury is direct rather than derivative.  While AFMS has pled facts showing that a non-duplicative recovery is possible, the court concludes, on balance, that, as currently pled, the complaint fails to state a claim for

1    violation of § 1 of the Sherman Act.  AFMS's first cause of action must therefore be dismissed.[76]

2            **C.    Whether AFMS States a Claim for Monopolization**

3           Section 2 of the Sherman Act makes it illegal for any "person" to "monopolize, or attempt

4    to monopolize, or combine or conspire with any other person or persons, to monopolize any part of

5    the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.  Private

6    parties are afforded a right of action to enforce this provision of the Sherman Act by Section 4 of

7    the Clayton Act, which states in part that "any person who shall be injured in his business or

8    property by reason of anything forbidden in the antitrust laws may sue therefor in any district court

9    of the United States . . . and shall recover threefold the damages by him sustained, and the cost of

10   suit, including a reasonable attorney's fee."  15 U.S.C. § 15; see also, e.g., *Assoc. Gen. Contractors*,

11   459 U.S. at 529-30; *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 185 (S.D.N.Y. 2000)

12   ("Section 4 of the Clayton Act allows private enforcement of the antitrust laws and broadly defines

13   the class of persons who may maintain a private damage action").

14         To state a claim for monopolization under § 2, a plaintiff must plead "'(1) the possession of

15   monopoly power and (2) the willful acquisition or maintenance of that power as distinguished from

16   growth or development as a consequence of a superior product, business acumen, or historic

17   accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992) (quoting

18   *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); accord *High Tech. Careers v. San Jose*

19   *Mercury News*, 996 F.2d 987, 989-90 (9th Cir. 1993).

20         To satisfy the first element, plaintiff must plead the relevant market and the fact that

21   defendant possessed monopoly power in that market.  See *MRO Communications, Inc. v. American*

22   *Tel. & Tel. Co.*, 205 F.3d 1351, 1999 WL 1178964, *1 (9th Cir. Dec. 13, 1999) (Unpub. Disp.) ("To

23   make out a claim of monopolization in violation of 15 U.S.C. § 2 , MRO had to allege: (1) AT &

24   T's possession of monopoly power in the relevant market; (2) AT & T's willful acquisition or

25   maintenance of that power through exclusionary conduct; and (3) causal antitrust injury," citing

26

27       [76]Because the court concludes that AFMS has not adequately alleged that it has antitrust standing
     to bring a Sherman Act § 1 claim, it does not reach the merits of defendants' alternate argument under

28   Rule 12(b)(6) that AFMS has failed adequately to allege the existence of a conspiracy.

*American Professional Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997)); *Amarel*, 102 F.3d at 1521 ("Claims for violation of Section 2 must allege two key elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power"); see also *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2"); *Griffiths v. Blue Cross & Blue Shield*, 147 F. Supp. 2d 1203, 1213, n. 12 (N.D. Ala. 2001) ("[A] plaintiff bringing a monopolization claim under Section 2 of the Sherman Act must define and prove the relevant market").[77]

To state a claim of attempted monopolization under Section 2, "'a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993), and citing *Amarel*, 102 F.3d at 1521); accord *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1422-23 (9th Cir. 1995) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988)); *California Computer Prod.*, 613 F.2d at 736. The requirements of a monopolization claim and attempted monopolization claim "are similar, differing primarily in the requisite intent and the necessary level of monopoly power." *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (citing *California*

---

[77]As noted in *MRO Communications*, to satisfy § 4 of the Clayton Act, a plaintiff must also plead "causal 'antitrust' injury." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987); see also *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F.Supp. 1443, 1466 (C.D. Cal. 1988) ("The Supreme Court has held that not all forms of injury caused by antitrust violations are compensable. In *Brunswick* [*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)], the Court held that an antitrust plaintiff must show that it was injured by the anticompetitive consequences of the antitrust violation. Plaintiff must show that 'the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts, since '[t]he antitrust laws . . . were enacted for the protection of competition not competitors,'" quoting *California Computer Prod. v. International Business Machines, Corp.*, 613 F.2d 727, 732 (9th Cir.1979) (some internal quotation marks omitted)), aff'd *sub nom Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).

1 | *Computer Prod.*, 613 F.2d at 736-37).

2      AFMS alleges that, "[b]eginning in the Fall of 2009 . . . each defendant has been and is

3 engaged in a plan and scheme to achieve or maintain monopoly power in the delivery of time

4 sensitive letters, documents and packages in violation of Section 2 of the Sherman Act. . . .  The

5 actual monopolization, or alternatively the attempt to monopolize, has consisted of a deliberate

6 course of action, undertaken by each defendant with the specific intent of eliminating plaintiff

7 AFMS, and other third party consultants as factors in the market for the delivery of letter, documents

8 and packages in the United States and in foreign commerce. . . .  This course of conduct has resulted

9 in each defendant actually monopolizing the delivery of letters, documents and packages. . . .

10 Alternatively, if either defendants' conduct has fallen short of actually monopolizing that market,

11 it presents a dangerous probability of success. . . ."[78]

12      It is clear from these allegations that AFMS has pled the relevant market as the market for

13 "delivery of time sensitive letters, documents and packages."[79]  See *Kodak*, 125 F.3d at 1202 ("To

14 demonstrate market power by circumstantial evidence, a plaintiff must: '(1) define the relevant

15 market. . . ," citing *Rebel Oil*, 51 F.3d at 1434).  AFMS alleges that UPS and FedEx are the two

16 participants in that market that have "actual or potential ability to deprive each other of significant

17 levels of business."[80]  *Kodak*, 125 F.3d at 1203 ("In *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, we

18 defined 'market' as the group of sellers or producers who have the 'actual or potential ability to

19 deprive each other of significant levels of business.'  Without a proper definition of the relevant

20 market, it is impossible to determine a party's influence over that market," citing *Rebel Oil*, 51 F.3d

21 at 1434, in turn quoting *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc*., 875 F.2d 1369, 1374

22 (9th Cir. 1989)).

23      AFMS's monopolization and attempted monopolization claims assert that "respectively and

24 individually," UPS and FedEx "succeeded in excluding [third party] consultants from providing

25

---

26     [78]FAC, ¶¶ 23-25.

27     [79]*Id.*, ¶ 23.

28     [80]*Id.*, ¶ 7.

consulting services regarding either UPS's or FedEx's delivery systems.  Both Defendants chose to do this after dealing successfully with third-party consultants for nearly twenty years, consequently making a significant change to an established pattern in a market that consultants had helped to make competitive."[81]  In addition, AFMS alleges that defendants "threatened potential consumers with higher prices and refusals to deal if they utilized third-party consultants."[82]  Defendants counter that: (1) UPS and FedEx have the right to choose with whom they deal, and (2) their conduct does not threaten to impair "the opportunities of *rivals*."[83]  The court addresses each point in turn.

"A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 (1960)); see also *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972) ("It is well settled that a manufacturer may discontinue dealing with a particular distributor 'for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade,'" citing *Ricchetti v. Meister Brau, Inc.*, 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939 (1971); *Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76-77 (9th Cir. 1969), cert. denied, 396 U.S. 1062 (1970); *Scanlan v. Anheuser-Busch, Inc.*, 388 F.2d 918, 921 (9th Cir. 1968), cert. denied, 391 U.S. 916 (1968)); accord *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 483 (9th Cir. 1988).

Although defendants have the right to deal with whom they choose, that right is not absolute. Companies may not refuse to deal for anticompetitive reasons. See *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985) ("The qualification on the right of a monopolist to deal with whom he pleases is not so narrow. . . .  In the actual case that we must decide, the monopolist did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a

---

[81]Opposition at 19; FAC, ¶ 24.

[82]*Id.* at 20.

[83]UPS Motion at 22-23; FedEx Motion at 8-9.

competitor.  Rather, the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years").[84]  Compare *Bushie*, 460 F.2d at 119 ("Bushie has failed to show anything from which it might be inferred that Stenocord's actions restrained trade or were motivated by an anticompetitive intent").

The court must therefore consider whether, assuming the truth of AFMS's allegations and drawing all inferences in AFMS's favor, defendants' decision to limit the extent of their dealing with third party consultants constitutes anticompetitive conduct within the meaning of § 2.  See *Aspen Skiing Co.*, 472 U.S. at 604 ("Ski Co.'s decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market.  Such a decision is not necessarily anticompetitive [however]. . . .  [The court must] draw[ ] a distinction 'between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other'" (citation omitted)).

As noted, defendants contend their conduct cannot be characterized as anticompetitive because AFMS has not alleged conduct harmful to rivals; specifically, the complaint alleges that UPS and FedEx together comprise nearly 100% of the market for time-sensitive package shipping and delivery, and that "the competitive impact of either FedEx or UPS unilaterally terminating its dealings with third party consultants was so significant that neither company would have dared to give the other such a huge potential competitive advantage/opportunity without an understanding that both would terminate dealings with third party consultants at or about the same time. . . ."[85]  Given this allegation, defendants assert, AFMS has alleged conduct that was *not* harmful to rivals.

"Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Cascade*

---

[84]The Supreme Court has commented that *Aspen Skiing Co.* "is at or near the outer boundary of § 2 liability."  *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (noting that Aspen Skiing had not only terminated "a voluntary (and thus presumably profitable) course of dealing," which "suggested a willingness to forsake short-term profits to achieve an anticompetitive end," but also that its refusal "to renew the [all-lift] ticket even if compensated at retail price" reflected "a distinctly anticompetitive bent").

[85]FAC, ¶¶ 6-7, 14.

28

*Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co.*, 472 U.S. at 605 n. 32); *Breakdown Services, Ltd. v. Now Casting, Inc.*, 550 F.Supp.2d 1123, 1139-40 (C.D. Cal. 2007) ("Predatory conduct is 'behavior that not only tends to impair the opportunities of rivals, but also either does not further competition on the merits or does so in an unnecessarily restrictive way,'" citing *Aspen Skiing Co.*, 472 U.S. at 605 n. 32); *Catch Curve, Inc. v. Venali, Inc.*, 519 F.Supp.2d 1028, 1036 (C.D. Cal. 2007) ("If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory. . . .  [The word] 'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way," citing *Aspen Skiing Co.*, 472 U.S. at 605).

As noted, AFMS has pled that the relevant market is the market for the "delivery of time sensitive letters, documents and packages," and that the sole competitors in that market of any note are UPS and FedEx.  The complaint is devoid of allegations of anticompetitive conduct harmful to those companies; indeed, the injury for which AFMS seeks redress affects shipping consultants – who are not rivals of either UPS or FedEx.  Stated differently, AFMS has not alleged that UPS's or FedEx's purported no third-party consultant policy harms the other, but rather, that each company's policy has *aided* the other – this is, in fact, the essence of AFMS's § 1 claim.  Consequently, AFMS has failed to allege the type of anticompetitive conduct that will support a monopolization or attempted monopolization claim – i.e., conduct that "impair[s] the opportunities of rivals" or "conduct that eliminates rivals."  See *Cascade Health Solutions*, 515 F.3d at 894; *Rebel Oil*, 51 F.3d at 1433 ("In deciding whether the plaintiff was injured by an anticompetitive aspect or effect of the defendant's behavior, care must be taken in defining 'competition.'  Competition consists of rivalry among competitors. . . .  [C]onduct that eliminates rivals reduces competition. . . ," citing *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987), aff'd, 496 U.S. 543 (1990)).

*Bushie* is instructive in this regard.  There, a manufacturer of office dictating machines terminated its distributor relationship with plaintiff and began selling and servicing the machines through its own outlets only.  *Bushie*, 460 F.2d at 118.  Plaintiff alleged, *inter alia*, that the manufacturer had monopolized or attempted to monopolize the market by gaining exclusive control over the sales and

servicing of its product.  The court disagreed, stating: "A manufacturer has a 'natural monopoly over his own products, especially when the products are sold under trademark. . . .'"  *Id.* at 120 (quoting *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344 (9th Cir. 1970)).  It is only when the manufacturer "use[s] his natural monopoly to gain control of the relevant market in which his products compete" that the antitrust laws are violated.  *Id.*  Here, as in *Bushie*, there is no allegation that either defendant has "total market dominance" in the market for time-sensitive package shipping and delivery.  To the contrary, there is an allegation that each has a significant share of that market and competes vigorously with the other.  Absent allegations that FedEx or UPS used its "'brand' monopoly" to gain total market dominance in the shipping and delivery market, AFMS's monopolization and attempted monopolization claims fail.[86]  Compare *Lorain Journal v. United States*, 342 U.S. 143, 149-50 (1951) (holding that when a newspaper that was indispensable to local businesses refused to sell advertising space to customers who bought advertising on a local radio station, the paper engaged in an illegal attempt to monopolize because its conduct was designed to destroy the competitor radio station); *Eastman Kodak*, 273 U.S. at 375 (holding that a jury was entitled to infer monopolistic intent from Kodak's refusal to deal with a distributor that declined to be bought out as part of Kodak's program to eliminate retail distributors of photographic supplies and vertically integrate wholesale and retail distribution of the supplies). See also *USA Petroleum Co. v. Atlantic Richfield Co.*, 577 F.Supp. 1296, 1304 (C.D. Cal. 1983) ("In the present case, the plaintiff's complaint, on its face, affirmatively alleges facts that indicate that no 'dangerous probability of success' exists. USA specifically asserts that the end

---

[86]The court is aware of authority equating conduct that constitutes a restraint of trade for purposes of § 1 and monopolization or attempted monopolization under § 2. See, e.g., *Industrial Bldg. Materials*, 437 F.2d at 1334 ("Industrial's third theory – that a manufacturer may be found to have attempted monopolization by driving a competing distributor out of business – is substantially the same claim as that made under section 1 of the Act. . . .  The similarity arises not only from the identity of the conduct alleged, but also from the fact that a restraint of trade often results in monopoly or is caused by an attempt to monopolize. In *Eastman Kodak*, defendant's refusal to give dealers' discounts after it had entered the retail market could be viewed either as being in furtherance of a monopolistic intent or as being a restraint on trade," citing *Eastman Kodak v. Southern Photo Material Co.*, 273 U.S. 359 (1927)).  Here, absent more complete allegations, the court cannot conclude that such a theory is available to AFMS.  AFMS's complaint contains no allegations suggesting that either FedEx or UPS sought to monopolize the market for shipping and delivery of time-sensitive packages.  It asserts only that they sought to exclude third party consultants from participating in that market.

result of Arco's conduct will be the destruction of the independent segment of the industry, leaving a

market controlled by the major oil companies.  Thus, there is absolutely no indication of a dangerous

probability of Arco successfully monopolizing the market"); *id.* ("[T]his court is not persuaded by

USA's attempt to avoid proving a 'dangerous probability of success' by emphasizing, instead, the

defendant's alleged predatory and anticompetitive conduct. This court is aware of the Ninth Circuit

holding that, in certain circumstances, the trier of fact may infer a dangerous probability of success from

evidence of conduct alone. . . .  However, such an inference is impermissible where the complaint

affirmatively alleges the very facts needed to rebut the inference.  Thus, in light of the present

complaint's undisputed allegation that the end result of Arco's misconduct would be a market controlled

by all of the major oil companies, this court cannot permit an obviously unsupportable inference to

overcome the defendant's motion to dismiss," citing *Foremost Pro Color, Inc. v. Eastman Kodak Co.*,

703 F.2d 534, 544 (9th Cir.1983); *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 853

(9th Cir.1977), cert. denied, 439 U.S. 829 (1978)).[87]

---

[87]AFMS has not pled a claim for monopoly leveraging.  Monopoly leveraging occurs when a monopolist in one market "use[s] its monopoly . . . to gain or attempt to gain a monopoly" over a related market.  *Kodak,* 125 F.3d at 1208. See *DocMagic, Inc. v. Ellie Mae, Inc.*, __ F.Supp.2d __, 2010 WL 3987495, *24 n. 2 (N.D. Cal. Oct. 12, 2010) ("Monopoly leveraging constitutes the use of monopoly power in one market to gain or attempt to gain, monopoly power in a related product market," citing *Kodak,* 125 F.3d at 1208); see also *John Doe 1 v. Abbott Laboratories*, 571 F.3d 930, 933 (9th Cir. 2009) ("In *Image Technical*, the defendant refused to sell aftermarket parts over which it had monopoly power to independent service organizations with whom it competed in the market for aftermarket services.  We described the plaintiff's theory as 'monopoly leveraging' and upheld a verdict in its favor" (citations omitted)).  To plead such a claim, AFMS would have to allege facts showing that defendants leveraged their market power in the package shipping and delivery market to monopolize the market for shipping consultation services.  Mere "competitive advantage" in the alleged secondary market is insufficient.  See *Tate v. Pacific Gas & Elec. Co.*, 230 F.Supp.2d 1072, 1081 (N.D. Cal. 2002) ("It is correct that the Ninth Circuit has rejected the Second Circuit's view that 'a firm violates § 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market.'  It is not enough, the Ninth Circuit held, merely to obtain a competitive advantage in the second market.  Rather, the firm must at least attempt to monopolize the second market," citing *Alaska Airlines, Inc., v. United Air Lines, Inc.*, 948 F.2d 536, 546 (9th Cir. 1991), quoting and rejecting *Berkey Photo, Inc., v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1980)).  AFMS's complaint contains no such allegations.

1

**II.  CONCLUSION**

2

For the reasons stated, the court grants defendants' motion to dismiss AFMS's claim under § 1

3

of the Sherman Act, and its § 2 monopolization and attempted monopolization claims.  AFMS may filed

4

an amended complaint within twenty (20) days of the date of this order.

5

6

DATED: May 27, 2011

7

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28