1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-Filed: 11.23.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AFMS, LLC,

               Plaintiff,

       vs.

UNITED PARCEL SERVICE CO.;
FEDEX CO.,

            Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 10-05830 MMM (AJWx)

ORDER GRANTING DEFENDANTS'
MOTIONS TO DISMISS

     On August 5, 2010, plaintiff AFMS, LLC filed this action against United Parcel Service Co. ("UPS") and FedEx Co. ("FedEx").[1] AFMS filed a first amended complaint on October 14, 2010.[2] The amended complaint states two claims: (1) violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and (2) violation of § 2 of the Sherman Act, 15 U.S.C. § 2.[3] AFMS seeks actual

---

[1]Complaint, Docket No. 1 (Aug. 5, 2010).

[2]First Amended Complaint ("FAC"), Docket No. 31 (Oct. 14, 2010).

[3]*Id.*, ¶¶ 17-25.

1  damages, treble damages, attorneys' fees, and costs of suit.[4]

2    On November 1, 2010, defendants filed separate motions to dismiss AFMS's first amended

3  complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[5]  On May 27, 2011, after

4  a hearing, the court granted defendants' motions in part and denied them in part.  It also afforded

5  AFMS leave to file a second amended complaint.[6]  AFMS did so on June 24, 2011.[7]  On July 5,

6  2011, defendants UPS and FedEx filed separate motions to dismiss,[8] which AFMS opposed in an

7  omnibus pleading.[9]

8

9           **I.  FACTUAL BACKGROUND**

10    **A.  Allegations in the Complaint**

11    AFMS is the industry leader in providing small parcel and freight consulting services.[10]

12  Its consultants – called managing directors – assist shippers in negotiating competitive small parcel

13  and freight contracts.[11] Prior to the events alleged in the complaint, AFMS generated

14  _____

15    [4]*Id.* at 10.

16    [5]Motion to Dismiss Case filed by defendant United Parcel Service Co., Docket No. 40
17  (Nov. 1, 2010); Motion to Dismiss Case filed by defendant FedEx Co., Docket No. 41 (Nov. 1,
    2010).  See also Reply in Support of Motion to Dismiss Case filed by defendant United Parcel
18  Service Co., Docket No. 48 (Dec. 20, 2010); Reply in Support of Motion to Dismiss Case filed
19  by defendant FedEx Co.. Docket No. 49 (Dec. 20, 2010).

20    [6]Order Granting in Part, Denying in Part Defendants' Motion to Dismiss ("FAC Order"),
    Docket No. 55 (May 27, 2011).

21
22    [7]Second Amended Complaint ("SAC"), Docket No. 56 (Jun. 24, 2011).

23    [8]Motion to Dismiss Second Amended Complaint by United Parcel Service Co. ("UPS
    MTD"), Docket No. 58 (Jul. 5, 2011); Motion to Dismiss Second Amended Complaint by
24  Defendant FedEx Corporation ("FedEx MTD"), Docket No. 59 (Jul. 5, 2011).

25    [9]Memorandum in Opposition to Motion to Dismiss Second Amended Complaint ("Opp."),
26  Docket No. 67 (Aug. 24, 2011).

27    [10]SAC, ¶ 3.

28    [11]*Id.*

approximately fifty percent of its consulting revenue in Southern California, through relationships with large shipping clients such as Sony, Toyota, Honda, Quiksilver, Guess, Applied Bio-Systems, and St. John Knits.[12]

UPS is the world's largest package delivery company, delivering more than fifteen million packages a day to more than six million customers in over two hundred countries.[13]  FedEx is the world's second largest package delivery and express shipping company.[14]  Both UPS and FedEx are engaged in the delivery, by ground and air, of time-sensitive letters, documents and packages.[15]  In fact, UPS and FedEx have emerged in recent years as the only two commercial entities engaged in the business of delivering time sensitive letters, documents, and packages on a national and international basis.[16]  They are in direct and substantial competition with one another.[17]  The United States Postal Service delivers letters, documents, and packages; however, its service offerings are not time sensitive or guaranteed and most shippers do not consider U.S. mail a reasonable substitute for, nor interchangeable with, UPS or FedEx.[18]  For this reason, AFMS alleges that the USPS does not operate as a serious competitive constraint on either UPS or FedEx.[19]  At one time, DHL was a significant competitor of UPS and FedEx; AFMS alleges, however, that it has been forced to curtail its activity in the United States, and provides shipping and time sensitive delivery services only to and from foreign countries.[20]

---

[12]*Id.*

[13]*Id.*, ¶ 4.

[14]*Id.*, ¶ 5.

[15]*Id.*, ¶ 8.

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id.*

[20]*Id.*

In 2009, FedEx had a larger market share of air shipments of time sensitive letters, documents, and packages than UPS.[21]  UPS had the largest share of the ground shipment market.[22]  The companies had a relatively equal market share of international shipments – UPS had 58.8% of the international market while FedEx had 41.2%.[23]  The combined domestic and international shipping markets together generated sixty billion dollars in revenue in 2009.[24]

AFMS alleges that both UPS and FedEx use complex customer contracts that shippers, even those with professional shipping departments, find difficult to understand.[25]  The companies' respective rates depend on a variety of factors, such as delivery time (next day, second day, or extended delivery time), volume of weekly or monthly shipments, weight, and distance.[26]  The companies also include a variety of additional charges, such as surcharges for fuel, delivery to remote zip code areas, commercial (versus residential) delivery, Saturday delivery, additional handling, address correction for air or ground, pick-up, hazardous materials, large packages, C.O.D., declared value, and delivery confirmation.[27]  AFMS contends that UPS and FedEx have created a rating and fee matrix so complex that many, if not most, shippers must employ specialists to help them understand the nuances of the agreements and how they pertain to particular shipments.[28]

Parcel consultants such as AFMS gather and analyze data, including shippers' past transactions, to develop strategies to save the shippers money and match the shippers' specific

---

[21]*Id.*, ¶ 9.

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.*, ¶ 10.

[26]*Id.*

[27]*Id.*

[28]*Id.*

needs to a carrier's delivery services.[29]  UPS and FedEx allegedly hold themselves out as either the best positioned or most qualified party to provide advice and address concerns regarding various aspects of their delivery services.[30]  AFMS alleges that it, UPS, and FedEx are therefore all "participants in the market for shipping consultation services, which is comprised of those business entities which advise shippers regarding the delivery of time sensitive letters, documents and packages by air or by ground within the United States and to and from the United States to foreign countries."[31]

Consultants, like those employed by AFMS, help shippers negotiate with UPS and FedEx to achieve maximum savings.[32]  The consultants also provide logistical support for shippers regarding such things as the selection of warehouse sites and technology solutions.[33]  Consultants provide these services primarily "by highlighting the hard and soft issues inherent in a very complex contractual and rating environment."[34]  In the past, the revenue generated by many or most consulting firms, including AFMS, was largely dependent on the savings achieved for each client.[35]  They were therefore highly motivated to achieve additional discounts, leading to savings for their clients.[36]

A 2006 Morgan Stanley survey of shippers using parcel delivery services showed that 11% of the shippers surveyed used a third-party consultant to negotiate their rates, and that the use of such consultants produced rates that were 49% lower than those a shipper could achieve by direct

---

[29]*Id.*, ¶ 11.

[30]*Id.*

[31]*Id.*

[32]*Id.*, ¶ 12.

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

negotiation with UPS or FedEx.[37]   The survey also reported that 14-15% of shippers switched from their primary domestic carrier to another carrier during the survey period, citing price differentials as the primary reason.[38]  A similar Morgan Stanley survey conducted in 2007 showed that 11% of all shippers used a consultant and that using third party consultants resulted in better discounts.[39]  That year, between 8-9% of shippers switched primary domestic carriers over a six month period, once again because of price.[40]

AFMS alleges that the "actual and potential effect" of third party consultants on UPS's and FedEx's revenues and profits "would be at least in the low billions per year."[41]  It asserts that eliminating such savings would significantly reduce discounted shipments and substantially increase the companies' profits.[42]

In addition to their direct impact on UPS and FedEx pricing, AFMS alleges that consultants have stimulated competition between the two companies that would not otherwise have existed.[43] It asserts that there is little, if any, "published price competition" between UPS and FedEx, and that the companies have announced lock-step price increases annually for many years.[44]  The use of "consultant generated discounts" has purportedly reinvigorated price competition; indeed, between 2007 and  2009, AFMS alleges that it alone achieved more than one

---

[37]*Id.*, ¶ 13.

[38]*Id.*

[39]*Id.*

[40]*Id.*

[41]*Id.*

[42]*Id.*, ¶ 14.  The complaint alleges that defendants' actions constitute price fixing under *United States v. Socony Vacuum Oil Co.*, 310 U.S. 150 (1940).

[43]*Id.*, ¶ 15.

[44]*Id.*

1    hundred million dollars of customer savings on UPS and FedEx shipments.[45]

2          AFMS asserts that UPS and FedEx determined that serious losses of revenues and profits

3    would result from the increasing use of third party consultants.  As a consequence, it contends,

4    they decided to discontinue dealing with third party consultants.[46]  At an industry event in Chicago

5    in October 2009, with more than two hundred "industry people" in attendance, executives from

6    both UPS and FedEx purportedly appeared on a panel and announced the "no third-party

7    consultant policy."[47]  Allegedly, the executives "did not deny collusion between the companies

8    in reaching this decision when confronted with and questioned about the[ir] new[ ] . . . policies."[48]

9

10         The no third-party consultant policies were purportedly confirmed in subsequent writings.

11   On April 23, 2010, UPS published an internal memorandum titled "Procedures for Interacting

12   with Third Party Negotiators and UPS Customers – Read Only."[49]  The same day, FedEx

13   published an internal memorandum titled "Third Party Consultant Rules of Engagement for Field

14   Sales."[50]  AFMS alleges that the memoranda describe a general policy of refusing to deal directly

15   with third party consultants, but also indicate that UPS and FedEx compete against those

16   consultants.[51]  UPS's memorandun states that salespeople should "[e]mphasize to the customer that

17   UPS will continue to provide a competitive value proposition and [that] UPS is best positioned to

18   directly address the customer's issues."  It also urges salespeople to "[r]einforce the existing value

19

20   _____

21        [45]*Id.*

22        [46]*Id.*, ¶ 16.

23        [47]*Id.*

24        [48]*Id.*

25

26        [49]*Id.*, ¶17.  This document is attached as Exhibit 1 to the complaint ("FedEx Memo").

27        [50]*Id.*  This document is attached as Exhibit 2 to the complaint ("UPS Memo").

28        [51]*Id.*, ¶ 17.

                                             7

proposition and partnership with UPS."[52]  FedEx's memorandum states that "[i]t is up to Sales to be able to sell the 'value' to the customer of dealing directly with FedEx."   It directs its salespeople to advise customers "that we believe our sales team members are the most qualified experts in discussing and providing information about our diverse shipping services, solutions and rate structures, and therefore, [that FedEx] do[es] not negotiate with third parties on their behalf."[53]

AFMS alleges that on "numerous occasions" since the October 2009 announcement, UPS and FedEx have directly informed shippers that they, and not third party consultants, are best positioned to help shippers with their rates and contracts.[54]  AFMS cites multiple occasions on which FedEx and UPS allegedly encouraged customers to deal directly with them, since they were best positioned to address the customers' shipping needs and answer questions regarding rate structure.[55]  In one notable instance, at or outside the premises of a customer that had traditionally done business with a third party consultant in Louisiana, UPS and FedEx representatives purportedly met and conferred with each other before separately telling the customer that neither company would deal with the customer if a third party consultant was involved.[56]

AFMS asserts that "the competitive impact of either FedEx or UPS unilaterally terminating its dealings with third party consultants was so significant that neither company would have dared

[52]*Id.*

[53]*Id.*

[54]*Id.*, ¶ 18.

[55]*Id.*, Exhs. 3-5.  For example, in an email to Andrew Klein, President of MEDCO, FedEx stated that it was "FedEx corporate policy [to] negotiat[e] business relationships directly and exclusively with our customers, not through a third party."   The email continues: "Federal Express has recently taken a position that we will not sign a Non Disclosure with any of these third party agents. . . .  Their sole intent is to drive your costs down which I have no issue with. . . .  We feel that dealing with you directly will produce more positive mutual results. . . .  We can negotiate with you directly and I assure you we will get you the desired result."  *(Id.*, Exh. 3.)

[56]*Id.*, ¶ 19.

8

to give the other such a huge potential competitive advantage/opportunity without an understanding that both would terminate dealings with third party consultants at or about the same time – as they did."[57]  It further alleges that after the policies were announced, UPS and FedEx ceased dealing with AFMS following a seventeen-year amicable and mutually profitable business relationship.[58] A UPS representative purportedly told an AFMS managing director that UPS "would not offer any different pricing [for an AFMS customer] because they knew FedEx was not going to be pursuing the business."[59]  AFMS also alleges that FedEx told an AFMS customer that it was not working with third party consultants, and that "UPS [was] going to be doing the same thing soon."[60]  AFMS contends that UPS and FedEx could have known each other's plans only if the two companies were communicating with each other.[61]

AFMS asserts that UPS and FedEx enforce their respective policies by informing shippers that if they (1) share contract data with third party consultants in violation of non-disclosure agreements with UPS and FedEx, or (2) engage third party consultants, regardless of the sharing of data, the carriers will refuse to discuss rates and terms, will refuse to negotiate price changes, and will raise the rates charged.[62]  AFMS also alleges that UPS and FedEx have required shippers to sign non-disclosure agreements and customer/carrier contracts, often carrying harsh penalties, that "greatly restrict or completely revoke the shipper's ability to share information regarding their delivery services with third-party consultants.  FedEx and UPS have also purportedly  disparaged

---

[57]*Id.*, ¶ 20.

[58]*Id.*

[59]*Id.*

[60]*Id.*  The complaint does not allege the time at which this statement was purportedly made, although there is perhaps an inference that it preceded the public meeting at which UPS and FedEx announced their new policies because the purported statement of the FedEx representative that UPS was "going to be doing the same thing soon," suggests that UPS had not yet implemented its policy.

[61]*Id.*

[62]*Id.*, ¶ 21.

third party consultants and the services they offer.[63]   AFMS alleges that it has "routinely" signed

confidentiality and non-disclosure agreements with the two defendants, and maintained information

it received concerning defendants' pricing data and contract terms confidentially.[64]

**B.      UPS's Internal Memorandum**[65]

As noted, UPS's internal memorandum is titled "Procedures for Interacting with Third

Party Negotiators and UPS Customers – Read Only."[66]  The memorandum states:

> "Third Party Negotiators (3PNs) are individuals or companies that intervene
>
> between two other parties (in this context, UPS and our customer).  Often, a 3PN
>
> will tell a UPS customer that it can more successfully represent the interests of the
>
> customer than the customer is able to represent themselves.  3PNs have varying
>
> degrees of experience, knowledge, and acumen.  Some UPS customers consider,
>
> or use, 3PNs because of their PERCEIVED expertise in our industry.
>
> This communication provides updated procedures to the UPS sales force for
>
> interaction with 3PNs retained by our customers. . . .  UPS has a legitimate
>
> business interest in avoiding improper interference with our customer relationships.
>
> Additionally, UPS must protect proprietary information from improper use and

---

[63]*Id.*

[64]*Id.*

[65]UPS's and FedEx's April 23, 2010 internal memoranda are attached as Exhibits 1 and 2 to the complaint.  Under Rule 10(c), the court may properly consider these documents in deciding the present motion. See, e.g., *Haskell v. Time, Inc.*, 857 F.Supp. 1392, 1396 (E.D. Cal. 1994) ("Under FED.R.CIV.P. 10(c), the complaint is deemed to include any documents attached to it as exhibits as well as any documents incorporated into the complaint by reference"); see also *DeMarco v. DepoTech Corp.*, 149 F.Supp.2d 1212, 1217 (S.D. Cal. 2001) ("A district court reviewing a motion to dismiss may consider the facts alleged in the complaint, documents properly attached to the complaint, and matters over which the Court may take judicial notice," citing *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1989)).

[66]UPS Memo at 1.

10

1    disclosure."[67]

2    The memorandum sets forth the following procedures for working with customers that

3    indicate they are contemplating use of a third party negotiator:

4        "Emphasize to the customer that UPS will continue to provide a competitive value

5        proposition and UPS is best positioned to directly address the customer's issues.

6        This will be done through a direct relationship with the customer.

7        Remind the customer of the underlying cost potentially associated with using a 3PN

8        (usually requiring upwards of 50% or more of any savings that might be

9        negotiated), thereby dramatically reducing their direct savings that might be

10       negotiated.  UPS will not provide lower rates simply because a 3PN is involved.

11       Reinforce the existing value proposition and partnership with UPS."[68]

12    The memorandum also details procedures for working with customers that have engaged

13    a third party negotiator:

14       "If the customer is still going to use a 3PN in any capacity, you MUST notify your

15       Director of Sales and contact the Corporate Sales Team . . . to discuss next steps

16       before taking any other action with the customer related to the 3PN.  At a minimum

17       be prepared to discuss [1]  The type and size of the risk or opportunity for UPS[;]

18       [2] The specific reason(s) the customer is going to use the 3PN[;] [3] The

19       customer's expected timeframe for 3PN engagement."[69]

20    The memorandum prohibits sales representatives from "providing any information to a 3PN

21    or having any discussions with a 3PN about a UPS customer or our relationship with a UPS

22    customer . . .unless the customer and the 3PN have signed a Third Party Confidentiality and

23    Non-Disclosure Agreement (NDA) with UPS that has been approved by the Corporate Sales Team

24

25    ─────────────────

26    [67]*Id.*

27    [68]*Id.* at 2.

28    [69]*Id.*

11

and by the Corporate Legal Department for that disclosure or series of disclosures."[70]

C.      **FedEx's Internal Memorandum**

FedEx's April 23, 2010 internal memorandum – titled "Third Party Consultant Rules of Engagement for Field Sales"[71] – describes FedEx's position regarding third party consultants:

- "[T]he message to the market place is 'no' for direct engagement with consultants providing . . . services where the only value is price negotiation.

- "Fed Ex's policy is to negotiate business relationships directly and exclusively with our customers, not through a third party consultant.

- "It is up to Sales to be able to sell the 'value' to the customer of dealing directly with FedEx.

- "Field Sales is in agreement with adopting a 'Say No' strategy but wants the ability to exercise limited exceptions based on the metrics outlined in this document.

- "Field Sales feels that having this exception process is vital to maintaining their business."[72]

The memorandum describes the manner in which FedEx wishes to have negotiations with a customer proceed:

> "If FedEx has previously done business directly with the customer, advise that we believe our sales team members are the most qualified experts in discussing and providing information about our diverse shipping services, solutions and rate structures and, therefore, do not negotiate with third parties on their behalf.  Offer to set up a meeting to explain the value of dealing directly with FedEx.

> If FedEx has previously negotiated business for the customer through this consultant, advise the customer that we no longer negotiate with third parties but as a courtesy to the customer, we will request an exception to bid on the business.

---

[70]*Id.*

[71]FedEx Memo at 1.

[72]*Id.* at 2.

Ask what functions the third party will handle for the customer to determine whether or not an exception is warranted."[73]

For new customers using a third party consultant, the memorandum instructs FedEx agents to "[a]dvise the customer that we do not negotiate with third parties," and "[o]ffer to set up a meeting to explain the value derived from dealing directly with FedEx. . . ."[74]  The document contains additional instructions regarding "suggested phraseology for selling customers on the value of doing business directly with FedEx," "recogniz[ing] whether a third party consultant is bringing value," and "steps to request the exception process."[75]  Among the suggested selling points is one that asserts that third party consultants "focus strictly on rate negotiations," while FedEx can "show [the customer] how . . . [to] reduc[e] overall supply chain cost[s]. . . ."[76]  The memorandum also notes that "incentives" are "an important piece of any service/price discussion," and that its sales agents are the "most qualified" "to discuss incentives and provide information on [its] rate structures and aligned services."[77]

## II.  DISCUSSION

### A.    Standard Governing Motions To Dismiss Under 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences

---

[73]*Id.* at 4.

[74]*Id.*

[75]*Id.* at 5-7.

[76]*Id.* at 5.

[77]*Id.*

from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S. 544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

**B.    Whether AFMS Has Alleged Antitrust Standing**

As a threshold matter, UPS asserts that AFMS lacks standing to bring antitrust claims.[78] The factors relevant in determining whether a plaintiff has standing to sue for violation of the antitrust laws are:

"(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;

(2) the directness of the injury;

---

[78]UPS MTD at 6.  Defendants do not dispute that AFMS has Article III standing.  This, however, is not co-extensive with antitrust standing.  See *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 n. 1 (9th Cir. 1995) ("Unlike Article III standing, the question of standing to sue under the antitrust laws does not go to subject matter jurisdiction").

(3) the speculative measure of the harm;

(4) the risk of duplicative recovery; and

(5) the complexity in apportioning damages."

*Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (citing *Assoc. Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 (1983)); see also *Handards, Inc. v. Ethicon, Inc.* ("*Handards II*"), 743 F.2d 1282, 1295 (9th Cir. 1984) (listing these factors). "To conclude that there is antitrust standing, a court need not find in favor of the plaintiff on each factor." *American Ad Management, Inc. v. General Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Moreover, "no single factor is decisive." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (en banc). The greatest weight, however, is given to the nature of plaintiff's injury. *American Ad Management*, 190 F.3d at 1055 ("[W]e give great weight to the nature of the plaintiff's alleged injury"). The parties' arguments focus on the first two factors and do not address the final three. As a consequence, the court's analysis focuses on the first two factors.[79]

## 1.  Nature of Plaintiff's Injury

"The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct. It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers." *American Ad Management*, 190 F.3d at 1055. Defendants contend that AFMS does not allege injury "of the type the antitrust laws were intended to prevent."[80] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); see also *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1009 (9th Cir. 2003) (noting that the primary issue on appeal was "whether [the] injury is 'of the type the antitrust laws were intended

---

[79]The court's prior order dismissing AFMS's first amended complaint concluded that non-duplicative recovery was possible in this case, which weighed in favor of a finding that AFMS had antitrust standing. The parties have not argued that issue in their briefs regarding the second amended complaint, and the court reiterates its prior conclusion regarding the subject. (FAC Order at 22-23.)

[80]UPS Motion at 6; FedEx Motion at 2.

to prevent'"); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) ("the 'nature of the plaintiff's alleged injury' [factor] requires a showing of 'antitrust injury,' i.e., 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful'"). "[T]he mere fact of . . . reduced profits resulting from an agreement between other parties does not constitute an antitrust injury to a plaintiff." *Juster Assoc. v. Rutland*, 901 F.2d 266, 269 (2d Cir. 1989) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1990)). Rather, to demonstrate that it has suffered an antitrust injury, a plaintiff must allege that defendants' unlawful actions have caused "anticompetitive effects." *Brunswick*, 429 U.S. at 487. This is because the antitrust laws were "enacted for 'the protection of *competition*, not *competitors*." *Id.* at 488 (emphasis original, quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

A necessary predicate to showing antitrust injury is that the plaintiff must compete in the same market in which defendants are allegedly restraining competition. See *American Ad Management*, 190 F.3d at 1057 ("The Supreme Court's cases have also 'emphasized the central interest [of the Sherman Act] in protecting the economic freedom of participants in the relevant market.' We have derived from this principle the 'corollary' that the 'injured party be a participant in the same market as the alleged malefactors.' Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury," citing *Assoc. Gen. Contractors*, 459 U.S. at 538; *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)). See also *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704-05 (9th Cir. 2001) ("[A]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury.' Although the Hospital Districts allege that they are potential participants in the nicotine delivery market, and this is the market where competition allegedly has been restrained, the district court ruled that they nonetheless failed to state an antitrust injury. The court reasoned that the Hospital Districts'

1  injuries were not experienced in the nicotine delivery market, but rather in the health care market.

2  We agree," citing, *inter alia*, *American Ad Management*, 190 F.3d at 1057); *Exhibitors' Serv.,*

3  *Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 578-79 (9th Cir. 1986) ("[E]xamining the nature

4  of ESI's injury, we find it was not of 'the type the antitrust laws were intended to forestall.'  As

5  with the union in *Associated General Contractors*, ESI is neither a consumer of defendants' goods

6  or services nor a competitor of the defendants in the *restrained* market. . . .  Here, it is undisputed

7  that the restraint is in the market for first-run film exhibition in the MetroCenter area of Phoenix.

8  As a licensing agent, ESI is quite clearly neither a competitor of these exhibitors nor a consumer

9  of goods or services in this market," citing *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 449 (9th

10 Cir. 1985), and *Assoc. Gen. Contractors*, 459 U.S. at 538-39 (emphasis original)).[81]

11       Courts have often expressed reluctance to dismiss antitrust complaints for failure to plead

12 the existence of a viable "market," because this is generally a question of fact that can only be

13 resolved after discovery.  See, e.g., *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)

14 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to

15 dismiss for failure to plead a relevant product market"); *Found. for Interior Design Educ.*

16 *Research v. Savannah College of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market

17 definition is a highly fact-based analysis that generally requires discovery"); *Double D Spotting*

18 *Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (discussing the relevant market

19 and noting that "courts are hesitant to dismiss antitrust actions before the parties have had an

20 opportunity for discovery"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436

21 (3d Cir. 1997) (explaining that "in most cases, proper market definition can be determined only

22 after a factual inquiry into the commercial realities faced by consumers").  Moreover, the

23 existence of a relevant market need not "be pled with specificity"; an antitrust complaint will

24 survive a Rule 12(b)(6) motion, therefore, "unless it is apparent from the face of the complaint

25

26       [81]The Ninth Circuit in *American Ad Management* commented that the holding in *Exhibitors'*
27 *Serv., Inc.* was "properly analyzed . . . under *Brunswick*" as a case in which plaintiff suffered no
    antitrust injury because its injury was independent of the unlawfulness of defendants' agreement
28 to split the market.  *American Ad Management*, 190 F.3d at 1058 n. 8.

1   that the alleged market suffers a fatal legal defect." *Newcal Industries, Inc. v. Ikon Office*

2   *Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

3        The parties vigorously dispute the validity of the market AFMS has alleged.  AFMS defines

4   the relevant market as "the market for shipping consultation services, which is composed of those

5   business entities which advise shippers regarding the delivery of time sensitive letters, documents,

6   and packages by air or by ground within the United States and to and from the United States to

7   foreign countries."[82]  Defendants attack this market definition on various grounds, and argue that,

8   assuming such a market exists, AFMS lacks antitrust standing because FedEx and UPS do not

9   compete in the market.[83]

10        Central to the adequacy of AFMS's market definition is the Ninth Circuit's decision in

11   *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158 (9th Cir. 1991).

12   There, the court considered whether Yellow Pages cost consultants had suffered antitrust injury

13   when GTE "announce[d] that it would end its decades-old practice of letting consultants order,

14   place, and process yellow page advertisements on behalf of advertisers."  *Id*. at 1160.  Plaintiffs

15   were "several distinct consulting firms that offer[ed] advice to businesses on advertising

16   effectively and efficiently in yellow pages directories."  *Id*. at 1159.  The consulting firms alleged

17   that because of GTE's "Byzantine pricing structure," the cost of advertisements that were virtually

18   indistinguishable in appearance and size varied radically.  *Id*.  The consultants offered advertisers

19   the "ability to fashion the most economical use of the yellow pages directories"; collectively, they

20   saved advertisers more than $3 million a year.  *Id*. at 1159-60.  The consultants provided advice

21   to clients who sought to minimize costs while maximizing ad space.  They also placed

22   advertisements directly with GTE on their clients' behalf.  *Id*. at 1159.  Although GTE had a

23   "decades-old practice of letting consultants order, place, and process yellow page advertisements

24   on behalf of customers," it reversed its position.  *Id*. at 1160.  GTE's insistence on dealing

25   directly with its customers led many advertisers to cancel their contracts with the consultants,

26   _____

27       [82]SAC, ¶ 6.

28       [83]UPS Motion at 6; FedEx Motion at 3.

citing "added inconvenience." *Id.*

In support of its conclusion that GTE was competing in the same market as the consultants, the court cited a GTE policy manual that recommended sending the following letter to advertisers that had previously retained consultants:

> "GTE Directories Corporation invites you to handle your yellow pages advertising directly with one of our trained professional representatives.  As you know, there are no service fees, commissions, or other hidden charges when you place your advertising directly with GTE Directories Corporation.  Some agencies, however, will charge you an extra fee to do exactly what GTE Directories corporations can do." *Id.* at 1161.

GTE also urged its employees to offer to work with advertisers to "modify, streamline, and yes, even reduce your yellow pages advertising program. . . ." *Id.*  Eschewing an overly rigid or formalistic definition of "competitor," the Ninth Circuit concluded that "the 'field of competition [includes] . . . the group or groups of sellers who have actual or potential ability to deprive each other of significant levels of business.'" *Id.* at 1162 (quoting *Thurman Industries, Inc. v. Pay N' Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (alterations original)).  It noted that the function of competition was to "impos[e] 'an essential discipline on producers and sellers of goods to provide the consumer with a better product at a lower cost. . . ." *Id.* (quoting *United States v. Syufy Enterprises*, 903 F.2d 659, 662-63 (9th Cir.1990)); see also *American Ad Management*, 190 F.3d at 1058 ("[I]t is not the status as a consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff").

The parallels between this case and *Yellow Pages Cost Consultants* are striking.  Like GTE's advertising rates, FedEx's and UPS's shipping rate structures are complex and difficult to understand, and can result in significant cost differentials.  Like the consultants in *Yellow Pages Cost Consultants*, AFMS advises shippers on navigating defendants' rate structures to maximize efficiency and reduce costs.  It does this by "gather[ing] and analyz[ing] data . . . to develop a strategy and advise a shipper on how to save money and match that shipper's specific needs to a

carrier's delivery services."[84]  On occasion, AFMS has dealt directly with FedEx and UPS on its client's behalf.[85]  Like GTE, UPS and FedEx recently decided to discontinue "direct dealings with third-party consultants like AFMS" after maintaining a business relationship with them for years. Also like GTE, UPS and FedEx attempted to discourage customers from using consultants like AFMS.[86]

Specifically, GTE had invited customers to deal directly with its sales and customer service representatives, and assured them that doing so would entail no additional service fees, commissions or other charges.  *Id.* at 1161.  The representatives were directed to offer "advertisers advice on the form and content of their advertisements," and assist them in "plac[ing] [the] advertisements [in] relevant GTE directories."  *Id.*  Here, in like fashion, UPS's internal memorandum directs its representatives to "[e]mphasize to the customer that UPS will continue to provide a competitive value proposition and [that] UPS is best positioned to directly address the customer's issues."  It also instructs them to "[r]einforce the existing value proposition and partnership with UPS."[87]  UPS suggests that its sales representatives tell customers that a third party negotiator will generally take as much as fifty percent of the savings it achieves as a fee, and that the actual reduction in shipping costs for a customer using a third party negotiator may thus be less than the savings it could achieve by dealing directly with UPS.[88]  FedEx's statements are even more explicit.  Its policy memorandum directs sales representatives to tell customers that FedEx sales team members "are the most qualified experts in discussing and providing information

---

[84]SAC, ¶ 11.

[85]*Id.*, ¶ 3 ("Often AFMS acts as an agent for shippers during contract negotiations with carriers").

[86]*Id.*, ¶ 17.

[87]UPS Memo at 1.

[88]*Id.* at 2.

about [FedEx's] diverse shipping services, solutions and rate structures. . . ."[89]  The memorandum also offers "suggested phraseology for selling customers on the value of doing business directly with FedEx," which includes such statements as:

- "Our ability to understand your business, develop solutions, apply FedEx service offerings and then quantify the value of these solutions to you is where we provide the greatest impact to your business."

- "Our current position is that by working with third party consultants that focus strictly on rate negotiations, we don't have an opportunity to show you how FedEx can assist with reducing overall supply chain cost, which offers a much greater value than price alone."

- "FedEx feels that our representatives are most qualified to discuss incentives and provide information on our rate structures and aligned services."

- "In our experience, we can help in the areas of revenue growth, profitability (managing expense), and capital utilization, which all impacts your company's financial performance."[90]

In addition to the policy memoranda, the complaint alleges that FedEx and UPS representatives urged customers to bypass third-party consultants both verbally and in writing, assuring them that doing so would achieve better results for the client.  AFMS asserts, for example, that a FedEx representative said his company was "in the best position to discuss [a customer's] shipping needs [and] . . . rate structure," hewing to the instructions in the company's internal memorandum.[91]

The myriad statements contained in the memoranda, as well as in defendants' alleged communications with customers, give rise to a plausible inference that defendants intended to compete with AFMS in the market for shipping consultation services.  While some of the statements in the memoranda are vaguely phrased, and while some indicate that the cost savings achieved by consultants such as AFMS could potentially be accomplished through a broad review

[89]FedEx Memo at 3.

[90]*Id.* at 4.

[91]SAC, ¶ 18.

of the customer's business and shipping practices that did not focus exclusively on shipping rates, UPS and FedEx clearly directed their sales representatives to imply or directly assert that customers did not need to use third party consultants because FedEx and UPS could readily provide the type of service the consultants offered.  See *Yellow Pages Cost Consultants*, 951 F.2d at 1161 ("GTE has cited no authority that a trier of fact could not conclude that otherwise identical services are distinct because one party charges for them as part of a package of products and the other charges for them separately in accordance with a different marketing scheme")

Defendants attack AFMS's market definition primarily on the basis that the services they offer and those AFMS offers are neither similar nor fungible.  The Ninth Circuit has "explained that the term relevant market 'encompasses notions of geography as well as product use, quality, and description.  The geographic market extends to the "area of effective competition . . . where buyers can turn for alternative sources of supply."  The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand.'" *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (quoting *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440, 1446 (9th Cir. 1988), and *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977) (alteration original; some internal quotation marks omitted)).

At this stage of the proceedings, and absent further factual development, the court cannot accept the distinction defendants posit.  One of defendants' central contentions is that AFMS's services are focused primarily on price negotiation, and that, as a matter of logic, defendants do not negotiate with *themselves* to give customers lower rates.[92]  While this assertion has some intuitive force, it is at least as reasonable to infer that in the midst of discussing rates with customers, and as a means of encouraging direct dealings with them, defendants advise shippers how to navigate their rate structures to maximize productivity while reducing cost.  See *Rebel Oil, Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("a "market" is the group of sellers or producers who have the "actual or potential ability to deprive each other of significant

---

[92]UPS Opp. at 8;

levels of business,'" quoting *Thurman Industries*, 875 F.2d at 1374).  Indeed, the *Yellow Pages Cost Consultants* court addressed and rejected a similar argument.  There, the district court defined the market as the "sale of 'advice to advertisers on how to reduce the cost of their advertisements.'"  951 F.2d at 1161.  Based on the Ninth Circuit's opinion, it appears that defendants there also argued that they could not possibly compete in a market whose purpose was to reduce the profit they made.  See *id.* at 1160 ("GTE argued that the relevant market for Consultants' services was that of offering independent advice on reducing yellow pages costs and that it could not compete in the market so defined because its salespersons were not independent of it").  The Ninth Circuit disagreed, relying on the opinion of one of the consultants' experts that

> "[t]he fact that . . . [GTE] generally advises its customers to spend greater amounts for Yellow Pages advertising, while Yellow Pages consultants generally advise their customers to spend lesser amounts, does not put GTEDC and Yellow Pages consultants in separate markets.  At any given time, some stockbrokers are telling their clients to sell, while other stockbrokers are telling their clients to buy. Yet both bull and bear stockbrokers are competing in a single market for investment advisement services."  *Id.* at 1161-62 (record citation omitted).

Defendants attempt to distinguish *Yellow Pages Cost Consultants* by noting that the court in that case observed that a trier of fact could conclude that defendants' marketing services were "essentially identical" to those of the consultants.  *Id.* at 1161-62.  These arguments ignore the different posture in which *Yellow Pages* came to the Ninth Circuit.  There, the parties had developed a summary judgment record; here the case is merely at the pleadings stage.  *Id.* at 1159-60.  Here, the undisputed evidence may show (or a trier of fact may find) that the parties' services are sufficiently distinct that defendants do not compete in the same market as AFMS.  In deciding a a Rule 12(b)(6) motion to dismiss, however, where the complaint is the only document before the court and where all inferences must be drawn in plaintiff's favor, the court must conclude that plaintiffs' allegations of a market for consulting services are adequate.

Turning to defendants' other arguments regarding AFMS's market definition, UPS asserts that "[u]nlike in *Yellow Pages* . . . the alleged statements show UPS urging shippers to forgo

third-party consultant services *in favor of reliance on [the] shippers' own resources.*"[93]  This assertion is at odds with the language of UPS's internal memorandum.  It does more than more than "urg[e] shippers to negotiate directly with UPS" by relying on their own resources.[94]  The memorandum clearly directs UPS customer service representatives and agents to emphasize the value of a "direct relationship" with the company and to remind customers that UPS is "best positioned" to address their shipping needs.[95]  UPS relies heavily on the fact that the memorandum does not baldly state the company will assist customers to achieve cost-effective shipping rates.  The statements made, however, give rise to a plausible inference that UPS intended to communicate to customers that they no longer needed to use third party consultants because they could achieve the same results working directly with a UPS customer service representative, who would assist them in achieving the best "value proposition."  Whether this interpretation or UPS's proffered construction is the correct one will be a factual question for the jury.  At the pleadings stage, however, the court must draw all inferences in favor of plaintiff.  *Newcal Industries*, 513 F.3d at 1043 n. 2 ("Because this case is an appeal from a dismissal under Fed.R.Civ.P. 12(b)(6), we accept as true all facts alleged in the complaint, and we draw all reasonable inferences in favor of Plaintiffs-Appellants"); see also *High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir.1993) (holding that proper definition of the market depends on a "factual inquiry into the 'commercial realities' faced by consumers" (quotations omitted)).

UPS also asserts that AFMS's alleged market is underinclusive because it does not include customers' "in-house resources."[96]  The relevant market is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *Thurman Industries*, 875 F.2d at 1374; *Newcal*, 513 F.3d at 1045 ("[T]he

---

[93]UPS Reply at 7 (emphasis added).

[94]UPS Reply at 8.

[95]UPS Memo at 2.

[96]UPS MTD at 14-15; UPS Reply at 5-6.

market must encompass the product at issue as well as all economic substitutes for the product").

A complaint can be dismissed if it fails to satisfy this test. *Id.* at 1045. UPS argues that many

shippers employ specialists who know how to interpret its and FedEx's rate structures, and thus

provide services similar to AFMS's.[97] The failure to include these individuals in the alleged

market, however, does not doom AFMS's claims at this stage of the litigation. AFMS's

allegations give rise to an inference that many, if not most, shippers lack in-house resources that

can provide services akin to those it offers. The complaint alleges that "third-party consultants,

UPS and FedEx, gather and analyze data, including a shipper's past transactions, to develop a

strategy and advise a shipper on how to save money and match that shipper's specific needs to a

carrier's delivery services."[98] It specifically pleads that even customers with professional shipping

departments find it difficult to understand defendants' contracts and rates.[99] The value that

consultants, FedEx, and UPS allegedly add is their intimate knowledge of defendants' rate

structures, which place them in a category separate from any in-house specialists. The case is thus

distinguishable from one in which plaintiff "alleges a proposed relevant market that *clearly* does

not encompass all interchangeable substitute products *even when all factual inferences are granted*

*in plaintiff's favor. . . .*" *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d

Cir. 1997) (emphasis added). See *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F.Supp.2d 1119, 1136

---

[97]UPS bases this assertion on two paragraphs in AFMS's complaint. The pleading alleges that "many, if not most, shippers must employ specialists to help them understand the nuances of the agreements and how they pertain to the specific parcels that a shipper wishes to deliver." (SAC, ¶ 10.) It also cites Morgan Stanley reports published in 2006 and 2007, which state that "11% of the surveyed shippers used a third-party consultant to negotiate their rates." (*Id.*, ¶ 13.)

From these allegations, UPS infers that a significant number of customers use in-house specialists to negotiate with defendants. It is just as reasonable to infer, however, that other shippers have no access to assistance in comprehending defendants' rate structures and in negotiating rates, or that they have shipping departments that do not understand the rate structures or the best ways to maximize savings. AFMS, in fact, expressly alleges the latter fact in paragraph 10 of the complaint.

[98]SAC, ¶ 11. The complaint alleges that consultants do this by "highlighting the hard and soft issues inherent in a very complex contractual and rating environment." (*Id.*, ¶ 12.)

[99]*Id.*, ¶ 10.

(N.D. Cal. 2010) ("Likewise, Ellie Mae's assertion that an adapter program such as DocMagic XL is reasonably interchangeable with a network, and so should be included in the alleged market, contradicts the complaint's allegations that participation in the network provides benefits beyond mere connectivity. Finally, Ellie Mae's factual contentions about the available network substitutes discussed in its SEC filing are not appropriate for resolution at the pleadings stage"); *In re eBay Seller Antitrust Litigation*, 545 F.Supp.2d 1027, 1032 (N.D. Cal. 2008) (quoting the statement in *Brownlee v. Applied Biosystems Inc.*, No. 88 20672, 1989 WL 53864, *3 (N.D. Cal. Jan. 9, 1989), that "[a]lthough plaintiffs' market [which included only the parties to the case] is narrowly defined and may be implausible as a theoretical matter, plaintiffs are entitled to the opportunity to prove their allegation that there is a [relevant market]," and concluding that "[p]laintiffs in the . . . case [before it were] similarly . . . entitled to an opportunity to prove their allegations"); see also *E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392, 1404 (9th Cir. 1989) ("The concept of a single 'relevant market' is itself an abstraction. Competition is a matter of degree. The demand for Pepsi, for example, may be extremely sensitive to changes in the price of other colas, somewhat sensitive to changes in the price of root beer, and still less sensitive to changes in the price of mineral water. It would be an oversimplification to draw the line at a single point along this continuum. . . . The ultimate issue in a rule of reason case[100] is whether a challenged practice will produce adverse effects on price or output").[101]

---

[100]Although plaintiff contends that after "all the evidence is amassed," it will be able to demonstrate that defendants' conduct is *per se* unlawful, AFMS assumes for the purposes of this motion that the rule of reason applies to its first cause of action. (Opp. at 3.) The court also assumes, without deciding, that the rule of reason applies.

[101]At oral argument, UPS cited two unpublished Ninth Circuit decisions that affirmed district court dismissal under Rule 12(b)(6) for failure to plead interchangeability of services. The cases are distinguishable. In *Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*, No. 10–15978, 2011 WL 1898150 (9th Cir. May 19, 2011) (Unpub. Disp.), plaintiff alleged that "the pharmaceutical industry" was the product market. This market encompassed the "manufacture, sale, and innovation of all pharmaceutical products, prescription pharmaceutical products, non-prescription pharmaceutical products, brand name pharmaceutical products and particular pharmaceutical products and therapies specifically noted and identified by Pfizer and Wyeth in their annual reports." *Id.* at *1. The complaint failed to allege facts suggesting interchangeability

Moreover, UPS apparently wishes the court to rule as a matter of law that in-house resources necessarily *must* be included in the relevant product market.  The authority it cites, however, does not so hold.  UPS relies heavily on *United States v. Sungard Data Systems, Inc.*, 172 F.Supp.2d 172 (D.D.C. 2001).  There, following a *a bench trial*, the court found that what it called "captive production" should be included in the relevant market because the services could viably replace those provided by outside parties.  *Id.* at 186; see also *In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 441 (5th Cir. 1982) (rejecting, on summary judgment, an argument that in-house resources should be excluded from the product market); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1272 n. 1 (9th Cir. 1975) (reviewing a trial court's findings of fact and conclusions of law, and suggesting that, "where provision of concession services to major league baseball was the relevant market, [plaintiff's] failure to include as participants in that market baseball clubs which supply their own concessions very likely would compel reversal").  Here, as noted, the parties and the court find themselves in a markedly different procedural posture.  When evidence is presented, it may be that shippers' in-house resources must be included in any definition of the relevant market.  UPS's cited authority demonstrates that under certain factual circumstances, inclusion of in-house resources in the relevant product market is warranted.  It also demonstrates, however, defining the product market is a highly factual matter best suited to resolution at a later stage of the proceeding unless the complaint reveals a "fatal legal defect" in the market alleged.  *Newcal Industries, Inc.*, 513

---

across such a broad market.  *Id.*  Here, the complaint alleges a rather narrowly tailored market, which is not obviously subject to facial attack.  It supports its claim, moreover, with factual allegations suggesting interchangeability of its services with UPS's and FedEx's.

More pertinent is *Colonial Medical Group, Inc. v. Catholic Health Care West*, No. 10–16490, 2011 WL 2938227 (9th Cir. Jul. 22, 2011) (Unpub. Disp.), where the circuit court upheld a Rule 12(b)(6) dismissal because the relevant market was underinclusive as alleged.  Plaintiff had defined the market as "healthcare providers in the business of providing medical services to prison inmates at secure or guarded hospital facilities within [Central California]."  *Id.* at *1.  The court affirmed dismissal because this definition failed to include medical services provided to inmates in facilities such as local jails.  *Id.*  While the underinclusiveness of the market alleged in *Colonial Medical* was apparent, given the more obvious facts of that case, the underinclusiveness of plaintiff's market definition here is not immediately apparent to the court.

1   F.3d at 1045.

2       Moreover, under *Newcal Industries*, AFMS may be able to demonstrate that the market it

3   has alleged is a viable submarket.  513 F.3d at 1045 ("[A]lthough the general market must include

4   all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket.

5   That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or

6   monopolization of a small part of the general market of substitutable products.  In order to

7   establish the existence of a legally cognizable submarket, the plaintiff must be able to show (*but*

8   *need not necessarily establish in the complaint*) that the alleged submarket is economically distinct

9   from the general product market" (emphasis added)).  Without further factual development, the

10   court cannot say that the market AFMS has alleged "suffers a fatal legal defect."  *Id.* ("[S]ince

11   the validity of the 'relevant market' is typically a factual element rather than a legal element,

12   alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary

13   judgment or trial"); *Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1203 (9th Cir. 1997)

14   ("Ultimately what constitutes a relevant market is a factual determination for the jury"); *Datel*

15   *Holdings Ltd. v. Microsoft Corp.*, 712 F.Supp.2d 974, 997 (N.D. Cal. 2010) ("[T]he question of

16   whether the market should include other products is better resolved at the summary judgment

17   stage, rather than on a motion to dismiss"); *Delano Farms Co. v. California Table Grapes*

18   *Comm'n*, 623 F.Supp.2d 1144, 1176 (E.D. Cal. 2009) ("Motions to dismiss are not the place to

19   delve into a factual inquiry on whether, in the market, local, regional, national, or international,

20   for table grapes, if other varieties of table grapes are effective substitutes").  The court thus finds

21   UPS's arguments regarding the underinclusiveness of the market alleged unavailing.[102]

22       FedEx, for its part, asserts that "consultation services" is a vague term that "can describe

23

24   ————————————————

25      [102]The market AFMS alleges for purposes of its restraint of trade claim is different from,

26   and appears to subsume, the submarkets it alleges for purposes of its monopolization and attempted monopolization claims.  The submarkets alleged are the market for shipping and

27   consultation services regarding UPS's delivery services, and the market for shipping and consultation services regarding FedEx's delivery services.  The viability of these submarkets is

28   addressed in Part C, *infra*.

a wide variety of activities in the context of the shipping industry."[103]   Given the ambiguity of the term, FedEx argues, the complaint fails to allege that it was competing with AFMS in the same market.  FedEx argues that from the perspective of the customer, the services AFMS offers primarily concern price negotiation and obtaining discounts on FedEx rates.  It contends that by contrast, it offers shipping services, and whatever shipping consultation services it offers are provided in the context of a package of broader advice that helps customers "solve their business needs."[104]   As a consequence, FedEx contends, the services it offers are not "reasonably interchangeable" with those AFMS offers, since a consumer would never look to FedEx to obtain the services AFMS provides.[105]

---

[103]FedEx Reply at 5.

[104]FedEx Internal Memorandum at 27.

[105]FedEx relies heavily on the Morgan Stanley reports cited in the complaint, which purportedly "refer to third-party consultants as a distinct group from carriers, such as FedEx and UPS."  (FedEx Reply at 6.)  While the court may consider documents on which the complaint relies, it cannot accept the truth of the assertions contained in such documents without converting a motion to dismiss into a motion for summary judgment.  *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir. 1995) ("Defendants attached to their motion to dismiss the full text of the Company's corporate disclosure documents and the securities analysts' reports quoted in the Complaint.  Plaintiffs argue that because the district court considered the full text of these documents – many portions of which were not pleaded in the complaint – defendants' motion to dismiss should have been converted into a motion for summary judgment, affording plaintiffs the opportunity to present additional evidentiary materials.  This argument is foreclosed by *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), cert. denied, 512 U.S. 1219 . . . (1994), in which we stated: 'As it makes sense and comports with existing practice, we hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.  Such consideration does 'not convert the motion to dismiss into a motion for summary judgment,'" quoting *Branch*, 14 F.3d at 454 (in turn quoting *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n. 3 (1st Cir. 1991))); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)); see also . 1994) ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth [of the matter] asserted therein because these findings are disputable and usually are disputed"); *San Luis v. Badgley,* 136 F.Supp.2d 1136, 1146 (E.D. Cal. 2000) (quoting *Jones* for the proposition that a court "may take judicial notice of a document filed in another court not for the truth of the matters asserted in the litigation, but rather to establish the

These assertions, however, are belied by the allegations in the complaint and FedEx's internal memorandum. The memorandum discusses the fact that sales representatives should provide customers with information regarding rate structures, implies that the negotiation of a specific shipping rate can be folded into a broader discussion of "rate structures and aligned services," and states that FedEx sales representatives can help with "profitability," which is defined as "managing expense."[106] It further states that FedEx "can assist with reducing overall supply chain cost[s]," and provide advice concerning "incentives."[107] The complaint alleges that FedEx told one customer that, while "cost of service" was "probably one of the most critical issues in a negotiation," the customer could obtain "more positive mutual results" by dealing directly with FedEx.[108] These allegations support an inference that FedEx knew its rate structure and pricing were of paramount importance to its customers, and implied that it could provide better information than third party consultants on maximizing "profitability" and managing "expenses." They also support an inference that FedEx communicated to its customers that it could provide everything they had received from consultants such as AFMS and more. In short, FedEx suggested that its services were a "reasonable substitute" for AFMS's services. See *Newcal Industries*, 513 F.3d at 1045 ("First and foremost, the relevant market must be a product

_____

fact of such litigation and related filings"); *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n. 6 (7th Cir Consequently, the court declines to accept as true the fact that there is a distinction between "carriers" and "consultants," although it takes notice of the fact that Morgan Stanley drew the distinction in its reports.

Moreover, while "examining such practical indicia as industry or public recognition" of a market may be helpful in determining its contours, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), the Morgan Stanley reports are not particularly helpful in this regard. The reports were issued in 2006 and 2007 and predate the beginning of the alleged anticompetitive behavior by defendants. It stands to reason that Morgan Stanley distinguished between "consultants" and "carriers" at that time, since defendants had not yet taken action to compete with providers such as AFMS.

[106]FedEx Memo at 4.

[107]*Id.*

[108]*Id.*, ¶ 18.

market.  The consumers do not define the boundaries of the market; the products or producers do," citing *Brown Shoe*, 370 U.S. at 325).

To the extent FedEx argues that AFMS's alleged market fails because FedEx offers its price consultation services as part of a broader overall package of "rate structures and aligned services," such that its services are not interchangeable with AFMS's, *Yellow Pages Cost Consultants* forecloses the argument.  That court explicitly disagreed with the "contention that a trier of fact could not find that GTE and Consultants compete in the market for yellow pages' advice because they do not supply advertisers with identical recommendations."  *Id.* at 1161. "Reasonable" interchangeability is the standard, see *Brown Shoe*, 370 U.S. at 325, not total fungibility.  See also *Pacific Telesis Group v. International Telesis Communications*, 994 F.2d 1364, 1369 (9th Cir. 1993) (approving *Yellow Pages Cost Consultants*'s holding that "the independent consultants and GTE were competitors as they each imposed on the other a discipline in providing consumers with a better product at a lower cost" and holding that the parties before it were "in competition in providing advice on the use and development of telecommunications services"); *Yellow Pages Cost Consultants*, 951 F.2d at 1161 ("[O]therwise identical services" are not distinct merely "because one party charges for them as part of a package of products and the other charges for them separately in accordance with a different marketing scheme").

Consequently, the court concludes that AFMS has adequately alleged antitrust injury in the relevant market.

### 2.    Directness of the Injury

Defendants next argue that AFMS's alleged injury is too indirect and derivative to confer standing.[109]  They maintain that, if anyone has suffered direct injury as a result of their conduct, it is AFMS's customers, who allegedly must now pay higher rates for UPS and FedEx package shipping and delivery services.[110]  "[A] plaintiff normally lacks standing where that plaintiff's customer is the immediate victim of the defendant's conduct. . . ."  *Amarel*, 102 F.3d at 1510

---

[109]UPS Motion at 10; FedEx Motion at 7.

[110]*Id.*

31

1   (citing *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284,

2   294 (1985)).  See also *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541-42 (9th Cir. 1987) ("The

3   chain of causation between the injury and the alleged restraint in the market should lead directly

4   to the 'immediate victims' of any alleged antitrust violation. . . .   The question then is whether

5   the injuries in the present case (lost wages, lost business opportunities, and lost union dues) are

6   direct injuries suffered by the class members or are derivative of the injuries suffered by the vessel

7   owners. . . .   The vessel owners have complete control over negotiations [for] the sale of the fish.

8   Once a sale has been completed, the crewmembers are paid their wages (after deducting expenses)

9   either on a 'share of the catch' or 'per-ton' basis.   Then, and only then, are the union dues

10  calculated.   Thus, any injury suffered by the class members is derived from any injury suffered

11  by the vessel owners during the sale of the fish"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster,*

12  *Ltd.*, 269 F.Supp.2d 1213, 1222 (C.D. Cal. 2003) ("Any injury suffered by Sharman is entirely

13  derivative of Altnet's alleged injuries, even if harm to Sharman is a foreseeable consequence of

14  the conduct alleged.   Indeed, it is specifically not the design of [federal antitrust laws] to provide

15  recourse to every party arguably injured by antitrust violations," citing *Eagle*, 812 F.2d at 542).

16        Whether AFMS's injury is direct is linked to the sufficiency of AFMS's allegations that

17  it competes in the same market as defendants.   The complaint alleges that AFMS "has been

18  deprived of revenue and profits it otherwise would have made," and estimates that its damages

19  are "in the range of between $15,000,000-$20,000.000."[111]   It asserts that, because defendants

20  "are the only two significant time-sensitive delivery carriers of any consequence in the United

21  States," their decision to cease dealing with third party consultants "directly threaten[ed] the

22  continued viability" of AFMS and other consultants.[112]   Moreover, the complaint alleges that

23  defendants have informed customers that they will not deal with third party consultants,

24  presumably causing customers to terminate their services or not to employ AFMS in the first

25

26  _____

27        [111]SAC, ¶ 32.

28        [112]*Id.*, ¶ 25.

instance.   This constitutes direct injury to plaintiff's interests.[113]   See *Yellow Pages Cost Consultants*, 951 F.2d at 1162 ("Directness in the antitrust context means 'close in the chain of causation.'  There could hardly be a closer causal link than the one between GTE's refusal to let Consultants place advertisements for their clients and their clients' canceling contracts in letters to Consultants that mention the GTE policy change" (internal citations omitted)).

UPS maintains that AFMS's injury is nonetheless derivative, since the true injury caused by defendants' decision to cease dealing with third party consultants is suffered by companies that ship packages, not AFMS.  UPS distinguishes *Yellow Pages Cost Consultants* on the basis that the plaintiffs in that case sometimes dealt directly with the defendant and conducted negotiations on behalf of advertisers.[114]   The challenged conduct there was a "refusal to deal" with plaintiffs.  Here, UPS asserts, the complaint does not allege that AFMS dealt directly with defendants.  UPS is mistaken, as the complaint alleges that "[o]ften, AFMS acts as an agent for shippers during contract negotiations with carriers."[115]  This indicates that defendants' refusal to deal with third party consultants has a direct causal effect on AFMS, not merely a derivative one.  While it is true that AFMS sometimes acts only in an advisory role for certain of its customers, the same was possibly true of the plaintiffs in *Yellow Pages Cost Consultants*.  See 951 F.2d at 1159 (observing that "[t]hese Consultants advise businesses on the content and form of their advertisements in yellow pages directories.  Prior to a change in GTE policy, the Consultants *also* placed such advertisements with directories published by GTE" (emphasis added)).

### 3.      Conclusion As Respects Standing

AFMS has adequately alleged that it competes with defendants in the market for shipping consultation services, and that it was direclty injured by defendants' decision to cease dealing with third party shipping consultants.  Although the parties have not argued the relevance of the remaining three *Amarel* factors, the nature of the injury allegedly suffered is given great weight

---

[113]*Id.*, ¶¶ 17, 20.

[114]UPS MTD at 12-13.

[115]SAC, ¶ 3.

1    in the standing analysis. *Amarel*, 102 F.3d at 1507 ("We have said, however, that the nature of

2    the plaintiff's alleged injury is of 'tremendous significance' in determining whether a plaintiff has

3    antitrust standing," quoting *Bhan*, 772 F.2d at 1470 n. 3)). As AFMS has alleged that factor with

4    sufficient specificity, and successfully pled the directness of its injury, the court concludes that

5    AFMS has adequately pled that it has standing to bring this action.

**C.    Whether AFMS States a Claim for Restraint of Trade Under Section 1**

7          Having concluded that AFMS had sufficiently alleged that it has standing, the court turns

8    to whether it has stated a claim for restraint of trade under Section 1 of the Sherman Act. "To

9    establish a section 1 violation under the Sherman Act, a plaintiff must demonstrate three elements:

10   (1) an agreement, conspiracy, or combination among two or more persons or distinct business

11   entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually

12   causes injury to competition, beyond the impact on the claimant, within a field of commerce in

13   which the claimant is engaged (i.e., 'antitrust injury')." *McGlinchy v. Shell Chem. Co.*, 845 F.2d

14   802 (9th Cir. 1988).[116] The parties dispute whether AFMS has demonstrated sufficient injury to

15   competition.

16         To establish injury to competition, a plaintiff must do more than plead injury to itself - it

17   must allege the existence of injury to the market's competitiveness as a whole. "Even 'the

18   elimination of a single competitor, standing alone, does not prove anticompetitive effect.' This

19   is the thrust of the third element of the *McGlinchy* test, which requires 'injury to competition,

20   beyond the impact on the claimant.'" *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992)

21   (quoting *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979) and *McGlinchy*, 845 F.2d

22   at 811)); *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989)

23   ("Plaintiffs correctly argue that removal of one or more competing sellers from any market

24   necessarily has an effect on competitive conditions within that market. But removal of one or a

25   few competitors need not equate with injury to competition"); *Fine v. Barry & Enright Prods.*,

26

27         [116]AFMS assumes, for purposes of this motion, that the rule of reason applies to its claims,
     although it reserves the right to demonstrate at a later stage in the litigation that defendants'

28   conduct constitutes a *per se* violation. (Opp. at 3.)

731 F.2d 1394, 1399 (9th Cir. 1984) ("To establish a section 1 violation under the rule of reason, a plaintiff must show an agreement which is intended to harm or unreasonably restrain competition and actually does so"); *Tominaga v. Shepherd*, 682 F.Supp. 1489, 1496 (C.D. Cal. 1988) ("Plaintiff must show injury to a market or to competition in general, not merely injury to individual competitors").

To satisfy this standard, plaintiff must provide more than conclusory allegations or bald assertions that injury has occurred. *In re Webkinz Antitrust Litigation*, 695 F.Supp.2d 987, 993 (N.D. Cal., 2010) ("Conclusory allegations of anticompetitive effect are insufficient without supporting facts as to how competition in the tied markets has actually been reduced or harmed"); *Perry v. Rado*, 504 F.Supp.2d 1043, 1047 (E.D. Wash. 2007) ("At most, the Complaint makes conclusory allegations of injury to competition.  This is insufficient"); see also *Les Shockley Racing*, 884 F.2d at 508 ("Ordinarily, the factual support needed to show injury to competition must include proof of the relevant geographic and product markets and demonstration of the restraint's anticompetitive effects within those markets.  Avoiding such market analysis requires proof of actual detrimental competitive effects such as output decreases or price increases." (internal citation omitted)).

The complaint alleges that defendants' purported antitrust violations "have had the effect of substantially lessening, suppressing, eliminating and interfering with competition in the business of advising shippers regarding the delivery of time sensitive letters, documents and packages by air or by ground . . ."[117]  AFMS also asserts that defendants' policy shift regarding third party consultants has had "injurious effects," such as the suppression and diminishment of competition, freedom of choice, competition among and between consultants, and higher prices.[118]  Other allegations assert that defendants' conduct "threatens the viability of any . . . third-party consultant

---

[117]SAC, ¶ 7.

[118]*Id.*, ¶ 26.

35

and largely eviscerates the ability of third-party consultants to compete in the relevant market."[119]
All of AFMS's allegations are defective in that they are wholly conclusory and are unsupported
by specific facts. The only allegation that any party has suffered concrete harm concerns AFMS's
monetary losses; as noted, however, injury to a single competitor does not suffice to support a
Section 1 claim.[120] Ninth Circuit precedent is clear that "a section one claimant may not merely
recite the bare legal conclusion that competition has been restrained unreasonably. Rather, a
claimant must, at a minimum, sketch the outline of the antitrust violation with allegations of
supporting factual detail." *Les Shockley Racing*, 884 F.2d at 507–08. Without facts regarding
the actual impact of defendants' policies on the relevant market and the injurious effects they have
had on competition in that market, the complaint fails to plead an essential element of a restraint
of trade claim.[121] As AFMS has not adequately alleged harm to competition in the relevant

---

[119]*Id.*, ¶ 30.

[120]In its opposition, AFMS asserts that it has, in fact, pled an effect on competition, e.g.,
reduced price competition and the elimination of a substantial sector of the relevant market. (Opp.
at 7-9.) It cites, as an example, paragraph 14 of the complaint, which states that "eliminating
TPCS and the discounts they produce is a form of price fixing." (Opp. at 7.) This statement is
a legal conclusion; it pleads no facts showing injury to competition in the relevant market. AFMS
also asserts that paragraph 15 states that prices have substantially increased as a result of
defendants' conduct. (*Id.*) To the contrary, paragraph 15 alleges that "[t]he use of consultant
generated discounts has reinvigorated price competition between UPS and FedEx, which otherwise
was at a reduced level." (SAC, ¶ 15.) This allegation does not address the current state of
competition in the market, nor how it has been affected by defendants' alleged antitrust violations.

[121]AFMS cites *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)
for the proposition that antitrust injury is "perfected" whenever an injury to "consumer welfare"
is threatened. Although the welfare of consumers was certainly one of the animating forces
behind passage of the Sherman Act, AFMS appear to contend that anytime a party with market
power engages in conduct that results in increased prices, consumer welfare is threatened. Such
a wide-ranging statement is not supported by *Rebel Oil*, which dealt specifically with primary-line
discrimination in pricing and the dangers inherent in that practice. See *id.* at 1445-46. Moreover,
the Ninth Circuit's recent holding in *Brantley* rejects the broad proposition AFMS advances. 2011
WL 2163961 at *5 (listing allegations that insufficiently allege injury to competition, including
"(1) limiting the manner in which Distributors compete with one another because Distributors are
unable to offer a la carte programming, (2) reducing consumer choice, and (3) increasing prices");

market, its claim under Section 1 of the Sherman Act fails.[122]

_id._ at *3 ("Nor do allegations regarding harm to consumers, either in the form of reduced choice or increased prices, state a Section 1 claim. The Supreme Court has noted that both are 'fully consistent with a free, competitive market,' and are therefore insufficient to establish an injury to competition." (quoting _Ill. Tool Works Inc. v. Indep. Ink, Inc._, 547 U.S. 28, 44-45 (2006))).

[122]Because AFMS's Section 1 claim adequately alleges injury to competition in the relevant market, the court declines to address whether AFMS has pled facts that plausibly suggest the existence of a conspiracy between UPS and FedEx. The court also declines to address FedEx's argument that vertical restraints are presumptively procompetitive, and that AFMS has failed to rebut that presumption in its pleading. (FedEx MTD at 14-15.)

As guidance, however, the court offers two observations. First, it is true that the Supreme Court in _Twombly_ held that allegations of parallel conduct, standing alone, are not sufficient to support a conspiracy claim. 550 U.S. at 564-65; see _William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co._, 588 F.3d 659, 667-68 (9th Cir. 2009) ("The Court concluded that allegations of parallel conduct in themselves do not provide a sufficient basis to sustain a conspiracy claim"). _Twombly_ makes clear, however, that it does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." _Id._ at 570. See also _In re Graphics Processing Units Antitrust Litig._, 527 F.Supp.2d 1011, 1024 (N.D. Cal. 2007) ("This is not to say that to survive a motion to dismiss [alleging inadequate pleading of conspiracy], plaintiffs must plead specific back-room meetings between specific actors at which specific decisions were made. Nor is this order imposing the stricter pleading standard set forth in Rule 9(b) to allegations of conspiracy"). Rather, the _Twombly_ Court noted that "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." _Twombly_, 550 U.S. at 557. Thus, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement. . . ." _Id._ They "need[ ] some setting suggesting the agreement necessary to make out a § 1 claim." _Id._ The Court in _Twombly_ noted that the parties before it agreed that "that 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy." _Id._ at 557 n. 4. Here, AFMS alleges just this type of thing. It asserts that after almost two decades of dealing with third party consultants, defendants announced on the same day, during the same panel discussion, that each had decided to cease dealing with consultants. It asserts that the companies' representatives did not deny collusion when questioned. (SAC, ¶ 16.) The complaint further alleges that the companies issued internal memoranda the same day that advised their employees of the specifics of the new policies. (_Id._, ¶ 17), and that their representatives made statements to customers indicating knowledge of the competitor's policy before it was announced (_id._, ¶ 20). Additionally, there is an allegation of collusive conduct in which sales representatives for the two companies conferred before telling a customer that neither defendant would deal with a customer that had engaged a third party consultant. (_Id._, ¶ 19.) While the complaint does not allege the timing of the incident, the fact that representatives of the companies

**D.     Whether AFMS States a Claim for Monopolization or Attempted Monopolization Under Section 2**

Section 2 of the Sherman Act makes it illegal for any "person" to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Private parties are afforded a right of action to enforce this provision of the Sherman Act by

were purportedly telling customers not just that *their* company would not deal with the customer if it engaged a third party consultant, but that *its competitor* would similarly refuse to deal with the customer, supports an inference of agreement. No discernible reason appears on the face of the complaint why the companies took these steps at the same time after dealing with third party consultants for so long. Thus, the complaint appears to contain "enough facts to 'nudge [AMFS's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Defendants contend that they had a rational economic motivation for taking the action they did. Whether such a motivation exists, of course, was central to *Twombly*'s analysis of the plausibility of antitrust allegations. See *id.* at 566 ("As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance"); see also *In re Graphics Processing Units*, 527 F.Supp.2d at 1024 ("At most, they have suggested that defendants' employees and executives attended the same meetings, and thereafter, defendants engaged in parallel behavior that could be explained by each firm acting in [its] own self-interest"). AFMS alleges that in addition to offering the delivery service that gives rise to the market for shipping consultation services, FedEx and UPS participate consulting services market. This dual role inherently gives defendants a competitive advantage in the shipping consultation market. The fact that they are exploiting that advantage does not render their conduct unlawful. Information about their pricing and rate structures is proprietary, and as defendants correctly note, they are under no obligation to share that information with outsiders if they choose not to do so. See *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1363 (Fed. Cir. 1999). Defendants' preference for dealing directly with their customers is similarly both logical and lawful.

The complaint does more, however, than simply allege that defendants refused to deal with middlemen or share proprietary information; it asserts that defendants threatened not to deal with *customers* who engaged third party consultants, even if those consultants acted not as agents negotiating shipping contracts, but as advisers. (SAC, ¶¶ 18-21.) It is true that defendants' internal memoranda do not explicitly state that customers dealing with third party consultants will be boycotted, and appear to grant some discretion to sales representatives to seek exceptions to the general policy. Nonetheless, it is not clear that exceptions will be granted or if so, with what frequency. It may well be, therefore, that AFMS alleges more than a mere refusal to deal with third party consultants, and that its allegations suggest an unlawful attempt to *force* customers to deal exclusively with them.

1   Section 4 of the Clayton Act, which states in part that "any person who shall be injured in his

2   business or property by reason of anything forbidden in the antitrust laws may sue therefor in any

3   district court of the United States . . . and shall recover threefold the damages by him sustained,

4   and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15; see also, e.g., *Assoc.*

5   *Gen. Contractors*, 459 U.S. at 529-30; *In re Nine West dxdShoes Antitrust Litig.*, 80 F.Supp.2d

6   181, 185 (S.D.N.Y. 2000) ("Section 4 of the Clayton Act allows private enforcement of the

7   antitrust laws and broadly defines the class of persons who may maintain a private damage

8   action"). To state a claim for monopolization under § 2, a plaintiff must plead "'(1) the

9   possession of monopoly power and (2) the willful acquisition or maintenance of that power as

10  distinguished from growth or development as a consequence of a superior product, business

11  acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S.

12  451, 480 (1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); accord

13  *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 989-90 (9th Cir. 1993).

14      To satisfy the monopoly power element, plaintiff must plead the relevant market and the

15  fact that defendant possesses monopoly power in that market. See *MRO Communications, Inc.*

16  *v. American Tel. & Tel. Co.*, 205 F.3d 1351, 1999 WL 1178964, *1 (9th Cir. Dec. 13, 1999)

17  (Unpub. Disp.) ("To make out a claim of monopolization in violation of 15 U.S.C. § 2 , MRO

18  had to allege: (1) AT & T's possession of monopoly power in the relevant market; (2) AT & T's

19  willful acquisition or maintenance of that power through exclusionary conduct; and (3) causal

20  antitrust injury," citing *American Professional Testing Serv., Inc. v. Harcourt Brace Jovanovich*

21  *Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997)); *Amarel*, 102

22  F.3d at 1521 ("Claims for violation of Section 2 must allege two key elements: (1) the possession

23  of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

24  power"); see also *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993)

25  ("Defining the market is a necessary step in any analysis of market power and thus an

26  indispensable element in the consideration of any monopolization or attempt case arising under

27  section 2"); *Griffiths v. Blue Cross & Blue Shield*, 147 F.Supp.2d 1203, 1213 n. 12 (N.D. Ala.

28  2001) ("[A] plaintiff bringing a monopolization claim under Section 2 of the Sherman Act must

define and prove the relevant market").[123]

Alternatively, a plaintiff can state a claim for attempted monopolization. The elements of that claim are: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993), and citing *Amarel*, 102 F.3d at 1521); accord *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1422-23 (9th Cir. 1995) (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988)); *California Computer Prod.*, 613 F.2d at 736. The requireme00nts of a monopolization claim and attempted monopolization claim "are similar, differing primarily in the requisite intent and the necessary level of monopoly power." *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) (citing *California Computer Prod.*, 613 F.2d at 736-37).

As it did with respect to its Section 1 claim, AFMS has redefined the relevant market for purposes of its Section 2 claims. Recognizing that neither defendant competes to provide shipping consultation services related to use of the other's shipping service, AFMS has divided the market into two sub-markets. These are defined respectively as "the market for shipping consultation services [to] advise shippers regarding UPS's delivery of time sensitive letters, documents, and packages" and "the market for shipping consultation services [to] advise shippers regarding

---

[123]As noted in *MRO Communications*, to satisfy § 4 of the Clayton Act, a plaintiff must also plead "causal 'antitrust' injury." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987); see also *In re Air Passenger Computer Reservations Sys. Antitrust Litig.*, 694 F.Supp. 1443, 1466 (C.D. Cal. 1988) ("The Supreme Court has held that not all forms of injury caused by antitrust violations are compensable. In *Brunswick* [*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)], the Court held that an antitrust plaintiff must show that it was injured by the anticompetitive consequences of the antitrust violation. Plaintiff must show that 'the injury was caused by a reduction, rather than an increase, in competition flowing from the defendant's acts, since '[t]he antitrust laws . . . were enacted for the protection of competition not competitors,'" quoting *California Computer Prod. v. International Business Machines, Corp.*, 613 F.2d 727, 732 (9th Cir.1979) (some internal quotation marks omitted)), aff'd *sub nom Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991).

1   FedEx's delivery of time sensitive letters, documents, and packages. . . ."[124]  AFMS alleges that:

2       "Beginning in the Fall of 2009 . . . [each defendant] has been and is engaged in a

3       plan and scheme . . . to achieve or maintain monopoly power . . . in the related

4       market for shipping consultation services regarding [each defendant's] own delivery

5       services.

6           The actual monopolization, or alternatively the attempt to monopolize, has

7       consisted of a deliberate course of action, undertaken by each defendant with the

8       specific intent of eliminating plaintiff AFMS, and other third party consultants as

9       factors in the market for shipping consultation services regarding [each defendant's]

10      own delivery services. . . . This course of conduct has resulted in [each defendant]

11      actually monopolizing the market for shipping consultation services regarding [its]

12      own delivery services. . . . Alternatively, if [either defendant's] conduct has fallen

13      short of actually monopolizing that market, it presents a dangerous probability of

14      success. . . ."[125]

15      Much like its definition of the relevant market for purposes of the Section 1 claim, the

16  validity of AFMS's definition of the relevant sub-markets is crucial to its ability to plead a Section

17  2 claim.  See *Kodak*, 125 F.3d at 1202 ("To demonstrate market power by circumstantial

18  evidence, a plaintiff must: '(1) define the relevant market. . . ,'" citing *Rebel Oil*, 51 F.3d at

19  1434).  "Without a proper definition of the relevant market, it is impossible to determine a party's

20  influence over that market. . . ." *Kodak*, 125 F.3d at 1203 (citing *Rebel Oil*, 51 F.3d at 1434,

21  in turn quoting *Thurman Industries*, 875 F.2d at 1374).  "Failure to identify a relevant market is

22  a proper ground for dismissing a Sherman Act claim."  *Tanaka v. University of Southern

23  California*, 252 F.3d 1059, 1063 (9th Cir. 2001).

24      The parties dispute whether AFMS has pled the existence of a "single-brand" market, such

25  that each defendant exercises monopoly power in the market for consultation regarding its own

26  _____

27      [124]SAC, ¶¶ 39, 44.

28      [125]*Id.*, ¶¶ 40-42.

shipping services.  AFMS relies heavily on *Newcal Industries* to defend the proposed submarkets.
513 F.3d at 1046-49.  There, the Ninth Circuit explained the characteristics of a single-brand
submarket by contrasting the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical
Services, Inc.*, 504 U.S. 451 (1992), which recognized a market restricted to consumers of
Kodak-brand products, with two decisions from the Third and Ninth Circuits, *Queen City Pizza,
Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir.1997), and *Forsyth v. Humana, Inc.*, 114 F.3d
1467 (9th Cir.1997), which held that plaintiffs who had entered into contractual agreements with
defendants to use certain of their services exclusively had not properly defined a market for
antitrust purposes.  As in those prior cases, the plaintiffs in *Newcal Industries* alleged the existence
of a primary market and an "aftermarket" in products related to the primary market.  Plaintiffs
did not assert that defendants engaged in anticompetitive conduct in the primary market; rather,
they alleged that defendants "locked" plaintiffs into purchasing services only from them in the
aftermarket.  *Id.* at 1048.  The *Newcal Industries* court distilled three basic principles from its
review of these cases:

> "First, the law permits an antitrust claimant to restrict the relevant market to a
> single brand of the product at issue (as in *Eastman Kodak*).  Second, the law
> prohibits an antitrust claimant from resting on market power that arises solely from
> contractual rights that consumers knowingly and voluntarily gave to the defendant
> (as in *Queen City Pizza* and *Forsyth* ).  Third, . . . the law permits an inquiry into
> whether a consumer's selection of a particular brand in the competitive market is
> the functional equivalent of a contractual commitment, giving that brand an
> agreed-upon right to monopolize its consumers in an aftermarket.  The law permits
> an inquiry into whether consumers entered into such 'contracts' knowing that they
> were agreeing to such a commitment."  *Newcal Industries*, 513 F.3d at 1048-49.

The critical questions identified by the *Newcal Industries* court were (1) the point at which the
customers were "locked-in" to the aftermarket and (2) whether they knowingly locked themselves
into using defendant's services in the aftermarket by an explicit contractual obligation or some
other means.  *Id.* at 1049-50.  Concluding that the case before it was more like *Eastman Kodak*

than *Queen City Pizza* and *Forsyth*, the Ninth Circuit observed that the *Newcal Industries* plaintiffs had not been forewarned by explicit contractual provisions that they were binding themselves to use only Ikon's services.  *Id.*  It noted that "market imperfections, as well as [Ikon's] fraud and deceit, prevent[ed] consumers from realizing that their choice in the initial market [would] impact their freedom to shop in the aftermarket."  *Id.*

The court finds *Newcal Industries* and *In re Apple & AT&TM Antitrust Litigation*, 596 F.Supp.2d 1288 (N.D. Cal. 2008)  – another case on which AFMS relies – inapposite.[126] Although the cases recognize the possibility that single-brand "submarkets" can exist, they are more properly characterized as "aftermarket" cases, in which customers' freedom to contract for services needed only after they have purchased a primary product is restricted by actions the defendant takes in the primary market at the time the primary product is sold.  *Newcal Industries*, 513 F.3d at 1049-51 (addressing an alleged aftermarket for replacement parts and services, derivative of a market for copy machines); *In re Apple & AT&TM Antitrust Litig.*, 596 F.Supp.2d at 1032 (addressing an alleged aftermarket for iPhone voice and data services, derivative of the market for iPhones).  The cases hold that whether a viable antitrust claim exists turns on whether, by buying the defendant's primary product, the customers knowingly and voluntarily agreed to be locked in to using only the defendant's services in the aftermarket.

Here, while AFMS purportedly alleges the existence of an aftermarket, it does not appear that any such aftermarket exists.[127]  Rather, AFMS alleges there is a foremarket for consulting services designed to aid customers purchasing defendants' primary offering – i.e., delivery services.  Even if the court attempts to apply the rule articulated in the aftermarket cases to such

---

[126]AFMS also cites *Portney v. CIBA Vision Corp.*, 593 F.Supp.2d 1120 (C.D. Cal. 2008), but that case does not address the type of single-brand submarket it alleges here.  Rather, the case concerns an alleged "market or submarket" for multifocal contact lenses, which the defendant-counterclaimant asserted were not reasonably interchangeable with monofocal contact lenses.  *Id.* at 1127.

[127]Opp. at 22-23 ("[U]pon selecting a Defendant to negotiate with, a shipper is essentially locked in to the relevant submarket of consultation regarding that Defendant's specific delivery services").

a disparate situation,[128] it is clear that insufficient facts are alleged to support the submarkets pleaded. AFMS does not allege that customers ever decide which shipping company's delivery services they will use *before* they consider the relative price and terms of the shipping contract being offered by that company. AFMS thus fails to allege that customers are ever "locked in" to using FedEx's or UPS's consultation services. Indeed, the complaint makes clear that customers engage in a comparative analysis of the price and terms offered by the shipping companies in assessing which company's delivery services to use. AFMS acknowledges that it and other third party consultants provide comparative information to help customers assess which provider to choose. It alleges that consultants are "highly motivated to produce additional discounts and hence savings for shippers."[129] One way of generating discounts is recommending that customers switch carriers, depending on the "hard and soft issues" they face.[130] The complaint alleges the content of Morgan Stanley reports reflecting that in 2006, 14-15% of shippers switched carriers based on

---

[128]Generally, in foremarket/aftermarket cases, the question is whether the defendant can "exert raw power in the aftermarket without regard for commercial consequences in the foremarket." If so, it is possible for the aftermarket to be the relevant market. See *SMS Systems Maintenance, Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 17 (1st Cir. 1999). If one applies this rule in reverse, as is necessary here, the question is whether either defendant exerts such raw power in the foremarket for consulting services related to its own delivery services that it need not fear commercial consequences in the aftermarket for those delivery services. There is no allegation, nor does it appear there could be one, that either defendant can exert such power in the foremarket for consulting services that there would be no consequences in the aftermarket for its delivery services. Rather, it appears that the delivery services market is rather evenly split between defendants; that, as discussed more fully *infra*, customers' decisions regarding which shipping company to use are driven in large measure by price; and that customers freely switch shippers to secure a more favorable contract. Thus, if anything, it appears that conduct in the foremarket for consultation services could have a direct impact on a defendant's performance in the aftermarket for delivery services.

[129]*Id.*, ¶ 12.

[130]*Id.*; see also *id.*, ¶ 11 ("Consultants . . . gather and analyze data, including a shipper's past transactions, to develop a strategy and advise a shipper on how to save money and *match that shipper's specific needs to a carrier's delivery services*" (emphasis added)).

price, and that 8-9% of carriers did so the following year.[131]  This suggests that part of the value third party consultants add is providing comparative information regarding the prices charged by competing shipping companies like defendants.  It also suggests that once customers obtain comparative price information, they more freely switch shipping companies.  Because customers can freely move from one shipping company to another to have packages delivered, it does not appear that they are ever "locked in" to using one defendant's consultation services or the other's.  Cf. *In re ATM Fee Antitrust Litig.*, 768 F.Supp.2d 984, 997 (N.D. Cal. 2009)  ("The prior single brand derivative aftermarket cases have focused on the provision of expensive, durable goods.  Once a consumer buys such a good, like a photocopier, he is 'locked in' to purchasing compatible parts and service for a considerable length of time, given the expense and difficulty of buying a new photocopier.  In those circumstances, market imperfections prevent customers from imposing market discipline in the derivative market because of the difficulty of switching among competitors in the primary market. . . .  It is unclear to the Court that a holder of a bank account, on the other hand, faces such hurdles in simply moving his business elsewhere.  Plaintiffs' 'relevant market' is a derivative aftermarket of the 'primary market for deposit accounts.' . . .  Plaintiffs argue that once customers open accounts with Star member banks, they become 'locked-in' to the Star network.  Thus, Plaintiffs contend they have no choice among ATM networks at the time of each foreign ATM transaction.  Where Plaintiffs fall short, however, is in their failure to plead a viable theory suggesting that once a customer signs up for a bank account, he is 'locked in' to that bank's services.  There are numerous banks that offer deposit accounts and ATM services, and customers may presumably switch to a new bank if they are unhappy with the services offered by their current institution.  Because Plaintiffs have failed to allege that they are effectively limited to the Star network as a result of their present banking relationships, they have failed to plead that they are 'locked in' to the derivative aftermarket").

Moreover, even assuming AFMS could allege that customers lock themselves into using one shipping company's services before considering price and terms, under *Newcal Industries*,

---

[131]*Id.*, ¶ 13.

the level of knowledge with which they make that decision is critical.  The complaint, however,

pleads no facts concerning customers' knowledge.  Compare *Newcal Industries*, 513 F.3d at 1050

("Newcal offers factual allegations to rebut the economic presumption that [Ikon] consumers make

a knowing choice to restrict their aftermarket options when they decide in the initial (competitive)

market to enter an IKON contract").  The complaint does not allege that, after defendants ceased

dealing with third party consultants, customers lacked knowledge that their decision to employ one

defendant or the other to deliver their packages meant that they were binding themselves to use

only UPS's or FedEx's consultation services.  Compare *Newcal Industries*, 513 F.3d at 1050

("The fourth relevant aspect of the complaint is that it alleges that market imperfections, as well

as [Ikon's] fraud and deceit, prevent consumers from realizing that their choice in the initial

market will impact their freedom to shop in the aftermarket"); *In re Apple & AT & TM Antitrust

Litig.*, 596 F.Supp.2d at 1303-04 ("These allegations state a claim which is ripe for adjudication

because Plaintiffs are alleging that at the point of purchase and initiation of service, Defendants

involuntarily impose on consumers a contract exclusivity restriction which restricts their freedom

from that point forward for at least the next five years and conceivably for the life of the iPhone").

Single-brand markets are rare, and the competitive circumstances alleged in the complaint

render their existence questionable here.  See *Apple, Inc. v. Psystar Corp.*, 586 F.Supp.2d 1190,

1198 (N.D. Cal. 2008) ("Single-brand markets are, at a minimum, extremely rare.  'Even where

brand loyalty is intense, courts reject the argument that a single branded product constitutes a

relevant market,'" quoting *Green Country Food Market, Inc. v. Bottling Group*, 371 F.3d 1275,

1282 (10th Cir. 2004)).

AFMS's failure to allege the existence of viable submarkets is a fatal defect in § 2

monopolization and attempted monopolization claims.[132]  Compare *Portney*, 593 F.Supp.2d at

---

[132]The court declines to address defendants' contention that AFMS has failed to plead facts showing anticompetitive conduct in the relevant market.  "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 (1960)); see also *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972) ("It is well

46

settled that a manufacturer may discontinue dealing with a particular distributor 'for business reasons which are sufficient to the manufacturer, and adverse effect on the business of the distributor is immaterial in the absence of any arrangement restraining trade,'" citing *Ricchetti v. Meister Brau, Inc.*, 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939 (1971); *Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76-77 (9th Cir. 1969), cert. denied, 396 U.S. 1062 (1970); *Scanlan v. Anheuser-Busch, Inc.*, 388 F.2d 918, 921 (9th Cir. 1968), cert. denied, 391 U.S. 916 (1968)); accord *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 483 (9th Cir. 1988).

AFMS relies heavily on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), for the proposition that "'a decision by a monopolist to make an important change in the character of the market' that detrimentally affects a competitor is sufficient to establish anticompetitive conduct." (Opp. at 24 (quoting *Aspen Skiing Co.*, 472 U.S. at 604).) The Supreme Court has commented, however, that *Aspen Skiing Co.* "is at or near the outer boundary of § 2 liability." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (noting that *Aspen Skiing Co.* had not only terminated "a voluntary (and thus presumably profitable) course of dealing," which "suggested a willingness to forsake short-term profits to achieve an anticompetitive end," but also that its refusal "to renew the [all-lift] ticket even if compensated at retail price" reflected "a distinctly anticompetitive bent"). See also *Aspen Skiing Co.*, 472 U.S. at 604 ("Ski Co.'s decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market. *Such a decision is not necessarily anticompetitive* [however]. . . . [The court must] draw[ ] a distinction 'between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other'" (citation omitted, emphasis added)). Here, the refusal to deal with third party consultants has a plausible economic motivation, given that a company may validly prefer to deal directly with customers. Moreover, third party consultants were presumably impacting defendants' profitability, which may also provide a legitimate reason for the refusal to deal. See *MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) ("Qwest attempted to change this prior course of dealing after it realized that the resale of Centrex by MetroNet and others was having a 'significantly negative' impact on its own profitability. Hence, Qwest was not forsaking short-term profits by switching from system pricing to per location pricing, but rather was attempting to increase its short-term profits. Qwest's termination of its prior course of dealing therefore 'sheds no light' upon whether Qwest was 'prompted not by competitive zeal but by anticompetitive malice,'" quoting *Verizon Communications*, 540 U.S. at 409)).

Were this a simple refusal to deal case, AFMS's heavy reliance on *Aspen Skiing* might be insufficient to support AFMS's claims. As noted, however, AFMS alleges that defendants have threatened to withhold delivery services from customers who engage third party consultants even on a purely advisory basis. The parties do not address the effect of this allegation in their briefs, treating the action primarily as a refusal to deal case. This conduct, however, may suggest "a distinctly anticompetitive bent," just as the refusal to renew the all-lift ticket at retail prices in *Aspen Skiing Co.*, or the termination of advertisers' contracts in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), did. See *id.*, 342 U.S. at 148-49. ("To carry out appellants' plan,

47

1127 ("And this is not the type of case where dismissal on the pleadings is appropriate, as such cases "frequently involve" either (1) failed attempts to limit product markets to a single brand, franchise, or institution, or (2) a failure even to attempt a plausible explanation as to why a market should be limited in a particular way," quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)). Defendants' motion to dismiss the claim is therefore granted.

### III.  CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss AFMS's claim under § 1 of the Sherman Act, and its § 2 monopolization and attempted monopolization claims.  AFMS may filed an amended complaint within twenty (20) days of the date of this order.  Given that the motion hearing cut-off date is approaching, the court will entertain a stipulation to amend the case management dates.  Any such stipulation should be filed no later than **December 12, 2011.**

DATED: November 23, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

_____

the publisher monitored WEOL programs to determine the identity of the station's local Lorain advertisers.  Those using the station's facilities had their contracts with the publisher terminated and were able to renew them only after ceasing to advertise through WEOL").