PAUL T. FRIEDMAN (CA SBN 98381)
PFriedman@mofo.com
RUTH N. BORENSTEIN (CA SBN 133797)
RBorenstein@mofo.com
STACEY M. SPRENKEL (CA SBN 241689)
SSprenkel@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone:  415.268.7000
Facsimile:    415.268.7522

GREGORY B. KOLTUN (CA SBN 130454)
GKoltun@mofo.com
SEAN P. GATES (CA SBN 186247)
SGates@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, California 90017-3543
Telephone:  213.892.5200
Facsimile:   213.892.5454

Attorneys for Defendant
UNITED PARCEL SERVICE CO.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| AFMS LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED PARCEL SERVICE CO. and FEDEX CORPORATION,<br><br>                    Defendants. | Case No. CV10-5830 JGB (AJW)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNITED PARCEL SERVICE CO.'S MOTION FOR SUMMARY JUDGMENT [FRCP 56]**<br><br>Date:  August 12, 2013<br>Time:  9:00 a.m.<br>Ctrm:  1<br><br>Hon. Jesus G. Bernal |

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................ vii

INTRODUCTION .................................................................................................1

STATEMENT OF FACTS ....................................................................................3

    A.    AFMS's Services ...................................................................................3

    B.    UPS's Business Strategy and Its Experience with 3PNs .....................4

        1.    UPS's Business Strategy Is to Provide Specialized Supply Chain Services in Conjunction with Its Delivery Services ......4

        2.    UPS Does Not Provide Price Negotiation Services .................6

        3.    The Inherent Conflict Between 3PNs' and UPS's Business Strategies .........................................................................8

        4.    UPS Strengthened Its 3PN Procedures After Seeing Increased 3PN Activity During the 2008-2009 Recession ........9

            a.    UPS Continued to Deliberate Long After the October 2009 Industry Event .........................................10

            b.    UPS Developed a Number of Options to Deal with 3PNs, but It Has Not Refused to Deal with Any Shipper Merely Because of 3PN Involvement.............12

AFMS'S CLAIMS.................................................................................................12

GOVERNING STANDARDS ..............................................................................14

ARGUMENT.........................................................................................................14

I.    AFMS LACKS STANDING TO BRING ITS ANTITRUST CLAIMS .....14

    A.    AFMS Cannot Establish Antitrust Injury .........................................16

        1.    UPS and AFMS Do Not Participate in the Same Relevant Market..........................................................................16

            a.    UPS's and AFMS's Services Are Not Reasonably Interchangeable .................................................18

            b.    There Is No Cross-Elasticity of Demand Between UPS's Services and AFMS's Services ........................20

        2.    AFMS Has No Evidence that It Competes with UPS in a Relevant Market.......................................................................20

            a.    UPS Documents Concerning Its Efforts to Deal Directly with Shippers Are Not Evidence that UPS's and AFMS's Services Are Reasonably Interchangeable .........................................................21

     b.  That AFMS and UPS Both Analyze Shipper Data to Give Advice About Potential Cost Savings Does Not Show that They Compete in a Relevant Market ....21

   3.  Given the Facts Here, the *Yellow Pages* Case Is Inapposite; Rather, Ninth Circuit Law Requires Summary Judgment ..................................................................26

  B.  AFMS's Asserted Injury Is Indirect ..................................28

  C.  AFMS's Asserted Harm Is Speculative ............................29

  D.  Determining Damages Would Be Unduly Complex .........29

II.  AFMS CANNOT SHOW HARM TO COMPETITION ............................31

  A.  AFMS Cannot Establish Its Alleged Relevant Market .....................31

   1.  AFMS's Market for Shipping Consultation Services Improperly Includes Services that Are Not Substitutes for Each Other ................................................................32

     a.  AFMS Cannot Show Reasonable Interchangeability Among the Diverse Services within Its Alleged Market ....................................................................32

     b.  AFMS Cannot Show Cross-Elasticity of Demand Among the Diverse Services within Its Alleged Market ....................................................................33

     c.  No "Practical Indicia" Support AFMS's Overly Broad Market Definition ..................................34

   2.  AFMS's Alleged Product Market Fails to Include All Sources of Supply for Price Negotiation Services .................34

  B.  AFMS Cannot Establish that UPS's and FedEx's Actions Resulted in Harm to Competition .........................................36

III.  AFMS CANNOT SHOW CONSPIRACY ................................................38

CONCLUSION ...............................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. Cal. 1998) .................................................................... 36

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ......................................................................... 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......................................................................................... 14

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) ........................................................................... 16

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters (AGC)*,
459 U.S. 519 (1983) .......................................................................... 14, 15, 28

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) .......................................................................................... 16

*Bhan v. NME Hospitals, Inc.*,
772 F.2d 1467 (9th Cir. 1985) ........................................................... 15, 16, 17

*Blomkest Fertilizer, Inc. v. Potash Corp.*,
203 F.3d 1028 (8th Cir. 2000) ........................................................................ 39

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) ..................................................................... 18, 32

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .................................................................................. 32, 34

*California v. Sutter Health Sys.*,
84 F. Supp. 2d 1057 (N.D. Cal.), *aff'd*, 217 F.3d 846 (9th Cir. 2000).............. 33

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) ............................................................................ 31

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) .......................................................................................... 15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................... 14

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) .................................................................. 39, 40

*Coniglio v. Highwood Servs., Inc.*,
495 F.2d 1286 (2d Cir. 1974) ......................................................................... 33

*Del. Valley Surgical Supply, Inc. v. Johnson & Johnson,*
   523 F.3d 1116 (9th Cir. 2008)................................................................... 15

*Eagle v. Star-Kist Foods, Inc.,*
   812 F.2d 538 (9th Cir. 1987).........................................................16, 28, 29, 30

*Equifax, Inc. v. Fed. Trade Comm'n,*
   618 F.2d 63 (9th Cir. 1980)....................................................................22, 32, 33

*Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.,*
   788 F.2d 574 (9th Cir. 1986)..............................................16, 17, 25, 26

*FTC v. Whole Foods Mkt., Inc.,*
   548 F.3d 1028 (D.C. Cir. 2008) ........................................................ 33

*Glen Holly Entm't Inc. v. Tektronix Inc.,*
   352 F.3d 367 (9th Cir. 2003)................................................................. 26

*Healy v. CTP Inc.,*
   No. 93 C 1727, 1994 WL 846898 (N.D. Ill. Sept. 22, 1994)............................. 30

*Hynix Semiconductor Inc. v. Rambus Inc.,*
   No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) ..........24, 33

*In re Baby Food Antitrust Litig.,*
   166 F.3d 112 (3d Cir. 1999)................................................................. 39

*In re Citric Acid Litig.,*
   191 F.3d 1090 (9th Cir. 1999)................................................................. 39

*In re Live Concert Antitrust Litig.,*
   863 F. Supp. 2d 966 (C.D. Cal. 2012)................................................... 25

*In re Mun. Bond Reporting Antitrust Litig.,*
   672 F.2d 436 (5th Cir. 1982)................................................................. 38

*Legal Econ. Evaluations v. Metro. Life Ins. Co.,*
   39 F.3d 951 (9th Cir. 1994)...........................................................15, 28

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,*
   884 F.2d 504 (9th Cir. 1989)................................................................. 36

*M.A.P. Oil Co., Inc. v. Texaco Inc.,*
   691 F.2d 1303 (9th Cir. 1982)...........................................................21, 32

*Malaney v. UAL Corp.,*
   434 Fed. App'x 620 (9th Cir. 2011)................................................... 33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ............................................................................ 38

*McGlinchy v. Shell Chem. Co.,*
   845 F.2d 802 (9th Cir. 1988)................................................................. 36

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ................................................................ 39

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ................................................ 24

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) ................................................ 24

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) ................................................ 14

*Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*,
670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ........... 21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .................................................. 17

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ................................... 31, 34, 36, 38

*Reifert v. South Central Wisconsin MLS Corp.*,
No. 04-C-969-S, 2005 WL 2055958 (W.D. Wis. Aug. 25, 2005),
*aff'd*, 450 F.3d 312 (7th Cir. 2006) .......................................... 23

*Richards v. Neilson Freight Lines*,
810 F.2d 898 (9th Cir. 1987) ................................................ 40

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
637 F.2d 1376 (9th Cir. 1981) ............................................... 36

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
642 F.3d 608 (8th Cir. 2011) ................................................ 24

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*,
711 F.3d 1264 (11th Cir. 2013) .............................................. 15

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
830 F.2d 1374 (7th Cir. 1987) ............................................... 29

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
546 F.3d 991 (9th Cir. 2008) ................................................ 20

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
536 F. Supp. 2d 1191 (C.D. Cal. 2008) .................................. 32, 33

*Tunis Bros. Co. v. Ford Motor Co.*,
952 F.2d 715 (3d Cir. 1991) ................................................. 37

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
512 F.2d 1264 (9th Cir. 1975) ............................................... 35

*U.S. Anchor Mfg. v. Rule Indus.*,
7 F.3d 986 (11th Cir. 1993) ................................................. 34

v

*United States v. Microsoft*,
   253 F.3d 34 (D.C. Cir. 2001)...............................................................22

*United States v. SunGard Data Sys., Inc.*,
   172 F. Supp. 2d 172 (D.D.C. 2001) ......................................................34

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001) .................................................................36

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010) ...................................................................36

*White Motor Co. v. United States*,
   372 U.S. 253 (1963) .............................................................................31

*Williamson Oil Co. v. Philip Morris USA*,
   346 F.3d 1287 (11th Cir. 2003).............................................................39

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
   951 F.2d 1158 (9th Cir. 1991)................................................. 26, 27, 28

STATUTES

15 U.S.C. § 1..........................................................................................12

*All quotations and internal citations are omitted unless otherwise indicated.

**TABLE OF ABBREVIATIONS**

| **Full Name** | **Abbreviation** |
|---|---|
| AFMS LLC | **AFMS** |
| United Parcel Service Co. | **UPS** |
| FedEx Corporation | **FedEx** |
| Third-Party Negotiator | **3PN** |
| Declaration of Sean P. Gates in Support of UPS's Motion for Summary Judgment | **Gates Decl.** |
| Declaration of Kathleen Gutmann in Support of UPS's Motion for Summary Judgment | **Gutmann Decl.** |
| Declaration of Donald Faby in Support of UPS's Motion for Summary Judgment | **Faby Decl.** |
| Declaration of Robert Harris in Support of UPS's Motion for Summary Judgment | **Harris Decl.** |
| Declaration of Darrell Williams in Support of UPS's Motion for Summary Judgment | **Williams Decl.** |
| Declaration of Joseph Kalt in Support of UPS's Motion for Summary Judgment | **Kalt Decl.** |
| Declaration of Clifford Kupperberg in Support of UPS's Motion for Summary Judgment | **Kupperberg Decl.** |
| Statement of Undisputed Facts | **UF** |

# INTRODUCTION

AFMS has careened from one theory to another in this case but has come up empty-handed.  AFMS cannot support its claims that UPS violated the Sherman Antitrust Act by allegedly refusing (either alone or in agreement with FedEx) to deal with AFMS and other "third-party negotiators" (3PNs) that represent shippers in negotiating package delivery contracts with UPS.

AFMS filed this action under the theory that UPS and AFMS both participate in a relevant market for time-sensitive package delivery.  Judge Morrow rejected that theory, holding that while package delivery companies like UPS participate in that purported market, AFMS does not.  Applying black-letter law that strictly limits antitrust standing to plaintiffs who participate in the same relevant market (the market in which the alleged harm occurred) as the defendant, Judge Morrow ruled that AFMS did not have standing to bring its antitrust claims based on its alleged package delivery market.  (ECF 55 at 19-20.)

Searching for a way to gain standing, AFMS abandoned its original theory and filed an amended complaint alleging that UPS competes with AFMS in a newly minted relevant market for "shipping consultation services."  This new market allegation ultimately leads to the defeat of AFMS's complaint for two reasons.

***First, AFMS still lacks standing to bring its claims***.  The problem this time is that while AFMS may participate in the alleged relevant market, the uncontroverted evidence shows that UPS does not.  UPS is a package delivery company; it competes with other carriers such as FedEx.  AFMS is a consultant to UPS's customers that helps those customers negotiate lower-priced contracts with UPS and other carriers; AFMS competes with other 3PNs that do the same.  The *Yellow Pages* case on which AFMS heavily relied to get past the pleading stage thus has no application here; the evidence in that case showed that the plaintiffs and the defendant offered "essentially identical" consulting services in competition with one another.  The fundamental differences in the services that UPS and AFMS

1

provide, and the markets in which each competes, preclude AFMS from proving that it participates in the same relevant market as UPS.  The same well-established antitrust standing principles that led to the dismissal of AFMS's prior claims mandate summary judgment against AFMS's amended claims.

*Second, AFMS cannot show harm to competition in its alleged "shipping consultation services market."*  In addition to proving that it has standing, AFMS must prove that UPS *harmed competition* in a *legally cognizable relevant market*. Trying to shoehorn both itself and UPS into the same market to manufacture antitrust standing, AFMS broadly defined its alleged market to include *any* firm that provides *any* sort of advice related to time-sensitive shipments.  This so-called market is not legally cognizable.  Bedrock antitrust principles require a relevant market to contain *only* those services that are close economic substitutes for each other.  *These principles limit the relevant market in this case to the services allegedly restrained—price negotiation services.*  Moreover, AFMS improperly excludes the primary source of supply—shippers' own employees who provide negotiation services for their employers.  AFMS's "shipping consultation services" market thus fails as a matter of law because it is both over- and under-inclusive.

Even if its market were cognizable, AFMS could not prove harm to competition in that market.  AFMS must show a *market-wide* impact.  The challenged conduct, however, could only affect one of many services in AFMS's broadly defined market—the contract-negotiation services that AFMS provides— precluding any finding of market-wide effects.  And, even if its alleged market were narrowly construed, AFMS could show at most that a few 3PNs may have lost business.  As Judge Morrow recognized, harm to a competitor, or even to a group of competitors, is not sufficient to show harm to competition.  (ECF 74 at 36.)

*In addition to its flawed market theories, AFMS's conspiracy claim also fails because there was no conspiracy.*  To prove conspiracy, AFMS relies on evidence that is as consistent with independent conduct as with conspiracy.  The

1    Supreme Court, however, requires antitrust conspiracy plaintiffs to proffer

2    "evidence that *tends to exclude the possibility*" that the defendants' conduct was the

3    result of independent action.  Evidence equally consistent with independent conduct

4    does not suffice.  Here, UPS had independent business reasons to limit its

5    interactions with 3PNs: they interfere with UPS's core business strategy by

6    inserting themselves between UPS and the customer, preventing UPS from

7    providing its customers with the best possible customized services.  UPS's actions

8    were thus fully consistent with independent conduct, and AFMS's conspiracy claim

9    therefore fails.  As set forth in FedEx's motion for summary judgment, AFMS also

10   ignores a plethora of evidence that flatly contradicts AFMS's conspiracy theory.

11            Accordingly, the Court should grant summary judgment against AFMS.

12                              **STATEMENT OF FACTS**

13            UPS is a package delivery company and a provider of specialized

14   transportation and logistics services for shippers.  (Gutmann Decl. ¶ 10.)

15            FedEx is, of course, one of UPS's competitors.  FedEx offers parcel delivery

16   services as well as other transportation-related services to shippers.

17            AFMS "advises and represents shippers in negotiating competitive small

18   parcel and freight contracts."  (TAC ¶ 3; UF 1.)

19       **A.    AFMS's Services**

20            To provide its service of advising and representing shippers in negotiating

21   contracts with package delivery companies, AFMS █████████████████████

22   ████████████████████████████████████████████████████████

23   ███████████████████  (UF 2.)  ████████████████████████████████.

24   (UF 3.)  ██████████████████████████████████████████

25   ██████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   ██████████████████████████████████████

28   ███████████████████████████████████████████

                                         3



1  (UF 4-7.)  AFMS also █████████████████████████████████████

2  ████████████████████████████████████████  (UF 8.)

3        AFMS and its officers describe this contract negotiation service as

4  ████████████████████████████████████████████████████

5  ████[1]  As AFMS's expert Robert Wunderlich explains, "███████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████████

8  ██████████████████████[2]

9        In exchange for providing this service, AFMS receives a percentage

10  █████████████  of the package delivery rate savings it negotiates for its customers,

11  ████████████████.[3]  (UF 9.)  This compensation arrangement is known

12  as a "gainshare."[4]  AFMS's price negotiation service is ███████████████

13  █████████████.[5]  (UF 10.)  According to AFMS's founder and CEO, ██████

14  ████████████████████████████████[6]

15    **B.    UPS's Business Strategy and Its Experience with 3PNs**

16        **1.    UPS's Business Strategy Is to Provide Specialized Supply Chain Services in Conjunction with Its Delivery Services**

17        UPS is a package delivery company.  (UF 13.)  It delivers on average more

18  than 16 million packages each business day worldwide, using a fleet of 562 aircraft

19

20        [1] *Sole focus*:  Gates Decl. ¶ 3, Ex. 2 (Dep. Ex. 462 at 829); ¶ 32, Ex. 31
21  (Corrado Dep. at 134:21-135:6).  *Core competency*:  *Id.* ¶ 4, Ex. 3 (Dep. Ex. 197 at 365).  *Unique strength*:  *Id.* ¶ 5, Ex. 4 (Dep. Ex. 13 at 860).

22        [2] Gates Decl. ¶ 33, Ex. 32 (Wunderlich Report at 5); *see also id.* ¶ 18, Ex. 17
23  (Osborne Dep. at 76:18-24); ¶ 34, Ex. 33 (Dep. Ex. 308 at 066) █████████████

24        [3] Gates Decl. ¶ 2, Ex. 1 (Erickson 30(b)(6) Dep. at 113:20-21) ████████
     ████████████████████

25        [4] Gates Decl. ¶ 35, Ex. 34 (Kohl Dep. at 29:8-14).
26        [5] To a far lesser extent, AFMS provides ████████████████████████
27  (UF 11-12.)

28        [6] Gates Decl. ¶ 2, Ex. 1 (Erickson 30(b)(6) Dep. at 17:22-18:1).

4

and nearly 100,000 package cars, vans, tractors, and motorcycles.  (Gutmann Decl. ¶ 9.)  Reflecting the increasing globalization of the world economy, UPS picks up and delivers packages and freight at all stages of its shippers' "supply chains"— transporting raw materials, parts, and finished goods that are sourced in distant countries, distributed to warehouses and retail locations all over the world, and delivered directly to consumers at their businesses and homes.  (*Id*. ¶ 11.)

To better market its package delivery services, UPS implemented a business strategy of working with shippers to provide, in conjunction with those services, specialized transportation and supply chain services (also known as "value-added" services) designed to help shippers reduce their overall supply chain costs and increase their profitability.  (UF 14.)  UPS has therefore invested billions of dollars to develop an array of both off-the-shelf and customized supply chain services that help shippers reduce costs in areas other than small-package delivery.  (UF 15.)  These so-called "soft dollar" savings are in such areas as the shipper's inventory, personnel, facilities, and finance costs.  (Gutmann Decl. ¶ 17.)  For example, ███ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (*Id*. ¶ 17, Ex. 3 at 725.)  UPS's specialized supply chain services also help shippers increase their revenues.  (*Id*. ¶ 15.)  For ████████████, UPS implemented flexible pickup times, ██████████████ █████████████████████████████████████████████████████ . (*Id*. ¶ 17, Ex. 3 at 724.) ███████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████



1   ███████████████████████████.[7]  (UF 16.)  ████████████

2   ██████████████████████████████████████████

3   ████████████████████████  (Gutmann Decl. ¶¶ 15,

4   29.)  Successfully providing these specialized supply chain services requires UPS to

5   work directly with a shipper to understand the shipper's supply chain, identify

6   potential improvements, and develop customized solutions.  (UF 17.)

7   ██████████████████████████████

8   ███████████████████████████████████

9   ████████████████████████████████████  ▬

10  █████████████████████████████████████

11  █████████████████.[9]  Because the specialized services provided by

12  UPS result in cost savings or additional revenue for shippers, this business strategy

13  thus has benefited both UPS and its customers.

        **2.    UPS Does Not Provide Price Negotiation Services**

15      Unlike AFMS, UPS does not provide small-package price negotiation

16  services for shippers.  (UF 18.)  UPS does not gather and analyze shippers' data to

17  ███████████████████████████████████

18  ████████████████████████████.  (UF 19.)  UPS does not ████

19  ███████████  for shippers.  (UF 20.)  It does not help shippers █████

20  ███████████████████████  (UF 21.)  UPS does not

21  help shippers ██████████████████████████

22  ███████████████.  (UF 22.)  Nor does it help shippers ██████

23

24

        ─────────────────────────

25      [7] When UPS and a shipper agree to the services that UPS will provide and
        the transportation rates the shipper will pay, those terms are memorialized in

26      written contracts, ████████████████  (Gutmann Decl. ¶ 34.)

27      [8] Gutmann Decl. ¶ 16, Ex. 2 at 988.

        [9] *Id.*

28

1   ███████████████████████████████████████████████

2   ████████████████████████.  (UF 23-24.)

3           Also unlike AFMS, ██████████████████████████████

4   ████████████████████████████████████████████████

5   ███████████████████████████████████████████████

6   ██████████████████████████████████████████████

7   ████████████████████████████  (Gutmann Decl. ¶¶ 12-17; *see id.* ¶

8   16, Ex. 2 at 988; ¶ 17, Ex. 3 at 723.)  An AFMS managing director explained this

9   difference to a potential client:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

_____

25         [10] *See, e.g.,* Gates Decl. ¶ 30, Ex. 29 (Romo Dep. at 158:13-17, 160:17-20)

26   ████████████████████████████████████████████████

27

28         [11] Gates Decl. ¶ 56, Ex. 55 (Dep. Ex. 146 at 859).

### 3.  The Inherent Conflict Between 3PNs' and UPS's Business Strategies

Since at least the early 2000s, UPS has been keenly aware that █████████ ████████████████████████████████████████████████████ █████████████████████████ (UF 25.)  3PNs' focus on reducing package delivery rates, driven by the fact that 3PNs are compensated by a "gainshare" percentage of the savings shippers receive from the new negotiated rates, causes 3PNs to ignore or downplay other forms of supply chain cost savings. (UF 26.)  Not surprisingly, UPS's experience has been that █████████████ ████████████████████████████████████████████████████ █████████████████████ (Gutmann Decl. ¶ 22, Ex. 5 at 858.)  This self-interested focus on package delivery rate reduction led some 3PNs to try to prevent UPS from working directly with UPS's own customers to identify specialized supply chain services and related cost savings.  (UF 27.)

For these reasons, a March 2002 UPS internal sales update advised the UPS sales force ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (Gutmann Decl. ¶ 21, Ex. 4 at 435.)  The update recognized that the ███████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████[12]  (*Id.*)

UPS had a related concern that 3PNs improperly use UPS's confidential pricing information.  ████████████████████████████████████████ ██████████████████████████████████████████

---

[12] For this same reason, ████████████████████████████████████ ████████████████████████████████████ (Gutmann Decl. ¶ 23, Ex. 6 at 216.)

1      ████████████████████. (UF 28.) ██████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████ (UF 29.)  Because each shipper's shipping needs and the associated

5 costs of providing UPS services are unique, UPS was concerned that benchmarking

6 puts misleading information into the market that undermines UPS's ability to sell

7 the value of its services.  (UF 30-31.)

8        **4.**     **UPS Strengthened Its 3PN Procedures After Seeing
9               Increased 3PN Activity During the 2008-2009 Recession**

10     As the worldwide economy imploded in 2008 and 2009, ███████████

11 ████████████████████████████████████████ (UF 32.)  In this same

12 time frame, a number of employees left UPS (and other carriers) to join 3PNs.

13 (UF 33.) █████████████████████████████████████████████

14 ████████████████████████████████████████████. (Gutmann

15 Decl. ¶ 28.) ████████████████████████████████████

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ██████████████████████████. (UF 34-35.)

19     As a result, UPS's concerns about 3PNs and their interference with UPS's

20 business strategy increased.  (UF 36.) ██████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████ (Gutmann Decl. ¶ 29.)

23     In response to the increased 3PN activity, the new UPS President of Strategic

24 Account Sales, Kate Gutmann, ██████████████████████████████

25 ████████████████████████████████████████████

26 (UF 37.) ██████████████████████████████████

27 ████████████████████████████████████████████

28 (UF 38.) ████████████████████████████████



1    ██████████████████████████████████████████.  (Gutmann

2    Decl. ¶ 40.)  This process included consideration of a variety of approaches,

3    attempted analyses of the financial impact of 3PNs, ████████████████████

4    ██████████████████████████████████████████████████████████

5    ████████████████████████████████████████████

6    ██████████████████████████████████████████████████

7    ██████████████████████████████████  (UF 39-43.)  UPS adopted

8    and disseminated its updated procedures with regard to 3PNs in April 2010 based

9    solely on its own business reasons and without any coordination whatsoever with

10   FedEx.  (UF 44-45.)

        a.   **UPS Continued to Deliberate Long After the October
             2009 Industry Event**

12          While a group within UPS continued to strategize regarding 3PNs, a UPS

13   employee not part of the decision-making process participated on a panel at an

14   industry event in October 2009 (an event on which AFMS relies heavily).  During

15   the panel, an audience member asked the FedEx participant about FedEx's dealings

16   with 3PNs.  The same question was then put to the UPS participant.  Exactly what

17   each said remains unclear.  ████████████████████████████████████

18   ██████████████████████████████████████████████████████

19   ██████████████████████████████████████████████████

20   ██████████████████████████████████████████████████

21   ████████████████████████████[13]██
                                                    .

─────────────────────────

23      [13] *Compare* Gates Decl. ¶ 79, Ex. 78 (Burt Dep. at 88:1-19)███████

24   ██████████████████████████████████ *with id.* ¶ 13, Ex. 12

25   (Manis-Anderson Dep. at 102:22-103:13)██████████████████████████

         *with id.* ¶ 25 Ex. 24 (Stanton Dep. at 38:23-39:5)

26   ██████████████████████████████████████████████████████

27   ██████████████████████████████████████████████████████



(UF 47.)

(UF 48-49.)

(*Id.* ¶ 62, Ex. 61 (Merrill Dep. at 17:12-21; 19:6-20:10); ¶ 81, Ex. 80 (Dep. Ex. 292 at 958).)

[14] Gates Decl. ¶ 82, Ex. 81 (Dep. Ex. 2043 at 869-70).

[15] *Id.* at 870.

[16] AFMS makes much of the fact that FedEx also has a memorandum dated April 23, 2010.

(Gates Decl. ¶ 83, Ex. 82 (Dep. Ex. 2092 at 060); ¶ 84, Ex. 83 (Dep. Ex. 2093 at 114).)

(*Id.* ¶ 85, Ex. 84 (Dep. Ex. 2171 at 122).)

1 ████████████████████████████████████████████████████

2 ████████████████ (Gutmann Decl. ¶ 36, Ex. 14 at 922.)

3               **b.**     **UPS Developed a Number of Options to Deal with 3PNs, but It Has Not Refused to Deal with Any Shipper Merely Because of 3PN Involvement**

4

5       The Strategy Room developed various options to minimize 3PN interference

6 with UPS's business strategy, ████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 (UF 50-55.) ████████████████████████████████████████

14 ████████████████████████████████████████████████

15 (UF 56.)

16     ████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████ (UF 57.)  UPS has not refused to deal with a

19 shipper as a result of the shipper's decision to use a 3PN.  (Faby Decl. ¶ 32.)

20                     **AFMS'S CLAIMS**

21       The Third Amended Complaint ("TAC") asserts three claims, all alleging

22 violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Count One alleges UPS

23 and FedEx unlawfully conspired to "unreasonably restrain trade and commerce in

24 the market for shipping consultation services for the delivery of time sensitive

25

26 ████████████████████████████████████████ (*Id.* ¶ 86, Ex. 85 (Exhibit 2034 at 689); ¶ 87, Ex. 86 (Mellon Dep. at 71:16-72:1, 73:9-11)

27 ████████████████████████████████████████████████████

28

1   letters, documents and packages by air or ground" by refusing to deal with third-

2   party consultants and refusing to negotiate discounts with shippers who share data

3   with or retain third-party consultants.  (ECF 76 ¶ 24.)  Counts Two and Three,

4   against UPS and FedEx respectively, allege that each defendant, acting alone, used

5   "non-disclosure agreements and customer/carrier contracts" to prevent shippers

6   from using 3PNs, allegedly restraining trade in the shipping consultation market.

7   (*Id*. ¶¶ 30, 36.)  The alleged purpose and effect of this conduct was to raise the rates

8   UPS and FedEx charged to shippers.  (*Id.* ¶¶ 13-15, 24, 26, 27(d), 33(d).)

9        According to AFMS, the purported "shipping consultation services" market

10   is composed of businesses that "advise shippers regarding the delivery of time

11   sensitive . . . packages."  (*Id*. ¶ 6.)  AFMS asserts that "[c]onsultants, like plaintiff

12   AFMS, typically help shippers negotiate or otherwise obtain maximum savings for

13   their shipping needs."  (*Id.* ¶ 12.)  The TAC cites survey data that allegedly show

14   that 11% of shippers "used a third party consultant to negotiate their rates" rather

15   than "negotiating directly with UPS or FedEx."  (*Id.* ¶ 13.)

16        AFMS's First Amended Complaint ("FAC") had alleged a completely

17   different market—the market for delivery of "time sensitive letters, documents and

18   packages."  (FAC ¶¶ 16, 18.)  The Court granted UPS's motion to dismiss, holding

19   that AFMS had not alleged facts necessary for antitrust standing, explaining:  "The

20   competitive harm AFMS identifies—the lessening of competition and the raising of

21   prices in the market for time-sensitive package shipping and delivery—occurs in a

22   market in which AFMS does not participate."  (ECF 55 at 19-20.)

23        AFMS then filed a Second Amended Complaint ("SAC") with a new alleged

24   relevant market (identical in the TAC)—the market for shipping consultation

25   services.  UPS again moved to dismiss for lack of antitrust standing, this time

26   arguing that UPS does not participate in the market alleged in the SAC, because

27   UPS does not do what AFMS does, i.e., negotiate lower rates on behalf of shippers.

28   The Court ruled, however, that AFMS's standing allegations could survive the

1   pleading stage, "where the complaint is the only document before the court and

2   where all inferences must be drawn in plaintiff's favor." (ECF 74 at 23.)  But the

3   Court was clear that factual development could defeat AFMS's standing, noting

4   that "the undisputed evidence may show . . . that the parties' services are

5   sufficiently distinct that defendants do not compete in the same market as AFMS."

6   (*Id.*)

7   **GOVERNING STANDARDS**

8   Summary judgment must be granted where there is not "sufficient evidence

9   favoring the nonmoving party for a jury to return a verdict for that party."

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  To survive a motion for

11   summary judgment, therefore, AFMS must produce sufficient evidence to establish

12   the existence of every essential element of its case.  *See Celotex Corp. v. Catrett*,

13   477 U.S. 317, 322 (1986).  Thus, where UPS points to AFMS's inability to prove

14   an essential element of a claim, the burden is on AFMS to produce sufficient

15   evidence demonstrating that it in fact can do so.  *See Nissan Fire & Marine Ins.*

16   *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

17   **ARGUMENT**

18   **I.   AFMS LACKS STANDING TO BRING ITS ANTITRUST CLAIMS**

19   Even assuming an antitrust claim could be proven on the facts here (which it

20   could not), the Supreme Court has made clear that the first inquiry in any antitrust

21   case is whether the plaintiffs are the proper parties to assert any such claim.

22   *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters (AGC)*,

23   459 U.S. 519, 535 & n.31 (1983).  "Antitrust standing" is distinct from Article III

24   standing; harm "sufficient to satisfy the constitutional standing requirement" is not

25   enough to show that "the plaintiff is a proper party to bring a private antitrust

26   action." *Id.* at 535 n.31.  "Congress did not intend to allow every person

27   tangentially affected by an antitrust violation to maintain an action." *Id.* at 535.  To

28   the contrary, "[t]he Supreme Court has interpreted [the relevant statute] narrowly,

thereby constraining the class of parties that have statutory standing to recover damages through antitrust suits." *Del. Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1119-20 (9th Cir. 2008).

Thus, when an antitrust violation is alleged, antitrust standing is "a conscientious method to find the proper private plaintiff to enforce the antitrust laws." *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013). Not everyone harmed by an alleged violation may fill the role of a "private attorney general" enforcing the antitrust laws. *AGC*, 459 U.S. at 542. Only a plaintiff that is an "efficient enforcer" of the antitrust laws has standing. *Del. Valley Surgical Supply*, 523 F.3d at 1123; *see also Sunbeam*, 711 F.3d at 1271.

The Ninth Circuit looks to five factors to determine whether a plaintiff has the requisite antitrust standing to pursue antitrust claims: (1) whether plaintiff has suffered "antitrust injury," i.e., whether its alleged injury is the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996). The first factor—antitrust injury—has "tremendous significance." *Bhan v. NME Hospitals, Inc*., 772 F.2d 1467, 1470 n.3 (9th Cir. 1985). "A showing of antitrust injury is necessary . . . to establish standing" under the antitrust laws. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *see also Legal Econ. Evaluations v. Metro. Life Ins. Co.*, 39 F.3d 951, 954-56 (9th Cir. 1994) (affirming summary judgment based solely on lack of antitrust injury).

*Evaluation of these factors shows that AFMS lacks antitrust standing. AFMS cannot show antitrust injury. Its supposed injury is indirect. Its asserted damages are speculative. And determining damages would be unduly complex.*

### A.    AFMS Cannot Establish Antitrust Injury

Antitrust injury is harm that flows from the "competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis added).  "The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." *Bhan*, 772 F.2d at 1470.  Thus, "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 705 (9th Cir. 2001).  Even if a plaintiff was "injured as a result of activity that also violated the antitrust laws," that plaintiff does not have standing if it "was not a participant in the restrained market." *Exhibitors' Serv., Inc. v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 578-79 (9th Cir. 1986).  The "crux of the matter" for standing purposes, therefore, is whether the plaintiff and defendant "are participants in a single . . . market or whether they each participate in their own markets." *Bhan*, 772 F.2d at 1470; *see also Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540-41 (9th Cir. 1987) (no standing for plaintiffs who did not participate in same market as defendant).

### 1.    UPS and AFMS Do Not Participate in the Same Relevant Market

From the outset of this case, the requirement that AFMS and UPS participate in the same relevant market has created an insurmountable barrier for AFMS.  UPS participates in a market for transportation services, while AFMS participates in a market for contract price negotiation services.  Recognizing that UPS is a package delivery company, AFMS initially attempted to allege a restraint of trade in a market for time-sensitive package shipping and delivery.  Yet, while UPS clearly participates in *that* alleged market, AFMS just as clearly does not.  The Court accordingly dismissed the FAC because AFMS "cannot have suffered antitrust injury" in a market in which it does not participate.  (ECF 55 at 18.)  Having failed

to state a claim for restraint of trade in the market in which UPS participates, AFMS reversed course and now contends that UPS competes with AFMS in a purported "market for shipping consultation services."[17]

The problem this time is that the uncontroverted evidence establishes that UPS does *not* compete against AFMS in that alleged market or, indeed, in any *relevant* market.  To demonstrate antitrust injury, AFMS must prove (1) that AFMS and UPS *provide services that compete* (i.e., that the services are "reasonabl[y] interchangeab[le]" and that there is "cross-elasticity of demand" between them) and (2) *that those competing services are in the relevant market in which the alleged harm occurred.*  *Bhan*, 772 F.2d at 1470-71.  In other words, AFMS must first show that shippers consider UPS services a reasonable substitute for those of AFMS.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 445 (3d Cir. 1997) ("purpose of analyzing interchangeability is to find competing products which are reasonable substitutes").  And AFMS must show that those competing services are included in the relevant market in which the alleged UPS refusal to deal caused injury.  *Exhibitors' Serv.*, 788 F.2d at 578-79.

AFMS cannot prove these two requirements.  While AFMS "represents shippers in negotiating competitive small parcel and freight contracts" and "help[s] shippers negotiate or otherwise obtain maximum savings for their shipping needs" (TAC ¶¶ 3,12), UPS does not.  UPS and AFMS do not provide services that are reasonably interchangeable and have the requisite cross-elasticity of demand.  And, even assuming that the two companies did provide competing services, they do not provide such services in the only possible *relevant* market, i.e., the market for contract price negotiation services.

---

[17] *See* Gates Decl. ¶ 88, Ex. 87 (AFMS Response to FedEx Interrogatory Nos. 14 & 15); TAC ¶¶ 3, 6, 11.

### a.   UPS's and AFMS's Services Are Not Reasonably Interchangeable

Reasonable interchangeability means "that one product is roughly equivalent to another for the use to which it is put." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 513 (3d Cir. 1998). AFMS's core service is assisting shippers in negotiating carrier contracts. (UF 1.) ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (UF 2-7.) ██████████

████████████████████████████████████████████

██████████████████████████ (UF 8.)

*UPS does not provide services that are reasonably interchangeable with AFMS's negotiation services.* (UF 58.) UPS sits on the other side of the negotiation table, seeking to sell its shipping and specialized supply chain services to shippers.

*Shippers* ████████ Every shipper deposed in this case testified that it ████████████████████████████████████████████████████████████████████████████████████████████████[18].

*AFMS managing directors and employees* ████████████████████████ ████████████████████████████████[19]. They also



------

[18] *See* Gates Decl. ¶ 46, Ex. 45 (Hersh Dep. at 53:14-55:25) ████████████████████ ██████████████ ¶ 50, Ex. 49 (Sell Dep. 39:9-40:11) ██████████████████ ████████████████████████████████); ¶ 42, Ex. 41 (Castillo Dep. at 49:24-54:24); ¶ 45, Ex. 44 (Dion Dep. at 32:15-35:6); ¶ 48, Ex. 47 (Goodwin Dep. at 33:3-34:7); ¶ 129, Ex. 128 (Khan Dep. at 51:9-17); ¶ 89, Ex. 88 (Seid Dep. at 37:13-15); ¶ 44, Ex. 43 (Carter Decl. ¶¶ 5, 7); ¶ 49, Ex. 48 (Breitenbach Dep. at 30:2-32:4); ¶ 47, Ex. 46 (Hreshko Dep. at 48:11-51:15).

1 ███████████████████████████████████████████████████

2 ██████████████████████████████████████████████████[20].

3 *Other 3PNs concur.* ████████████████████████████████

4 ███████████████████████████████████████████████████

5 ████████████████████████████████████[21]

6      *Economic analysis is in accord.*  Uncontroverted economic analysis confirms

7 that UPS's and AFMS's services are not reasonably interchangeable.  (Harris Decl.

8 ¶¶ 4, 24-26; Williams Decl. ¶ 3, 20.)  Based on a thorough examination of

9 AFMS's services and the economic evidence, Dr. Robert Harris concludes that,

10 from "a shipping customer's point of view," UPS does not "offer services that are

11 reasonably interchangeable with the services offered by AFMS" and that UPS does

12 not compete "with AFMS in the alleged market for shipping consultation services."

13 (Harris Decl. ¶ 1, Ex. 1 (Harris Expert Report ¶ 13(a),(c)).)  AFMS has offered no

14 economic analysis in rebuttal.

15      In short, unlike AFMS, UPS does not "represent[] shippers in negotiating

16 competitive small parcel and freight contracts" or "act[] as an agent for shippers

17 during contract negotiations with carriers."  (TAC ¶ 3.)  UPS cannot "help shippers

---

[19] *See, e.g.*, Gates Decl. ¶ 19, Ex. 18 (Collins Dep. at 165:2-166:2)████████████████████████████████████ ¶ 26, Ex. 25 (Sokol Dep. at 15:18-16:9)

[20] *See, e.g.*, Gates Decl. ¶ 31, Ex. 30 (Hastings Dep. at 94:20-25); ¶ 10, Ex. 9 (Priest Dep. at 67:8-71:14); ¶ 26, Ex. 25 (Sokol Dep. at 66:22-67:11); ¶ 19, Ex. 18 (Collins Dep. at 157:22-158:9); ¶ 18, Ex. 17 (Osborne Dep. at 156:14-16); ¶ 24, Ex. 23 (Vanning Dep. at 126:7-16).  On rare occasions, UPS will help a customer with a regional carrier if UPS cannot profitably provide a specific service.  *Id.* ¶ 26, Ex. 25 (Sokol Dep. at 16:10-18:1).

[21] *See, e.g.*, Gates Decl. ¶ 31, Ex. 30 (Felts Dep. at 77:8-13) (UPS and FedEx not competitors of DMG); ¶ 51, Ex. 50 (Jacobs Dep. at 16:13-23) ████████████████ ¶ 53, Ex. 52 (Martinez Dep. at 95:21-96:23, ██████████████; *see also id.* ¶ 131, Ex. 130 (Dep. Ex. 1175); ¶ 74, Ex. 73 (Kuppersmith Decl. at ¶ 7); ¶ 75, Ex. 74 (Fagin Decl. at ¶ 7); ¶ 41, Ex. 40 (Sigworth Dep. at 120:14-16) █████████████; *id.* ¶ 43, Ex. 42 (Stitz Dep. at 29:15-16); ¶ 51, Ex. 50 (Jacobs Dep. at 16:10-12); ¶ 53, Ex. 52 (Martinez Dep. at 40:6-14).

1   negotiate" with itself, nor does it help shippers negotiate with other carriers to

2   obtain package delivery services that UPS itself provides.

### b.   There Is No Cross-Elasticity of Demand Between UPS's Services and AFMS's Services

5   The uncontroverted evidence shows that there is no cross-elasticity of

6   demand between UPS's and AFMS's services.  (UF 59.)  Cross-elasticity of

7   demand measures the change in quantity of consumers' purchases of one service in

8   response to a change in the price of another.  *Theme Promotions, Inc. v. News Am.*

9   *Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).  Here, shippers uniformly testified

10  they ███████████████████████████████████████████████████

11  ████████████████████████.[22]  This demonstrates that UPS does not provide

12  services in competition with AFMS.  *Id.*

### 2.   AFMS Has No Evidence that It Competes with UPS in a Relevant Market

15  Despite the lack of reasonable interchangeability between its services and

16  UPS's services, AFMS contends that UPS and AFMS participate in the same

17  market based on (1) UPS documents urging UPS salespeople to treat 3PNs as

18  "competitors" and to convince customers to deal with UPS directly and (2) the

19  contention that both companies analyze shipper data to find potential cost savings.

20  Neither satisfies the necessary criteria for standing:  that UPS offers services

21  reasonably interchangeable with those of AFMS, that there is cross-elasticity of

22  demand, that shippers view UPS services as a close substitute for those of AFMS,

23  and that these competing services are in a *relevant* market, i.e., the market in which

24  injury allegedly occurred.

25

26  [22] ████████████████████████████████████████████████████

27  ███████████████████████████████████████(Gates Decl. ¶ 50, Ex. 49 (Sell Dep. at 41:21-42:7); ¶ 48, Ex. 47 (Goodwin Dep. at 40:4-12); ¶ 89, Ex. 88 (Seid Dep. at 34:21-35:25).)

28

### a. UPS Documents Concerning Its Efforts to Deal Directly with Shippers Are Not Evidence that UPS's and AFMS's Services Are Reasonably Interchangeable

Reasonable interchangeability and cross-elasticity of demand must be assessed from the *consumer's point of view*. *M.A.P. Oil Co., Inc. v. Texaco Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982). AFMS cites no evidence of shippers' views, but rather points to UPS documents advising sales representatives to "consider [3PNs] as a direct competitor and treat them as such" (TAC Ex. 1), and to tell customers that UPS "is best positioned to directly address the customer's issues." (TAC ¶ 17.) These documents are not evidence that UPS's services are reasonably interchangeable with AFMS's services; the documents do not show that *shippers* consider UPS's services to be a substitute for AFMS's services. *See also Nobel Scientific Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1318-19 (D. Md. 1986) (business documents referring to products in a certain market did not raise triable issue), *aff'd*, 831 F.2d 537 (4th Cir. 1987). The undisputed evidence is to the contrary. (*See* UF 58-59.)

### b. That AFMS and UPS Both Analyze Shipper Data to Give Advice About Potential Cost Savings Does Not Show that They Compete in a Relevant Market

AFMS also asserts that UPS and AFMS compete based on the contention that each gathers and analyzes data to help shippers "develop a strategy and advise a shipper on how to save money and match that shipper's specific needs to a carrier's delivery services."[23] But AFMS cannot show that AFMS's and UPS's cost savings advice are interchangeable. And even if aspects of these analyses were similar, this would not show that UPS and AFMS compete in a *relevant* market.

---

[23] Gates Decl. ¶ 99, Ex. 87 (Response to FedEx Interrog. 16).

### (i)   The Alleged Advice Is Not Interchangeable

AFMS's contention that UPS and AFMS both gather and analyze data to develop a cost reduction strategy does not show that the companies compete. AFMS and UPS gather different data for different purposes.  AFMS gathers and analyzes a shipper's data, ████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████ (UF 2.)  Because it is compensated with a share of any savings from package delivery rate reductions, ████████████████████ ██████████████████████████████.[24]

In contrast, UPS gathers and analyzes shipper data to develop its bids for the shipper's business and customized supply chain services (which produce cost savings from sources other than rate discounts), which UPS offers in connection with its package delivery services.  (UF 60.)  The goal is to motivate shippers to purchase more of UPS's package delivery services.  (UF 60.)  Moreover, UPS generally does not have access to shipper data showing prices for UPS competitors. (UF 61.)  The multi-carrier data analyses provided by AFMS are not reasonably interchangeable with the UPS-specific data analyses provided by UPS.  (UF 62.) *See Equifax, Inc. v. Fed. Trade Comm'n*, 618 F.2d 63, 66-67 (9th Cir. 1980) ("credit reports" showing a "person's bill-paying habits" were not interchangeable with "mortgage reports," which were "extensive written narratives exploring a person's character and financial assets"); *United States v. Microsoft*, 253 F.3d 34, 52-54 (D.C. Cir. 2001) (middleware not interchangeable with operating system; it

---

[24] Gates Decl. ¶ 56, Ex. 55 (Dep. Ex. 146 at 859 )████████████████████ ██ ¶ 58, Ex. 57 (Dep. Ex. 336 at 785)████████████████████████████████ ████████████████ ¶ 67, Ex. 66 (Larson Dep. at 181:1 - 182:11)██████████ ████ *See also* Gutmann Decl. ¶¶ 19-23; *see id.* ¶ 21, Ex. 4 at 435; Kalt Decl. ¶ 9.

could not "take over all operating system functions"). *Simply put, disparate cost reduction strategies are not substitutes for one another.*

    **(ii)**  **The Alleged Advice Is Not in the Relevant Market that Was Allegedly Harmed**

  To the extent that AFMS and UPS may each sometimes offer advice on similar means for shippers to save money—such as helping shippers decide what modes of shipping best suit their purposes (mode optimization)—that does not make them competitors in the relevant market.  (Williams Decl. ¶ 16.)

  First, AFMS has no evidence that customers hire UPS instead of AFMS, or vice versa, to obtain the allegedly overlapping data analysis advice.  Shippers retain AFMS because they want price negotiation services.  They hire UPS because they want delivery and specialized supply chain services.  *No shipper testified that it viewed UPS advice about mode optimization or any other subject to be a substitute for advice given by AFMS.*  To the contrary, shippers uniformly testified ███████ ████████████████████████████████████████████████████.[25]  No AFMS document indicates any concern by AFMS about competition from UPS, period— whether based on data analysis, cost savings advice, or any other advice or service. Any overlap in such ancillary advice is insufficient to show that UPS and AFMS compete in the relevant market.  *See Reifert v. South Central Wisconsin MLS Corp.*, No. 04-C-969-S, 2005 WL 2055958, at *4 (W.D. Wis. Aug. 25, 2005) ("superficial overlap in the offerings of [realtor] associations" did not show they competed in the same market), *aff'd*, 450 F.3d 312 (7th Cir. 2006).

  Second, assuming for the sake of argument that UPS and AFMS did provide competing "data analysis and cost savings advice," that would not create antitrust standing for AFMS.  *This case is about price negotiation services*.  That is the service AFMS describes in its complaint as being restrained; AFMS alleges that

---

  [25] *See* evidence cited, note 18, *supra*.

23

1   UPS and FedEx instituted policies not to deal with third-party consultants providing

2   negotiation services.[26] ████████████████████████████████████

3   ████████.[27] ████████████████████████████████████████

4   ████████████████████████.[28] ████████████████████

5   ████████████████████████████.[29]

6        AFMS thus cannot prove (as it must for antitrust standing) that any

7   supposedly overlapping data analysis and cost savings advice is part of the *relevant*

8   *market—the market in which there is alleged competitive injury.*  For antitrust

9   purposes, the relevant market is "the field of competition: the group or groups of

10   sellers or producers who have actual or potential ability to deprive each other of

11   significant levels of business."  *Morgan, Strand, Wheeler & Biggs v. Radiology,*

12   *Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991).  It is therefore "made up of products [or

13   services] that consumers view as reasonable substitutes."  *Se. Mo. Hosp. v. C.R.*

14   *Bard, Inc.*, 642 F.3d 608, 617 (8th Cir. 2011); *see also Newcal Indus., Inc. v. Ikon*

15   *Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  Relevant market definition

16   thus starts with the allegedly restrained services (here, price negotiation services)

17   and then seeks to include in the market any close substitutes.  *Hynix Semiconductor*

18   *Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *3 (N.D. Cal.

19

20

---

21        [26] *See* TAC ¶ 3 (AFMS "represents shippers in negotiating small parcel and
22   freight contracts"); ¶ 12 ("Consultants, like plaintiff AFMS, typically help shippers
     negotiate or otherwise obtain the maximum savings for their shipping needs."); ¶ 13
23   (shippers who "used a third-party consultant to negotiate their rates" supposedly
     obtained better discounts); ¶ 24b (UPS allegedly refused "to negotiate with"
24   shippers using third-party consultants); Ex. 2 (UPS memorandum re "Procedures
     for Interacting with Third Party Negotiators and UPS Customers").

25        [27] *See* evidence cited, note 1, *supra.*

26        [28] Gates Decl. ¶ 2, Ex. 1 (Erickson 30(b)(6) Dep. at 17:22-18:1).

          [29] Faby Decl. ¶ 31; Gutmann Decl. ¶ 4, Ex. 1 at 808 ████████████████
27   ████████████████████████████████████████████████████████████
28   ████████████████████████████████████████████████████████████

1  Jan. 5, 2008); *see also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988
2  (C.D. Cal. 2012).

3        These governing antitrust principles limit the relevant market in this case to
4  price negotiation services.  (UF 63.)  Any supposedly overlapping data analysis or
5  advice, even those that might lead to cost savings, is not a close economic substitute
6  for price negotiation services and therefore must be *excluded* from the relevant
7  market.  (UF 64.)  As Dr. Darrell Williams explains, "Price negotiation services are
8  distinguished from other types of shipping consulting services in that the focus is
9  on negotiating reduced shipping rates ….  Although other types of logistics
10 consulting services may reduce shipping costs, such services are not demand
11 substitutes for price negotiation services and therefore are not in the same relevant
12 market."  (Williams Decl. ¶ 2, Ex. 1 (Williams Expert Report ¶ 51).)

13       AFMS therefore cannot create standing based on supposedly similar data
14 analysis and cost savings advice.  The Ninth Circuit has made clear that the fact that
15 two firms offer competing services *outside* of the market allegedly harmed is
16 *insufficient* to prove standing.  In *Exhibitors' Services, Inc. v. Am. Multi-Cinema,*
17 *Inc.*, 788 F.2d 574 (9th Cir. 1986), for instance, a licensing agent for independent
18 motion picture exhibitors alleged that two exhibitors and a subsidiary (a licensing
19 agent) of one of the exhibitors violated the antitrust laws by conspiring to eliminate
20 bidding wars for first-run film rights from film distributors.  *Id.* at 576.  Reversing a
21 jury finding in favor of the plaintiff, the Ninth Circuit held that (though injured by
22 the conspiracy) the plaintiff licensing agent did not have standing because it did not
23 participate in the market in which competitive injury occurred (the market for first-
24 run film exhibition).  *Id.* at 578-79.  The court rejected the plaintiff's contention that
25 it had standing because it competed with the exhibitor's subsidiary licensing agent.
26 "While it is true that the two firms compete, the requirement laid down in
27 *Associated General Contractors* is that the plaintiff and conspirators compete in the
28 'market in which trade was restrained.'"  *Id.* at 579.  The court further explained, "It

1    is plain that the restrained competition was that between film exhibitors, and the

2    direct and intended injury was to film distributors.  As a licensing agent, ESI was

3    not a participant in the restrained market."  *Id.*  There was no "overlap" in the

4    relevant market, and the plaintiff therefore lacked antitrust standing.  *Id.*

5              **3.    Given the Facts Here, the *Yellow Pages* Case Is Inapposite;
                       Rather, Ninth Circuit Law Requires Summary Judgment**

6

7              As the Court suggested might happen (ECF 74 at 23), the fully developed

8    record in this case demonstrates that the *Yellow Pages* case on which AFMS relied

9    to survive the motions to dismiss is inapposite here.  *See Yellow Pages Cost*

10   *Consultants, Inc. v. GTE Directories Corp.*, 951 F.2d 1158 (9th Cir. 1991).  In

11   *Yellow Pages*, the plaintiff consultants and the defendant provided "essentially

12   identical" services.  *Id.* at 1161.  The Ninth Circuit therefore concluded that the

13   companies competed with one another and the plaintiffs had standing.  *Id*. at 1164;

14   *see also Glen Holly Entm't Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003)

15   (plaintiff "'must be either a consumer of the alleged violator's goods or services or

16   a competitor of the alleged violator in the restrained market'") (quoting *Eagle*, 812

17   F.2d at 538).  The facts of that case are fundamentally different.

18             In *Yellow Pages*, defendant GTE sold advertising space in its yellow pages

19   directories.  The plaintiffs were "consulting firms that offer[ed] advice to

20   businesses on advertising effectively and efficiently in yellow pages directories."

21   951 F.2d at 1159.  GTE also offered "advertisers advice on the form and content of

22   their advertisements."  *Id.*  Based on the evidentiary record, the Ninth Circuit held

23   that the district court erred in concluding that the consultants did not compete with

24   GTE.  The evidence did "not show that Consultants offer *different* services from

25   GTE"; it showed they provided "services that are essentially identical."  *Id.* at 1161.

26   In fact, in *Yellow Pages*, the consultants could not offer advertisers different

27   advertising services than GTE.  The consultants did not negotiate rates on behalf of

28   advertisers.  *Id*. at 1159-60.  (*See also* Harris Decl. ¶ 40 & Ex. 1 (Harris Expert

26

Report ¶ 63 & n.117 (GTE's rates were non-negotiable)).)  Nor could the consultants compare and leverage one publisher's offerings or rates against another's; GTE was essentially the only available yellow pages publisher.  *Yellow Pages*, 951 F.2d at 1159-60.  As a result, the actual service the consultants in *Yellow Pages* provided—advice on ad design and placement—was *the same service that GTE provided*, even though the advice might have come with different biases. *Id.* at 1161-62.

That is *not* the case here.  The evidence in this case shows that AFMS and UPS do not offer services that are "essentially identical"; the two companies' services are fundamentally different and are not reasonably interchangeable.  (UF 58.)  Unlike the consultants in *Yellow Pages*, who dealt with a single publisher that did not negotiate rates, AFMS can negotiate with carriers about rates and can compare carriers' offerings, leveraging one against another.  Indeed, such rate negotiation is the essence of AFMS's business.  Thus, unlike the *Yellow Pages* consultants, AFMS offers a service that is not only different from UPS's services, it is a service that UPS does not, and cannot, provide.

That these cases are fundamentally different is confirmed by the testimony of Dr. Robert Harris, who served as the *plaintiffs'* economic expert in *Yellow Pages* (and on whose opinion the Ninth Circuit relied).  (Harris Decl. ¶¶ 33-34.)  As Dr. Harris explains, this case does not present "a situation where suppliers offer *differentiated* products, which customers might select between according to their preferences and needs (e.g., one with a 'seller's bias,' the other with a 'buyer's bias').  Rather, the services offered by UPS and FedEx, as compared to AFMS, are *dissimilar* and not *interchangeable*."  (*Id.* ¶ 1, Ex. 1 (Harris Expert Report ¶ 59).)  Unlike the consultants in *Yellow Pages* who would "advise on placement and design of advertising at whatever rates were set by the monopolist GTE, just as the sales staff of GTE did," the "essential aspects of AFMS's contract price negotiation service are ████████████████████████████████████████████

1 ████████████████████████████████████████████

2 ██████████   (Harris Decl. ¶ 40.)

3      This is not a service that UPS provides; UPS provides advice only about its

4 own services.  (*Id.*)  Moreover, unlike the consultants in *Yellow Pages*, AFMS

5 provides a service that UPS does not provide: price negotiation.  (*Id.* ¶ 5; *see also*

6 *id.* ¶ 1, Ex. 1 (Harris Expert Report ¶¶ 59, 63).)  These "critical differences"

7 distinguish *Yellow Pages* and preclude AFMS from proving antitrust injury.

8      AFMS is thus in the same position as the consultants in *Legal Economic*

9 *Evaluations v. Metropolitan Life Ins. Co.*, 39 F.3d 951 (9th Cir. 1994).  In that case,

10 consultants that advised tort plaintiffs on structured settlements alleged that life

11 insurance carriers and brokers conspired to boycott the consultants.  In a manner

12 similar to AFMS's complaint, the consultants alleged a relevant market for

13 consulting services, *id.* at 954, and contended that the boycott deprived "tort

14 plaintiffs of a stronger negotiating position," *id.* at 953.  While the consultants

15 competed in a market for consulting services, however, the alleged harm to tort

16 plaintiffs and decreased competition among liability insurance carriers "occur[ed]

17 in a market in which [the consultants did] not compete."  *Id.* at 955.  The Ninth

18 Circuit therefore affirmed summary judgment for the defendants on the ground that

19 the consultants failed to show antitrust injury.  *Id.* at 956.

20      **B.    AFMS's Asserted Injury Is Indirect**

21      AFMS's theory of harm in this case also weighs against standing.  AFMS

22 contends that the purpose and effect of the challenged conduct is "increased prices

23 for time sensitive deliveries"—i.e., the prices paid by shippers.  (TAC ¶¶ 24, 26;

24 *see also id.* ¶¶ 27(d), 33(d).)  Shippers are thus "an identifiable class of persons

25 whose self-interest would normally motivate them to vindicate the public interest in

26 antitrust enforcement," which weighs against allowing AFMS "to perform the

27 office of a private attorney general."  *AGC*, 459 U.S. at 542; *Eagle*, 812 F.2d at 542

28 (identifiable class of vessel owners diminished justification to allow crew members

to bring suit); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1379 (7th Cir. 1987) (despite "direct action" against supplier, injury from alleged boycott derivative of injury to supplier's customer).

### C.  AFMS's Asserted Harm Is Speculative

The evidence also shows that AFMS's alleged damages—lost profits—"may have been produced by independent factors," which weighs against standing. *Eagle*, 812 F.2d at 542.  Due to increased competition, the recession, and ████ ████████████████████████████████████████████████ ████████████████████████████████████ (UF 65.)  Even AFMS's damages expert acknowledged that ██████████████████████████ ████████████████████████████████████████ (Gates Decl. ¶ 33, Ex. 32 (Wunderlich Report at 9).)  In addition, AFMS made █ ██████████████████████████████████████████ ███████████████████████████████ (UF 66.)  The impact of these other factors on AFMS's profits is confirmed by the fact that several of AFMS's competitors testified ████████████████████████████ ████████████████████████████████████████████████ ██████████████ (UF 67-68.)  Each of these alternative, "independent factors" weighs against standing.  *Eagle*, 812 F.2d at 542.

### D.  Determining Damages Would Be Unduly Complex

The complexity of determining AFMS's alleged damages also weighs against standing.  *Eagle*, 812 F.2d at 543.  AFMS contends that due to the alleged conduct, it lost sales to at least 96 potential shipper customers.[30]  Proving lost sales would entail customer-by-customer proof of causation; AFMS's historical revenues are

---

[30] *See* Gates Decl. ¶ 100, Ex. 99 (AFMS Response to UPS Interrog. No. 1); ¶ 88, Ex. 87 (AFMS Response to FedEx Interrog. No. 5).

1  too episodic to use as a benchmark.[31]  *See Healy v. CTP Inc.*, No. 93 C 1727, 1994

2  WL 846898 (N.D. Ill. Sept. 22, 1994) (sales pattern too unpredictable to form basis

3  for damages).  Moreover, AFMS's witnesses have repeatedly admitted that, ████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████.[32]  ████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████.[33]

9          Assuming that the trier of fact could find specific lost sales, ascertaining

10  AFMS's alleged damages would thus require (1) the terms of the customer's carrier

11  agreement in place when AFMS would have won the customer's business,

12  (2) analysis of whether there were any potential savings opportunities that AFMS

13  could have identified for the customer, (3) determining the amount of savings the

14  customer would actually have obtained had AFMS provided its services, and

15  (4) application of hypothetical terms that AFMS would have negotiated as its

16  compensation from the shipper.  Such complex machinations weigh against

17  standing; the calculation of lost sales would involve a mini-trial for each customer

18  for which there were lost sales.  *See Eagle*, 812 F.2d at 543.

19          AFMS lacks antitrust standing.  Summary judgment should be entered in

20  favor of UPS.

---

21  [31] Kupperberg Decl. Ex. A (Kupperberg Report at 6, 9-10).

22  [32] Gates Decl. ¶ 93, Ex. 92 (Humes Dep. at 43:2-10); ¶ 14, Ex. 13 (Malech

23  Dep. at 87:24-89:15)██████████████████ ¶ 31, Ex. 30 (Hastings Dep. at 71:22-74:13)

24  (same); ¶ 32, Ex. 31 (Corrado Dep. at 44:17-20)███████████████████████ Gates Decl.

25  ¶ 24, Ex. 23 (Vanning Dep. at 104:1-5).

26  [33] Gates Decl. ¶ 31, Ex. 30 (Hastings Dep. at 178:23-182:1)███████████; ¶ 18, Ex. 17 (Osborne Dep.

27  at 28:13-21)█████████ ¶ 35, Ex. 34 (Kohl Dep. at 63:14-66:10)████████████

28

## II.   AFMS CANNOT SHOW HARM TO COMPETITION

Even assuming AFMS could show standing (which it cannot), its antitrust claims fail because AFMS cannot establish its alleged relevant market.  Separate and apart from having standing, to succeed on the merits of any antitrust claim, a plaintiff must establish a legally cognizable relevant market and show significant anticompetitive effects within that relevant market.[34]  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (where plaintiff "cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate"); *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993) (affirming summary judgment for failure to show anticompetitive effects).  AFMS cannot do either; it cannot prove a legally cognizable relevant market or the required anticompetitive effects.

### A.   AFMS Cannot Establish Its Alleged Relevant Market

Trying to force-fit UPS into its alleged relevant market, AFMS defines a broad and amorphous market: "the market for shipping consultation services, which is composed of those business entities which advise shippers regarding the delivery of time sensitive letters, documents, and packages by air or by ground within the United States and to and from the United States to foreign countries."  (TAC ¶ 6.)

This alleged market definition fails for two reasons.  First, it is *over-inclusive*; it improperly includes services that are not substitutes for one another.  Second, AFMS's alleged market is *under-inclusive*; it improperly excludes the primary suppliers of negotiation services—shippers' own employees who perform negotiations with the carrier on the behalf of their employers.

---

[34] A narrow category of joint business conduct is subject to *per se* analysis, which does not require proof of harm to competition, but AFMS's conspiracy claim does not qualify for that exceptional treatment (as AFMS assumed at the pleading stage, *see* ECF 67 at 3).  *See, e.g.*, *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963) (*per se* rule applies only where prior judicial experience demonstrates that the conduct is a "naked restraint[] of trade with no purpose except stifling of competition").

### 1.   AFMS's Market for Shipping Consultation Services Improperly Includes Services that Are Not Substitutes for Each Other

An alleged market that includes services that are not close economic substitutes is over-inclusive and fails as a matter of law. *Equifax*, 618 F.2d at 66-67; *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 536 F. Supp. 2d 1191, 1196 (C.D. Cal. 2008). Whether services are close economic substitutes, and thus are included in the relevant market, is "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *see also M.A.P. Oil*, 691 F.2d at 1306. Courts also look at such "practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* AFMS's relevant market fails on all counts.

### a.   AFMS Cannot Show Reasonable Interchangeability Among the Diverse Services within Its Alleged Market

As described by its own witnesses, AFMS's alleged market includes a ███████ ████████████████████████████████████████████ ███████████████████████████████████████████████ ███.[35] (UF 69.) None is "roughly equivalent" to the other "for the use to which it is put"; none would "work effectively" as a substitute for the other. *Brokerage Concepts*, 140 F.3d at 513. Consulting on how shippers should package their

_____

[35] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████ (UF 70-81.)

1   products, for instance, would not work effectively as a substitute for consulting on

2   contract negotiations.  (Williams Decl. ¶¶ 21-22.)

3      AFMS thus cannot show that its alleged market is limited to close substitutes,

4   and its market definition therefore fails as a matter of law.[36]  *See, e.g.*, *Malaney v.*

5   *UAL Corp.*, 434 Fed. App'x 620, 621 (9th Cir. 2011) ("national market in air

6   travel" improper; flights from San Francisco to Newark are not interchangeable

7   with flights from Seattle to Miami); *Equifax*, 618 F.2d at 66-67 (vacating FTC

8   order that improperly included non-interchangeable services in relevant market);

9   *Coniglio v. Highwood Servs., Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974) (affirming

10  summary judgment where alleged market encompassed non-interchangeable

11  products); *Ticketmaster*, 536 F. Supp. 2d at 1196 ("ticket distribution services and

12  tickets do not belong in the same market").

13       **b. AFMS Cannot Show Cross-Elasticity of Demand**
        **Among the Diverse Services within Its Alleged Market**

14

15     AFMS also cannot show cross-elasticity of demand among the various

16  consulting services in its relevant market.  To examine cross-elasticity of demand,

17  courts routinely rely on economic evidence to determine whether consumers will

18  shift to substitute services in the face of a price increase.  *FTC v. Whole Foods*

19  *Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008); *see also California v. Sutter*

20  *Health Sys.*, 84 F. Supp. 2d 1057, 1068-69 (N.D. Cal.), *aff'd*, 217 F.3d 846 (9th Cir.

21  2000); *Hynix Semiconductor*, 2008 WL 73689, at *3.  In this case, the

22

23     [36] AFMS's apparent effort to narrow its market definition through
interrogatory responses would be unavailing even if considered.  AFMS contends

24  that "[p]articipants in the market for shipping consultation services … gather and
analyze data, including a shipper's past transactions, to develop a strategy and

25  advise a shipper on how to save money and match that shipper's specific needs to a
carrier's delivery services."  (Gates Decl. ¶ 88, Ex. 87 (AFMS Response to FedEx

26  Interrogatory No. 14).)  This definition too encompasses myriad non-
interchangeable services.  *(See, e.g., id.* ¶ 25, Ex. 24 (Stanton Dep. at 22:5-24:19)
              ¶ 101, Ex. 100 (Dep. Ex. 538 at 591)

27

28

                   33

uncontroverted economic evidence shows that there is no cross-elasticity of demand among the consulting services in AFMS's market definition.  (UF 82.)  AFMS's purported market definition thus fails.  *See, e.g.*, *U.S. Anchor Mfg. v. Rule Indus.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (relevant market overbroad; plaintiff could not show that significant number of consumers would switch in response to increases in prices).

### c.   No "Practical Indicia" Support AFMS's Overly Broad Market Definition

Nor can AFMS point to any "practical indicia" to support its broad market definition.  There is no evidence of industry or public recognition of any market encompassing the myriad services in AFMS's "shipping consultation market."  Nor is there evidence of "the [services'] peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Brown Shoe*, 370 U.S. at 325.  Indeed, AFMS witnesses testified ████████████████████████████████████████████████

██████████.[37]

### 2.   AFMS's Alleged Product Market Fails to Include All Sources of Supply for Price Negotiation Services

Even if the relevant market were limited to negotiation services, that market would fail because it is under-inclusive; it does not include all sources of supply that can constrain market prices.  *Rebel Oil Co.*, 51 F.3d at 1436.  "As a matter of law, 'courts have generally recognized that when a customer can replace the services of [an external product] with an internally-created [ ] system, this "captive output" (i.e., the self-production of all or part of the relevant product) should be included in the same market.'"  *United States v. SunGard Data Sys., Inc.*, 172 F.

---

[37] Gates Decl. ¶ 19, Ex. 18 (Collins Dep. at 108:25-113:14) ████████
████████████████████████████████████████████████████████████████

1   Supp. 2d 172, 186 (D.D.C. 2001); *see also Twin City Sportservice, Inc. v. Charles*

2   *O. Finley & Co., Inc.*, 512 F.2d 1264, 1272 n.1 (9th Cir. 1975) (failure to include

3   self-supply of concessions by baseball teams would lead to reversal).  In other

4   words, where customers can and do use their own employees to obtain the services

5   also provided by outside companies, that source of "self-supply" cannot be ignored.

6        AFMS's relevant market excludes "self-supply" and includes only "business

7   entities" that advise shippers.  But shippers routinely use their own employees to

8   provide the types of negotiation services provided by AFMS.  (UF 83.)  Shippers

9   that had used 3PNs in the past testified ████████████████████████████

10  ████████████████████████.[38]  (UF 84.)  AFMS witnesses and other

11  3PNs admitted ████████████████████████████████████

12  ██████████████████.[39]  Industry surveys relied on by AFMS show that the vast

13  majority of shippers perform their own negotiations instead of employing a 3PN.[40]

14  And economic analyses demonstrate that shippers' use of their own employees

15  instead of 3PNs constrains pricing for price negotiation services.  (Williams Decl.

16  ¶¶ 32-35.)

17  _____

18  [38] *See, e.g.*, Gates Decl. ¶ 49, Ex. 48 (Breitenbach Dep. at 15:6-25, 17:2-11)

19  ██████████████████████████████████████████████

20  ███████████████████████████ ¶ 46, Ex. 45 (Hersh Dep. at 11:1-13:16)

21  [39] Gates Decl. ¶ 2, Ex. 1 (Erickson 30(b)(6) Dep. at 133:4-7)████████

22  ██████████████████████████ ¶ 18, Ex. 17 (Osborne Dep.

23  ████████████████████ ¶ 53, Ex. 52 (Martinez

    Dep. at 39:1-7)██████████████

24  ██████████████████████ ¶ 105, Ex. 104 (Benge Dep.

    at 111:1-112:5)████████

25  [40] TAC ¶ 13; Gates Decl. ¶ 103, Ex. 102 (Dep. Ex. 245 at 096) (█████

26  █████████████████████████████████████████

27  ██████████████████████); ¶ 104, Ex. 103 (Dep. Ex. 128

    at 251) (██████████████████████████████████

28  ██████████████████████████████████

1    AFMS's exclusion of shippers' use of their own employees for negotiation

2    services (self-supply) is fatal to AFMS's claims; the exclusion renders AFMS's

3    alleged relevant market unsustainable.  *See, e.g.*, *Rebel Oil*, 51 F.3d at 1435, 1436

4    (regarding failure to include all sources of supply).

5    **B.    AFMS Cannot Establish that UPS's and FedEx's Actions Resulted
        in Harm to Competition**

6

7    Regardless of the market definition, AFMS cannot show a *substantial* "injury

8    to competition *in the market as a whole*."  *Les Shockley Racing, Inc. v. Nat'l Hot

9    Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) (emphasis added); *see also Adaptive

10    Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. Cal.

11    1998) ("[t]o constitute an injury to competition the restraint must be of 'significant

12    magnitude'"); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376,

13    1388 (9th Cir. 1981) (plaintiff must "evince a substantially adverse effect on

14    competition").  AFMS has admitted that its only evidence of harm to competition is

15    that a "significant number" of 3PNs indicated to AFMS "that they had been

16    adversely affected by UPS's and FedEx's boycott of, or refusal to deal with, third-

17    party consultants."[41]  But harm to a competitor, or even to a group of competitors,

18    is not sufficient to show harm to competition.  *See Les Shockley*, 884 F.2d at 508;

19    *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 812-13 (9th Cir. 1988).

20    There is also no evidence of market-wide, substantial anticompetitive effects.

21    AFMS cannot show increased market prices for consulting services or decreased

22    market output.  *See, e.g.*, *Adaptive Power Solutions*, 141 F.3d at 950; *see also W.

23    Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010); *Virgin

24    Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).  To the

25    contrary, the evidence shows that many 3PNs ██████████████████

26

27    _____

28    [41] Gates Decl. ¶ 106, Ex. 105 (AFMS Response to UPS Interrogatory 23).

36

1    ████████████████████████████████████.[42]  (UF 85.)  While some 3PNs claim

2    ████████████████████████████████,[43]  other 3PNs ████████████████

3    ████████████████████████████  (UF 67-68.)  AFMS cannot meet its

4    burden to proffer evidence showing it could prove a *market-wide* impact due to the

5    alleged conduct.  (Williams Decl. ¶¶ 27-31.)

6         In fact, if AFMS's allegation that the market comprises a wide array of

7    consulting services is correct, then by definition those services would have to be

8    reasonably interchangeable, and a restraint that affects only a small portion of such

9    services could not have market-wide effects.  It is uncontroverted that the alleged

10   UPS conduct does not apply to services other than price negotiation services.

11   (UF 86.)  Any restraint would thus be limited to one service that is only a small

12   portion of AFMS's alleged shipping consultation market.  (Williams Decl. ¶¶ 36-

13   37.)  The conduct could not have harmed competition in the alleged shipping

14   consultation market.  (*Id.*)  *Cf. Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715,

15   728 (3d Cir. 1991) (consumers able to purchase other products in relevant market).

16        Shippers' ability to use their own employees to provide negotiation services

17   also prevents AFMS from showing harm to competition.  Only a small percentage

18   of shippers rely on third-party consultants; industry surveys relied on by AFMS

19   show that only "11% of the surveyed shippers used a third-party consultant to

20   negotiate their rates."[44]  The alleged restraints have no impact on shippers' ability

21   ────────────────

22   [42] *See, e.g.*, Gates Decl. ¶ 95, Ex. 94 (Jacobs Decl. at ¶ 4) ████████████████

23   ████████████████████ ¶ 52, Ex. 53 (Febus Dep. at 60:15-20) ████

24   ████████ ¶ 98, Ex. 97 (Michas Decl. at ¶ 3) ████████████████████

25   [43] *See, e.g.*, Gates Decl. ¶ 107, Ex. 106 (Felts Dep. at 8:5-9:7) ████████

26   ████████████████████████████████████████████████

27   [44] ████████████████████████████████████████████

28   ████████████████████); ¶ 104, Ex. 103 (Dep. Ex. 128

to perform contract negotiation services for themselves, and shippers can (and do) switch from third-party services to in-house resources.  (UF 83-84.)  This demonstrated "supply-side response" precludes any inference of harm to competition—shippers could simply switch to using their own employees, which would prevent any significant increase in prices or decrease in output.  (Williams Decl. ¶¶ 32-35.)  *See, e.g.*, *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 441 (5th Cir. 1982) (affirming summary judgment where consumers could switch to in-house systems in response to price increase); *Rebel Oil*, 51 F.3d at 1436.

The Court should enter summary judgment on the ground that AFMS cannot raise a genuine issue of material fact regarding harm to competition.

## III.   AFMS CANNOT SHOW CONSPIRACY

As explained in detail in FedEx's motion, summary judgment is also appropriate as to Count One—alleging a conspiracy between UPS and FedEx—because there was no conspiracy.  UPS developed its ███████████ independently and did not have any agreement with FedEx.  (UF 37-49, 87-91.) This being the case, AFMS relies on evidence that is as consistent with unilateral conduct as it is with conspiracy.[45]  Such evidence is insufficient to survive summary judgment.

To avoid false verdicts, "antitrust law limits the range of permissible inferences from ambiguous evidence," even on summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  In the absence of *direct* evidence of an agreement, AFMS must produce "evidence that *tends to*

---

at 251) (███████████████████████████████████████████████████
████████████████████████████████████████████████████).

[45] UPS incorporates the arguments in FedEx's summary judgment motion.

*exclude the possibility*" of independent action by the defendants.[46]  *Monsanto Co. v.*

*Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (emphasis added).  A defendant

can thus "rebut an allegation of conspiracy by showing a plausible and justifiable

reason for its conduct that is consistent with proper business practice." *Cnty. of*

*Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1156 (9th Cir. 2001).  The

plaintiff must then "provide specific evidence tending to show that the defendant

was not engaging in permissible competitive behavior." *Id.*

     UPS had legitimate and justifiable reasons to limit its interactions with 3PNs.

As explained above, UPS's ███████████████████████████████

█████████████████████████████████████████████

███████ (UF 14.) ████████████████████████████. (UF 25, 34-36.)

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████. (UF 26-27.) █████████████

█████████████████████████████████████████████

████████████████████. (UF 28-31.) ███████████████████

█████████████████████████████████████████████

███████████████████████████████████████ (UF 34-

36.) ████████████████████████████ (Gutmann Decl. ¶ 29.)

█████████████████████████████████████████████

██████████████████████████████. (UF 37-38.) █████████████

---

[46] Applying this standard, courts routinely grant summary judgment in antitrust conspiracy cases, even in the face of an extensive factual record, evaluating each set of evidence proffered by the plaintiff to determine whether it can be plausibly explained by independent conduct and evaluating whether the evidence as a whole tends to exclude independent conduct.  *See, e.g.*, *In re Citric Acid Litig.*, 191 F.3d 1090, 1105-08 (9th Cir. 1999); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1299-1323 (11th Cir. 2003); *Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1032-38 (8th Cir. 2000); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118-38 (3d Cir. 1999).

1

2  ████████████████████████████████████████████. (UF 56.) UPS's

3  conduct was thus "consistent with proper business practice." *See Cnty. of*

4  *Tuolumne*, 236 F.3d at 1156 (policy consistent with providing quality patient care

5  and containing costs); *Richards v. Neilson Freight Lines*, 810 F.2d 898, 902-03 (9th

6  Cir. 1987) (refusal to deal justified by competitive risk).

7      In light of these plausible and justifiable reasons for UPS's conduct,

8  summary judgment is appropriate.  As explained in FedEx's motion for summary

9  judgment, AFMS cannot proffer "specific evidence tending to show that

10  [defendants were] not engaging in permissible competitive behavior." *Cnty. of*

11  *Tuolumne*, 236 F.3d at 1156.

12                                **CONCLUSION**

13      The Court should enter summary judgment in favor of UPS.

14  Dated: May 1, 2013                    MORRISON & FOERSTER LLP

15

16                                By:  Paul T. Friedman/SPC
                                       Paul T. Friedman
17

18                                Attorneys for Defendant
                                  UNITED PARCEL SERVICE CO.

19  la-1207881

20

21

22

23

24

25

26

27

28

                                      40