BLECHER COLLINS PEPPERMAN & JOYE, P.C.
Maxwell M. Blecher (State Bar No. 26202)
 *mblecher@blechercollins.com*
Courtney A. Palko (State Bar No. 233822)
 *cpalko@blechercollins.com*
Alyson C. Decker (State Bar No. 252384)
 *adecker@blechercollins.com*
515 South Figueroa Street, Suite 1750
Los Angeles, California 90071-3334
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

CHARLES T. COLLETT, P.C.
ctcollett@earthlink.net
620 Newport Center Drive, Suite 280
Newport Beach, California 92660
Telephone: (949) 640-7676
Facsimile:  (949) 640-5858

Attorneys for Plaintiff
AFMS LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| AFMS LLC, <br><br> Plaintiff, <br><br> vs. <br><br> UNITED PARCEL SERVICE CO. and FEDEX CORPORATION, <br><br> Defendant. | Case No. CV-10-05830-JGB-AJWx <br><br> Hon. Jesus G. Bernal <br><br> **PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** <br><br> Date:    August 5, 2013 <br> Time:    9:00 a.m. <br> Crtrm.:  1 <br><br> Complaint Filed:    August 5, 2010 <br> Trial Date:            February 4, 2014 |

Blecher Collins
Pepperman & Joye

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ....................................................................................1

II.    STATEMENTS OF FACTS AND PROCEDURAL HISTORY ....................3

       A.    Statement of Facts ...................................................................3

             1.   FedEx and UPS Duopoly in the Time-Sensitive Delivery Market in the United States ...........................................3

             2.   Shipping Consultation Services .....................................3

             3.   FedEx and UPS's No TPC Policy ..................................4

             4.   Harm to Competition and Anticompetitive Effects......................5

       B.    Procedural History ...................................................................5

III.   ARGUMENT ..........................................................................................6

       A.    FedEx and UPS Have Committed *Per Se* Violations of the Antitrust Laws...............................................................7

       B.    Direct and Circumstantial Evidence Demonstrate that FedEx and UPS Conspired to Eliminate TPCs from the Marketplace ..................10

             1.   Direct Evidence ........................................................11

             2.   Circumstantial Evidence .............................................15

       C.    AFMS Has Antitrust Standing ..................................................22

             1.   AFMS, UPS, and FedEx Are Participants in the Same Markets in Which AFMS Has Suffered Antitrust Injury ..........23

             2.   AFMS's Injuries Are Directly Caused by the Elimination of Competition Resulting from Defendants' Illegal Actions.................29

             3.   The Harm Caused by FedEx and UPS's Anticompetitive Conduct Is Not Speculative .....................30

             4.   AFMS's Damages Are Not Duplicative...................31

             5.   AFMS's Damages Are Capable of Being Calculated and Apportioned ...............32

       D.    Defendants' Unlawful Actions Have Harmed Competition................33

             1.   AFMS's Market Definitions Are Both Factually and Legally Supported......................34

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

(a)     The Alleged Consulting Market Is Narrowly
Defined ................................................................ 34

(b)     The Relevant Consulting Market Does Not Include
Inadequate In-House Substitutes ....................................... 37

2.     Competition Within the Consultation Marketplace Has
Been Harmed ....................................................................... 38

3.     There Is Injury to Competition in the Delivery Services
Market ................................................................................... 40

E.     AFMS's Second and Third Claims Raise Justiciable Issues ................ 41

IV.     CONCLUSION .............................................................................. 42

Blecher Collins
Pepperman & Joye

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

# TABLE OF AUTHORITIES

**Page**

Cases

*Ace v. Aetna Life Ins. Co.*,
  139 F.3d 1241 (9th Cir. 1998) ...................................................................... 10

*Am. Ad Mgmt., Inc. v. Gen Tel. Co. of Cal.*,
  92 F.3d at 788 ................................................................................... 6, 7, 34

*Am. Ad Mgmt., Inc. v. Gen Tel. Co. of Cal.*,
  190 F.3d at 1051, 1054 (9th Cir. 1999) ................................................... passim

*Adaptive Power Solutions v. Hughes Missile Sys.*,
  141 F.3d 947 (9th Cir. 1998) ......................................................................... 8

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996) ................................................................. passim

*Arizona v. Maricopa County Med. Soc.*,
  457 U.S. 332 (1982) ...................................................................................... 8

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................................. 23, 29

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................. 15

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ............................................................. 7, 8, 33

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946) .................................................................................. 32

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
  140 F.3d 494 (3d Cir. 1998) ....................................................................... 28

*Cal. ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ................................................................ passim

*Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432, 441(9th Cir. 1990) ...................................................... 10, 11, 14

*Eagle v. StarKist Foods, Inc.*,
  812 F.2d 538 (9th Cir. 1987) ............................................................... 25, 29

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) .................................................................................. 33

*Hahn v. Or. Physicians' Serv.*,
  868 F.2d 1022 (9th Cir. 1988) ...................................................................... 8

Blecher Collins
Pepperman & Joye

-1-

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*,
   850 F.2d 477 (9th Cir. 1988) ..................................................................... 8

*High Tech. Careers v. San Jose Mercury News*,
   996 F.2d 987 (9th Cir. 1993) ..................................................................... 34

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................................... 34

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) ...................................................... 11, 15, 28

*In re Publ'n Paper Antitrust Litig.*,
   690 F.3d at 63 .................................................................................... 11, 14

*Interstate Cir. v. U.S.*,
   306 U.S. 208 (1939) ......................................................................... passim

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959) ................................................................................. 40

*Knutson v. Daily Review, Inc.*,
   548 F.2d 795 (9th Cir. 1976) ..................................................................... 31

*L.A. Mem'l Coliseum v. NFL*,
   726 F.2d 1381 (9th Cir. 1984) ................................................................... 33

*Legal Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*,
   39 F.3d 951 (9th Cir. 1994) ............................................................ 25, 26, 27

*Lucas v. Bechtel Corp.*,
   800 F.2d 839 (9th Cir. 1986) ..................................................................... 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................. 11

*MGM Studios, Inc. v. Grokster, Ltd.*,
   269 F. Supp. 2d 1213 (C.D. Cal. 2003) ..................................................... 23

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ...................................................................... 10, 11, 22

*Moore v. James H. Matthews & Co.*,
   682 F.2d 830 (9th Cir. 1982) ..................................................................... 32

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) ............................................................... 7, 10

*NCAA v. Bd. of Regents of Univ. of, Okla.*,
   468 U.S. 85 (1984) ................................................................................... 41

*Newcal Indus., Inc. v. Ikon Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................. 28, 37

Blecher Collins
Pepperman & Joye

**BC**
**PJ**

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ................................................................33

*Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ................................................................................10

*Pac. Telesis Grp. v. Int'l Telesis*,
  Commc'ns, 994 F.2d 1364 (9th Cir. 1993) ............................................26

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ..................................................................41

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
  637 F.2d 1376 (9th Cir. 1981) ..................................................................8

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ......................................................................................7

*Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
  830 F.2d 1374 (7th Cir. 1987) ................................................................29

*Sutter Health Sys.*,
  84 F. Supp. 2d 1057(N.D. Cal. 2000) ....................................................36

*Theme Promotions*,
  546 F.3d at 1002 ......................................................................................29

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ..........................................................passim

*Toscano v. PGA*,
  258 F.3d 978 (9th Cir. 2001) ................................................6, 7, 10, 14

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ......................................................24, 25, 28

*White Motor Co. v. U.S.*,
  372 U.S. 253 (1963) ..............................................................................7, 8

*Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,
  951 F.2d 1158 (9th Cir. 1991) ..........................................................passim

Statutes

15 U.S.C. § 1 ................................................................................................10

Blecher Collins
Pepperman & Joye

BC
PJ

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

Plaintiff AFMS LLC ("AFMS") hereby sumits its Omnibus Memorandum of Points and Authorities in Opposition to Defendants' Motions for Summary Judgment.

## I.    INTRODUCTION

These facts are essentially undisputed:

1.    For about 17 years prior to 2009, Defendants UPS and FedEx permitted third party consultants ("TPCs")[1] to participate directly in negotiating contracts with shippers and advising shippers as to such contracts.

2.    The compensation of TPCs during this period was largely dependent and contingent on achieving savings for shippers.

3.    Overall, the activities of TPCs in negotiating and advising shipping contracts reduced the revenues and profits of UPS and FedEx.

4.    DHL (a German entity) was a substantial player in the time-sensitive delivery market worldwide. ████████████████████ ████████████████████████████████████████████ In late 2008, DHL announced its withdrawal from the domestic time-sensitive delivery market (within the United States). ████████████████████████████████ ████████████████████████████████████████ ████████████████████ Plaintiffs Statement of Undisputed Facts ("PSUF") No. 18.

The following facts are contested but supported by substantial evidence (as set forth herein and in the accompanying papers), thereby creating disputed issues of material fact which preclude summary judgment:

1.    At the October 2009 Parcel Forum in Chicago, representatives of FedEx and UPS agreed to a new policy under which neither would negotiate directly with TPCs or allow shippers to utilize TPCs to provide advice (the "No TPC Policy") by prohibiting shippers from sharing prices, rates, and contract information

_____

[1] TPCs are also referred to as TPNs (third party negotiators) by Defendants.

Blecher Collins
Pepperman & Joye

1  with TPCs.

2        2.      On the same day in April 2010, UPS and FedEx issued separate but

3  parallel internal memoranda implementing their new No TPC Policy.  In the case of

4  FedEx, the April memorandum implemented the No TPC Policy applicable to its

5  largest sales group, Field Sales, which made the policy uniform throughout FedEx.

6        3.      ████████████████████████████████████████

7  ██████████████████████████████████████████████████████

8  █████████████████████████

9        4.      The No TPC Policy would not be successful unless FedEx and UPS

10  both agreed to the change.

11        5.      FedEx and UPS implemented the No TPC Policy, which has had the

12  anticompetitive effects of:

13              a.      raising the cost of time-sensitive deliveries to shippers and

14  consumers;

15              b.      increasing the revenues and profits of FedEx and UPS;

16              c.      significantly diminishing the activities of TPCs in the process of

17  negotiating and advising on shipping contracts, which in turn has:

18                    i.      caused TCPs, including AFMS, to lose substantial

19  revenues and profits;

20                    ii.      caused shippers and consumers to pay more for time-

21  sensitive deliveries; and

22                    iii.      allowed UPS and FedEx to increase their revenues and

23  profits notwithstanding a serious recession.

24        6.      As Judge Morrow noted in the Court's November 23, 2011 Order

25  Granting Defendants' Motion to Dismiss, (*see* Dkt. No. 74 at p. 19), this case has

26  "striking" parallels to another Ninth Circuit case condemning, as antitrust violations,

27  the elimination of consultants who were able to obtain better terms and conditions

28  for their customers: *Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp.*,

-2-

Blecher Collins
Pepperman & Joye

1  951 F.2d 1158 (9th Cir. 1991).

2     For these reasons, AFMS respectfully requests that the Court deny

3  Defendants' Motions for Summary Judgment in their entirety.

4  **II.    STATEMENTS OF FACTS AND PROCEDURAL HISTORY**

5     **A.    Statement of Facts**

6        **1.    FedEx and UPS Duopoly in the Time-Sensitive Delivery**

7             **Market in the United States**

8  By the start of 2009, DHL had left the express small parcel delivery business

9  in the United States.  *See* PSUF at No. 15. ███████████████████

10 ████████████████████████████████████ *See id.* at No. 17.  Its

11 departure left UPS and FedEx with a duopoly in the domestic market for the

12 delivery of time-sensitive letters, documents, and packages by air or ground within

13 the United States.  *See id.* at No. 15.

14     Prior to DHL's departure from the domestic United States market, and for

15 nearly two decades, FedEx and UPS had consistently permitted shippers to hire

16 TPCs to provide advice on UPS's and FedEx's services and rates and to participate

17 in the negotiation of shipper contracts with UPS and FedEx.  *See id.* at Nos. 1-2. ██

18 ████████████████████████████████████████████

19 ██████████████████████████ *See id.* at No. 25.

20        **2.    Shipping Consultation Services**

21     Like FedEx and UPS, TPCs gather and analyze shipper data, including a

22 shipper's past shipping history, to provide advice regarding which of Defendants'

23 services best match that shipper's specific delivery needs and help the shipper

24 maximize profit.  *See id.* at No. 3.  This advice allows shippers to make an informed

25 choice with regard to which carrier and which delivery services to use.  *See id.*

26 TPCs, such as AFMS, are able to do this because they have special expertise with

27 regard to the incredibly complex carrier contracts and rate structures that FedEx and

28 UPS use.  *See id.* at Nos. 9-10, 59-61.  In fact, most TPCs are former employees of

Blecher Collins Pepperman & Joye

1 UPS, FedEx, and DHL. *See id.* at No. 10. Because of their experience and

2 expertise, TPCs achieved savings for shippers which necessarily and significantly

3 reduced FedEx and UPS's revenues and profits. *See id.* at No. 11. FedEx and UPS

4 had a strong incentive to stop the bleeding. However, acting independently was

5 fraught with danger because a refusal to deal made by only one party would have

6 allowed the other to exploit the market by continuing to deal with TPCs. *See id.* at

7 No. 21. Accordingly, this abrupt change of a decades-old policy would work only if

8 both parties agreed to implement it. And that is exactly what happened.

### 3. FedEx and UPS's No TPC Policy

10     In October of 2009, representatives from FedEx and UPS attended a carrier

11 roundtable at the Parcel Forum in Chicago. *See id.* at No. 26. ████████

12 ██████████████████████████████████████████████████████

13 ████████████████ *See id.* ████████████████████████████

14 ██████████████████████████████ *See id.* During the public

15 carrier roundtable event, FedEx and UPS representatives announced, in response to

16 a question posed by the moderator, that each of their respective companies would no

17 longer be dealing with TPCs, such as AFMS. *See id.* This simultaneous

18 announcement of a refusal to deal, however, pales in comparison to what actually

19 occurred behind the scenes at the 2009 Parcel Forum.

20     ██████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ██████████████████████████████████████████████████████

23 ████████████████████████████████████ *See id.* ████████████

24 ██████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████ *See*

26 *id.* ████████████████████████████████████████████

27 ██████████████████████████████████████████████████████

28 ████████████████████████████████████ *See id.* at No. 28.

Blecher Collins
Pepperman & Joye

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ████████████████████████████████   *See id.* at No. 34.

4      Then, on April 23, 2010, UPS released an internal memorandum officially

5 implementing, throughout their domestic small package sales force, a No TPC

6 Policy.  *See id.* at No. 36.  **On that very same day**, the largest of FedEx's domestic

7 small parcel sales groups, and the last sales group to adopt the new policy, officially

8 implemented the No TPC Policy at FedEx[2].  *See id.* at No. 39.

9                    **4.    Harm to Competition and Anticompetitive Effects**

10      The impact of FedEx and UPS's No TPC Policy was swiftly felt.  Since April

11 2010, many TPCs have been essentially forced out of business or forced to work far

12 behind the scenes, which has led to dramatic decreases in efficiency and revenue.

13 *See id.* at Nos. 44-45.  In contrast, and in spite of the weak economy, FedEx and

14 UPS raised their prices in 2010, 2011, and 2012 and had dramatic revenue increases

15 in those years.  *See id.* at No. 46. ████████████████████████████████

16 ██████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ████████████████████████████   *See id.* at No. 43.  Faced with the near destruction of its

19 consulting business due to Defendants' anticompetitive and illegal actions, AFMS

20 filed this current action.

21      **B.    Procedural History**

22      AFMS filed its complaint on August 5, 2010.  *See* Dkt. No. 1.  After meeting

23 and conferring with Defendants, AFMS filed a First Amended Complaint on

24 October 14, 2010.  *See* Dkt. No. 31.  FedEx and UPS filed separate motions to

25 _____

26 [2]████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████   *See*

28 PSUF at No. 39.

Blecher Collins
Pepperman & Joye

1   dismiss, (*see* Dkt. Nos. 40, 41), which were granted on May 27, 2011, (*see* Dkt. No.

2   55).  On June 24, 2011, AFMS filed its Second Amended Complaint alleging five

3   causes of action.  *See* Dkt. No. 56.  Again, FedEx and UPS filed separate, but

4   frequently overlapping, motions to dismiss.  *See* Dkt. Nos. 64, 65.

5       On November 23, 2011, Judge Morrow issued an order granting Defendants'

6   motions to dismiss the Second Amended Complaint.  *See* Dkt. No. 74.  As to

7   AFMS's Sherman Act Section 1 claims, Judge Morrow found that AFMS had

8   "adequately alleged antitrust injury in the relevant market," that AFMS appeared to

9   have suffered a direct antitrust injury, and that AFMS had "adequately pled that it

10  has standing to bring this action."  *Id.* at p. 31-34.  In fact, Judge Morrow took issue

11  with only one aspect of AFMS's Section 1 claims, stating, essentially, that AFMS

12  had not pled facts sufficient to show injury to competition beyond the injuries

13  suffered by AFMS.  *See id.* at p. 34-37.

14      On December 12, 2011, AFMS filed a Third Amended Complaint ("TAC") .

15  *See* Dkt. No. 76.  The TAC, the operative complaint, alleges three Section 1 claims

16  and includes specific statements and documents evidencing injury, directly caused

17  by Defendants' actions, to other TPCs and to consumers.  *See* TAC ¶¶ 14-16, 25-27,

18  31-33, 37-39.  On January 16, 2012, FedEx and UPS answered the TAC without any

19  further motion practice.  *See* Dkt. Nos. 81, 82.

20  **III.   <u>ARGUMENT</u>**

21      "[S]ummary judgment is disfavored in complex antitrust litigation where

22  motive and intent are important, proof is largely in the hands of the alleged

23  conspirators, and relevant information is controlled by hostile witnesses."  *Toscano*

24  *v. PGA*, 258 F.3d 978, 982 (9th Cir. 2001); *see also Am. Ad Mgmt.*, 92 F.3d at 788

25  ("[B]ecause antitrust cases consist of primarily factual issues, summary judgment

26  should be used 'sparingly.'").  That is what is currently before this Court: a

27  conspiracy case where motive and intent are at issue and the details of the

28  conspiracy are in the hands of the alleged conspirators, who are antagonistic to

Blecher Collins Pepperman & Joye

AFMS.  In addition, "the Court must view the evidence in the light most favorable

to" AFMS and should only grant summary judgment if there are no genuine issues

of material fact.  *Am. Ad Mgmt.*, 92 F.3d at 787; *see also Toscano*, 258 F.3d at 982.

"'[S]ummary judgment is appropriate only in the clear absence of any significant

probative evidence tending to support the complaint.'"  *Toscano*, 258 F.3d at 983

(quoting *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1248 (9th

Cir. 1990)).  As there is ample evidence to support AFMS's claims, Defendants'

motions for summary judgment should be denied.

A.    **FedEx and UPS Have Committed *Per Se* Violations of the Antitrust
        Laws**

Defendants' conduct in this case is *per se* unlawful and, therefore, the Court

need not perform an elaborate inquiry into the alleged market, the harm suffered by

AFMS or competition, or any claimed business justifications of Defendants.  *See,*

*e.g.*, *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011); *Big*

*Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1101-02 (9th Cir. 1999);

*Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996) (stating that an agreement

to restrain trade are "inherently destructive of competitive conditions and may be

condemned even without proof of its actual market effect").  The types of restraints

in this case are not only predictable as to their anticompetitive effect but also have

"'such limited potential for procompetitive benefit, that they are deemed unlawful

*per se*.'"  *Safeway*, 651 F.3d at 1133 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10

(1997)); *see also White Motor Co. v. U.S.*, 372 U.S. 253, 263 (1963); *Big Bear*

*Lodging*, 182 F.3d at 1101.  AFMS's first claim alleges a concerted refusal to deal

with TPCs, orchestrated by two firms with dominant market power (and the ability

to leverage their duopoly in the market for domestic express delivery), which has

///

///

///

-7-

Blecher Collins
Pepperman & Joye

Blecher Collins
Pepperman & Joye

resulted in increasing prices to shippers and consumers.[3]  *See* TAC  ¶¶ 23-28; PSUF at Nos. 16, 42.  This is a perfect example of what has long been referred to as a *per se* illegal boycott.[4]  Furthermore, "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it [should] appl[y] a conclusive presumption that the restraint is unreasonable."  *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 344 (1982).  As discussed later in this brief, the Ninth Circuit has previously condemned similar boycotts of third parties, and therefore a detailed rule of reason review is unnecessary because it is clear that these types of boycotts result in an unreasonable restraint.  *See infra* Section III.C.  For these reasons, a *per se* analysis is appropriate.[5]

---

[3] FedEx argues that its misconduct does not rise to the level of *per se* treatment because UPS, FedEx, and AFMS are not "traditional competitors."  *See* FedEx's Mot. for Summ. J. ("FMSJ") at 30:14-31:20.  As discussed in greater depth below in Section III.C.1, UPS, FedEx, and AFMS are all participants in the same market who are able to deprive each other of business and, thus, are competitors under the antitrust laws.

[4] *See, e.g.*, *White Motor*, 372 U.S. at 263; *Big Bear Lodging*, 182 F.3d at 1101; *Adaptive Power Solutions v. Hughes Missile Sys.*, 141 F.3d 947, 949-50 (9th Cir. 1998); *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988) (noting that the *per se* approach is generally applied to cases involving "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing [. . .] customers to deny relationships the competitors need in the competitive struggle'" (internal citations omitted)); *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 486 (9th Cir. 1988); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1382 (9th Cir. 1981).

[5] In the alternative, the restraints require "'no more than [a] cursory examination to establish that their principal or only effect is anticompetitive.'"  *Safeway*, 651 F.3d at 1134.  This "quick look" approach is an alternative to the *per se* and rule of reason analyses.  Here, FedEx and UPS have engaged in anticompetitive conduct that is nearly identical to that of the defendants in *Yellow Pages* , 951 F.2d at 1159-60.  *See infra* Section III.C.  In addition, it cannot be disputed that TPCs, such as AFMS, obtained savings for shippers that shippers are typically unable to achieve

1    Similarly, AFMS's second and third claims of refusals to deal based on

2  individual conduct by FedEx and UPS—claims which Defendants have tried to

3  characterize as vertical restraints, (*see* FMSJ at 38:3-13)—are also illegal.  *See* TAC

4  ¶¶ 29-40; PSUF at Nos. 64-65.  Section 1 of the Sherman Act makes no distinction

5  between horizontal or vertical agreements, declaring simply that "restraints of trade"

6  are unlawful.  For this reason, the leading antitrust treatise states that "horizontal

7  and vertical restraints do not always threaten competition in different ways, or call

8  for a different analysis."  7 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:

9  An Analysis of Antitrust Principles and Their Application ¶ 1503a at 392 (3d ed.

10  2010).  In short, the Sherman Act jurisprudence is clear: Courts are not to focus on

11  vertical or horizontal characterizations, but rather on the impact of vertical contracts

12  and coercion that, as in this case, foster cartel-like conduct.[6]

13    In any event, significant evidence establishes that FedEx and UPS's concerted

14  conduct has imposed severe anticompetitive effects (higher prices and reduced

15  choice) on suppliers and consumers and can be found to violate Section 1 of the

16  Sherman Act even under a rule of reason analysis.

17  ///

18  _____

19  on their own.  *See* PSUF at No. 11.  Furthermore, Defendants' conduct has all but
   eliminated TPCs from the market, causing prices to increase as shippers are unable

20  to obtain the same level of discounts as they were able to get previously when using
   TPCs.  *See* PSUF at Nos. 42, 44-45.  In short, even with the most basic

21  understanding of economics and without a detailed market analysis, one can readily

22  conclude that Defendants' refusal to deal with TPCs has had anticompetitive effects
   on the market.  *See Safeway*, 651 F.3d at 1134.  Using this "quick look" approach,

23  once it is determined that the conduct is "inherently suspect and the anticompetitive

24  effects are easily ascertained,[...] then the burden shifts to [Defendants] to produce
   evidence of procompetitive justification or effects and thus demonstrate the need for

25  more extensive market inquiry."  *Id.* at 1138.  Defendants have not met and cannot

26  meet this burden.

27  [6] These two individual claims are also appropriate for "quick-look" treatment and do

28  not require a detailed rule of reason review.  *See Safeway*, 651 F.3d at 1134.

Blecher Collins Pepperman & Joye

**B.**    **Direct and Circumstantial Evidence Demonstrate that FedEx and UPS Conspired to Eliminate TPCs from the Marketplace**

Under Section 1 of the Sherman Act, every combination or conspiracy in restraint of trade is illegal.  *See* 15 U.S.C. § 1.  Such an agreement may be implicit or explicit, formal, or informal.  *See Safeway*, 651 F.3d at 1133; *Movie 1 & 2*, 909 F.2d at 1251-52.  Additionally, the Court must look at the evidence of the conspiracy as a whole and not as compartmentalized individual facts.  *See, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1247 (9th Cir. 1998).

AFMS may rely on direct and circumstantial evidence to establish the two elements of this claim: (1) concerted action by more than one entity; and (2) a "'conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Toscano*, 258 F.3d at 983 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).  If there is direct evidence of the conspiracy, which is "taken as true," a motion for summary judgment will be defeated.  *See Toscano*, 258 F.3d at 983; *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.* ("*In re Petroleum*"), 906 F.2d 432, 441 (9th Cir. 1990) (holding that if the plaintiff offers "direct evidence to support each element, then summary judgment must be denied").[7]  Likewise, circumstantial evidence of a conspiracy can defeat a motion for summary judgment if, as the Court is required to do, inferences are drawn in favor of the non-movant.  *See Toscano*, 258 F.3d at 983.  The inferences that can be drawn are broader, as in this case, "when the conspiracy is economically sensible for the alleged conspirators to undertake" and the alleged

---

[7]  "Of course, the standards established in *Matsushita* do not apply at all when a plaintiff has produced *unambiguous* evidence of an agreement . . . summary judgment is generally not appropriate where a plaintiff has produced direct, as opposed to circumstantial, evidence of an agreement . . ."  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63-64 (2d Cir. 2012) (internal citations omitted).

-10-

1   conduct is not procompetitive.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d at 63.

2           It is important not to be misled by *Matsushita*'s

3           statement…that the plaintiff's evidence, if it is to prevail,

4           must 'tend…to exclude the possibility that the alleged

5           conspirators acted independently.'  The Court surely did

6           not mean that the plaintiff must disprove all

7           nonconspiratorial explanations for the defendants'

8           conduct.  Not only did the court use the word 'tend,' but

9           the context made clear that the Court was simply requiring

10          sufficient evidence to allow a reasonable fact finder to

11          infer that the conspiratorial explanation is more likely than

12          not.

13  Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*, §

14  14.03(b), at 14-25 (4th ed. 2011) (footnotes omitted).

15          Furthermore, summary judgment should **not** be granted simply because the

16  circumstantial "evidence is plausibly consistent with both inferences of conspiracy

17  and inferences of innocent conduct" as to do so "would seriously undercut the

18  effectiveness of the antitrust laws."  *In re Petroleum*, 906 F.2d at 439 (discussing,

19  interpreting, and applying *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

20  U.S. 574 (1986) and *Monsanto*, 465 U.S. at 764).  For example, parallel conduct is a

21  relevant factor that along with other circumstantial evidence will allow a plaintiff to

22  withstand a motion for summary judgment.  *See* FMSJ at 17:8-10; *In re Citric Acid*

23  *Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999).

24          **1.      Direct Evidence**

25          Here, AFMS has several pieces of direct evidence of the conspiracy between

26  FedEx and UPS to boycott TPCs.  ██████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Blecher Collins
Pepperman & Joye



1

2          *See* PSUF at No. 26.

3

4

5

6          *See id.* at Nos. 26-27.

7

8

9

10

11

12

13

14

15

16

17

18   *Id.* at No. 26.

19          *Id.* at No. 27.

20              *Id.*

21

22

23   *Id.*

24

25   _____

26   [8]

27                        *See* PSUF at No.

28   30.

Blecher Collins
Pepperman & Joye

B|C
P|J



1
2
3
4   *Id.* at No. 31.
5
6   *Id.*
7
8   *Id.*
9   *See id.* at Nos. 31-
10  32.
11
12
13
14
15
16  *See id.*at No. 41.
17
18
19
20
21
22
23  *Id.*                                    *See id*
24
25
26                                          *Id.*
27
28                                      *Id.*

Blecher Collins
Pepperman & Joye

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

1  This is **direct** evidence of: ██████████████████████████

2  ████████████████████████████████████████████████████

3  ███ (3) a conspiracy between FedEx and UPS; and (4) a violation of Section 1 of

4  the Sherman Act.  Whether FedEx and UPS can present other evidence "justifying"

5  their decision is irrelevant because any truthful direct evidence of a conspiracy will

6  defeat a motion for summary judgment.[9]  *See Toscano*, 258 F.3d at 983; *In re*

7  *Petroleum*, 906 F.2d at 441.  **In short, this evidence raises a jury issue.**

8  Nor have FedEx and UPS refuted that these communications and documents

9  are anything other than direct evidence of a conspiracy.[10]  Even if, in an abundance

10  of caution, the above evidence were labeled as circumstantial instead of direct,

11  particularly when viewed in the light most favorable to the non-moving party as

12  required, it supports a reasonable inference that FedEx and UPS entered into an

13  agreement to refuse to deal with TPCs, and tends to exclude the possibility that

14  ─────────────

15  [9] FedEx and UPS raised several *post hoc* alleged justifications for why they "independently" chose not to deal with TPCs. ████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████  *See*

19  PSUF at No. 48. ██████████████████████████████████████

20  ████████████████████████  *See id.*  Moreover, there are many less extreme

21  alternatives for protecting confidential information than refusing to work with an

22  entire industry after more than 17 years of doing so.  Defendants could have simply refused to work with individual TPCs that they believe had misused confidential

23  information or they could have pursued legal action to protect against future misconduct.  They did neither.

24  [10] *See* FMSJ at 17:21-20:26 (citing primarily to non-precedential unpublished

25  decisions and non-controlling opinions from different circuits and non-California district courts); UMSJ at 38:12-40:11 n.46 (failing to discuss any of this direct

26  evidence of the conspiracy and relying on various decisions from other circuits to

27  incorrectly imply that motions for summary judgment are routinely granted in antitrust cases).

28

-14-

Blecher Collins
Pepperman & Joye

1 │ FedEx and UPS acted independently.

2 │       **2.**      **Circumstantial Evidence**

3 │       Before detailing the plethora of circumstantial evidence and facts supporting

4 │ AFMS's conspiracy allegations, it is important to provide the necessary context.

5 │ First, this is **not** a case of parallel conduct based on inaction, such as that found in

6 │ *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). ████████████

7 │ ████████████████████████████████████████████

8 │ ████████████████████████████████████████████

9 │ ████ *See* PSUF at Nos. 26, 31, 38-39.  This was a conscious decision marked by

10 │ a change in the status quo that had existed for nearly two decades.  *See id.* at Nos. 1-

11 │ 2.

12 │       Second, although FedEx and UPS argue that they would have adopted the No

13 │ TPC Policy even if the other had not also agreed to do so, (*see* UMSJ at 38:15-16;

14 │ FMSJ at 23:1-24:5),████████████████████████████

15 │ ████████████████████████████████████████████

16 │ ████████████████████████which "cannot be used to prove the existence" of

17 │ such facts.  *In re Citric Acid Litig.*, 191 F.3d at 1102. ████████████

18 │ ████████████████████████████████████████████

19 │ ████████████████████████████████████████████

20 │ ████████████████████████████████████████

21 │ ████████████████████████████████████████████

22 │ ████████████ *See* PSUF at Nos. 20-21, 26-27, 29, 31, 33-34, 37, 39.

23 │       Lastly, FedEx argues that it did not act in parallel with UPS, relying on two

24 │ non-precedential and factually distinguishable cases.  *See* FMSJ at 24:6-29:13.  For

25 │ several reasons, this is an insufficient ground on which to base a motion for

26 │ summary judgment.  To begin with, there is no simultaneity requirement for a

27 │ violation of Section 1 of the Sherman Act.  *See Interstate Cir. v. U.S.*, 306 U.S. 208,

28 │ 227 (1939).  It does not matter if one of the conspirators acted before the other; what

Blecher Collins
Pepperman & Joye

1  matters is that both eventually agreed to it.[11]  In addition, FedEx and UPS are rather

2  large companies; implementing even the simplest of policy changes is not

3  something that can occur overnight.  Nor does it matter if on paper UPS and FedEx

4  had conveniently "different" No TPC Policies tailored to their differing business

5  structures.  Rather, what matters is how this policy was carried out and enforced by

6  FedEx and UPS, and the ultimate foreclosure effect it had on TPCs.

7         Once you dig past the many red herrings, unimportant meetings, and "events"

8  highlighted by FedEx and UPS, the actual timeline focusing on the key changes to

9  the market, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮and the implementation of the No TPC Policy, the evidence supports a

11  finding that FedEx and UPS were acting in concert, not independently.

| UPS | DATE | FEDEX |
|---|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* PSUF at No. 2 | Prior to Winter 2008<br><br>UPS, FedEx, and Airborne/DHL are all competitors in the domestic market for the delivery of time-sensitive letters, documents, and packages.  *See* PSUF at Nos. 15, 17. | FedEx deals freely with TPCs.  *See* PSUF at No. 1. |
| ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* PSUF at No. 17. | October/November 2008<br><br>DHL announces that it is leaving the domestic market.  *See* PSUF at No. 15. | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PSUF at No. 18. |

[11] That said, FedEx and UPS did in fact publish internal memoranda regarding the No TPC Policy on the exact same day in April 2010.  *See* PSUF at Nos. 38-39.

-16-

Blecher Collins
Pepperman & Joye

| UPS | DATE | FEDEX |
|---|---|---|
|  | January 2009<br><br>DHL's exit leaves UPS and FedEx with a duopoly in the domestic market for the delivery of time-sensitive letters, documents, and packages. *See* PSUF at No. 15. | ████████████<br><br>*See id.* at No. 20. |
| ████████████ *See* PSUF at No. 15. ████████████ *See id.* at No. 22. ████████████ *See id.* | February/March 2009 |  |
| ████████████ *See* PSUF No. 23. | Summer 2009 |  |
|  | August 2009 | ████████████ PSUF at No. 24. |

Blecher Collins
Pepperman & Joye



Blecher Collins
Pepperman & Joye

| UPS | DATE | FEDEX |
|---|---|---|
| | | *See id.* |
| | | |
| | | |
| | | *See id.* |
| | September 2009 | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| *See* PSUF at No. 25. | | |
| | October 2009 | |
| | | |
| | | |
| | | |
| | | PSUF |
| | | at No. 29. |
| | | |
| | | |
| PSUF at No. | | |
| 26. | | |
| | | |
| *See* | | |
| *id.* at No. 28. | | *See* PSUF at No. |
| | | 26. |
| | | |
| | | |
| | | |

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT

Blecher Collins
Pepperman & Joye

| UPS | DATE | FEDEX |
|---|---|---|
| ███████ *Id.* | | |
| ████████ *See* PSUF at No. 31. ████████ *See id.* at No. 32. ████████ *See id.* ████████ *See id.* | November 2009 | ████████ *See* PSUF at No. 31. |
| ████████ *See* PSUF at No. 35. | December 2009 | ████████ *See* PSUF at No. 33. ████████ *See id.* at No. 34. |
| ████████ | March 2010 | |

-19-

| UPS | DATE | FEDEX |
|---|---|---|
| ███████████ *See* PSUF at No. 36. | | |
| | April 2010 | ██████████ *See* PSUF at No. 37. |
| On April 23, 2010, UPS internally publishes a memorandum detailing the No TPC Policy and begins implementation across the entire sales force. *See* PSUF at No. 38. | April 23, 2010 | Field Sales, the largest and last sales group to adopt the No TPC Policy, finalizes their internal memorandum explaining the policy on April 23, 2010 and begins implementation. *See* PSUF at No. 39. |
| ███████████ *See* PSUF at No. 41. ███████████ *Id.* ███████████ *Id.* | Post April 2010 Since FedEx and UPS successfully implemented the No TPC Policy, there has been a significant and devastating foreclosure of the market for shipping consultation services regarding the delivery of time-sensitive letters, documents, and packages. *See* PSUF at Nos. 42, 44-45. | |

This timeline reveals several key and important facts which evidence that a conspiracy between FedEx and UPS to exclude TPCs from the relevant markets does, indeed, exist. ████████████████

-20-

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████ *See* PSUF at Nos. 15-

5 22.

6        Prior to achieving a duopoly, FedEx and UPS allowed shippers to freely work

7 with TPCs.  *See id.* at Nos. 1-2. ███████████████████████

8 ████████████████████████████████████

9 ██████████████████████████████████████ *See id.* at

10 No. 49. ██████████████████████████████████

11 ██████████████████████████████████

12 ████████████████████████████████████████

13 ██████████████████████████ *See id.* at No. 50.

14 ██████████████████████████████████

15 ████████████████████████████████████████████████

16 ██████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████

19 ███████████ *See id.* at Nos. 24, 26-27, 29, 31, 33-34, 37, 39. ████████

20 ████████████████████████████████████████████

21 ██████████████████████████████ *See id.* at No. 28.  Despite how

22 difficult it is to draft and implement a new nationwide policy for a large company,

23 here, two large companies both managed to do just that within a mere matter of

24 months and with near simultaneity, even releasing internal memoranda regarding the

25 policy on the same day, which is statistically **very** unlikely to be just a mere

26 coincidence.  *See id.* at Nos. 38-40.

27 ████████████████████████████████████████████

28

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Blecher Collins
Pepperman & Joye



1    ████████████ [2] , ████████████████████████████

2    ████████████████████████████████████████████

3    ███████████████████████████████ *See id.* at No. 51. ██

4    ████████████████████████████████████

5    ███████████████████████████ *See id.* ████████

6    ██████████████████████████████████

7    ██████████ *See id.*  The effect and the results are the key facts to look at in

8    determining whether FedEx and UPS implemented the same policy, not the way

9    each of their legal departments may have worded it. *See, e.g.*, *Monsanto*, 465 U.S.

10   at 764, 768 (reiterating that the focus of the analysis is whether there is a "conscious

11   commitment to a common scheme designed to achieve an unlawful objective").

12        There is ample evidence, both direct and circumstantial, that FedEx and UPS

13   acted together when they decided to refuse to deal with TPCs. ████████████

14   ██████████████████████████████████████████████

15   ████████████████ to a timeline that evidences when an agreement between FedEx

16   and UPS was made, to the actions taken specifically in reliance on that agreement,

17   ███████████████████████████████████████—there can be

18   no legitimate claim that this issue should not go to a jury.  Defendants' motions for

19   summary judgment should be denied.

20        **C.    AFMS Has Antitrust Standing**

21        The Supreme Court has identified five factors that aid in determining whether

22   a plaintiff has antitrust standing: (1) that the injury suffered is one that "the antitrust

23   laws were intended to forestall"; (2) "the directness of the injury"; (3) "the

24   speculative measure of the harm"; (4) "the risk of duplicative recovery"; and (5)

25   "the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen Tel. Co. of*

26   ─────────────────────────────
     [12] ████████████████████████████████████████

27   ████████████████████████████████████████ *See*

28   PSUF at No. 51.

Blecher Collins
Pepperman & Joye

*Cal.*, 190 F.3d at 1051, 1054 (9th Cir. 1999); *Amarel,* 102 F.3d at 1507; *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537 (1983); *MGM Studios, Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1219 (C.D. Cal. 2003).  While antitrust injury is the key factor, "a court need not find in favor of the plaintiff on each factor" and should instead balance the five factors.  *Am. Ad Mgmt.*, 190 F.3d at 1055; *see also Amarel*, 102 F.3d at 1507.  As discussed below, all five factors have been established by the factual record developed in this case.  *See Am. Ad Mgmt.*, 190 F.3d at 1059-60; *Yellow Pages*, 951 F.2d at 1163.  Accordingly, AFMS has antitrust standing.

### 1. AFMS, UPS, and FedEx Are Participants in the Same Markets in Which AFMS Has Suffered Antitrust Injury

FedEx, UPS, AFMS, and other similar TPCs are **participants** in (1) the market for shipping consultation services regarding the delivery of time-sensitive letters, documents, and packages by air or by ground within the United States; and (2) the market for such delivery services.  Because competition has been and is being restrained in these markets and because AFMS's injury flows from the reduction of that competition, AFMS has suffered antitrust injury.  "As a corollary to the requirement that 'the alleged injury be related to anti-competitive behavior,' we require that 'the injured party be a **participant** in the same market as the alleged malefactors.'"  *Amarel*, 102 F.3d at 1508.

In *Amarel*, the defendants opposed plaintiffs' standing on the grounds that plaintiffs that tendered **paddy** rice were neither consumers nor competitors in the market for **milled** rice.  *Id*. at 1509.  The plaintiffs argued that they earned profits from the sale of milled rice under their "participant contracts."  *Id*.  The Ninth Circuit held that "[b]ecause plaintiffs thus participate in the market for milled rice, defendants' alleged predatory pricing, if true, caused them a direct monetary loss."  *Id*.

Similarly, as *Amarel* discussed at length (*id*. at 1510), *Yellow Pages* , 951

-23-

Blecher Collins Pepperman & Joye

Blecher Collins
Pepperman & Joye

BC
PJ

1  F.2d at 1159-62, is also instructive.  In *Yellow Pages*, plaintiffs were consulting

2  firms that advised businesses on the form and content of yellow page

3  advertisements, and ordered, placed, and processed advertisements on behalf of

4  those businesses.  *Id.* at 1159.  Defendants published yellow page directories and

5  also advised businesses as to yellow page advertising.  *Id.*  The Ninth Circuit

6  concluded that the consultants and publishers were competitors in a meaningful

7  way: offering advice to purchasers of yellow page advertisements.  *Id.* at 1161.

8  When analyzing antitrust standing, "the field of competition [includes]…the group

9  or groups of sellers who have actual or potential ability to deprive each other of

10  significant levels of business."  *Id.* at 1162 (citing *Thurman Indus., Inc. v. Pay 'N*

11  *Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)).  By competing with the

12  publishers to advise businesses, *Yellow Pages* noted that the plaintiffs served a

13  significant function as competitors: "imposing 'an essential discipline on producers

14  and sellers of goods to provide the consumer with a better product at a lower

15  cost….'"  *Id.* (citing *United States v. Syufy Enters.*, 903 F.2d 659, 662-63 (9th Cir.

16  1990)).

17      *Amarel* and *Yellow Pages* are directly on point.  Here, FedEx and UPS cannot

18  reasonably claim otherwise given the relevant case law and the developed facts.

19  FedEx and UPS incorrectly use the traditional non-legal definition of "competitor"

20  as the basis for their argument that they are not participants in the same market as

21  AFMS.  But on several occasions, the Ninth Circuit has ruled that consultants or

22  similar third parties are participants, have antitrust standing, and have sustained

23  antitrust injury.  *See generally Yellow Pages*, 951 F.2d at 1161-64; *Am. Ad Mgmt.*,

24  190 F.3d at 1057-58.  TPCs are included in the field of competition as one of the

25  groups "'who have actual or potential ability to deprive each other of significant

26  levels of business.'"  *See Yellow Pages*, 951 F.2d at 1162 (quoting *Thurman*, 875

27  F.2d at 1374).  TPCs, regardless of whether true competitors of FedEx and UPS,

28  "serve[d] the function of competitors" by "imposing 'an essential discipline on

-24-

1   producers and sellers of goods to provide the consumer with a better product at a

2   lower cost.'" *See id.* (quoting *Syufy*, 903 F.2d at 662-63).  Accordingly, AFMS, like

3   other consultants, is afforded antitrust standing.

4         Defendants' argument boils down to this one premise: because AFMS does

5   not make deliveries as do UPS and FedEx, and because FedEx and UPS do not

6   engage in conduct as independent third parties, AFMS cannot have antitrust

7   standing.  The fatal flaw of Defendants' theory is that under controlling antitrust

8   precedent it is not necessary that AFMS be either a consumer or a traditional

9   competitor.  It is sufficient that AFMS be a **participant** in the relevant markets that

10  are being restrained.  *See, e.g.*, *Am. Ad Mgmt.*, 190 F.3d at 1057-58; *Amarel*, 102

11  F.3d at 1509-11; *Yellow Pages*, 951 F.2d at 1159-64.  In short, the analysis should

12  focus on "the relationship between the defendant's alleged unlawful conduct and the

13  resulting harm to the plaintiff." *Am. Ad Mgmt.*, 190 F.3d at 1058; *accord Legal*

14  *Econ. Evaluations, Inc. v. Metro. Life Ins. Co.*, 39 F.3d 951, 953 (9th Cir. 1994)

15  ("antitrust laws are concerned about injury to competition, not competitors").

16        The Ninth Circuit has specifically found antitrust standing despite the fact that

17  the plaintiffs and the defendant were "not identical entities." *Amarel*, 102 F.3d at

18  1510.  In *Amarel*, all of the parties were **participants** in the same market for milled

19  rice, and the Ninth Circuit's overriding concern was that the anticompetitive activity

20  had been directed, in part, towards the elimination of plaintiffs, the independent rice

21  growers, from the rice industry.  *See id*.  This is exactly what is alleged and proven

22  here.  *Amarel* expressly distinguished other cases, such as *Eagle v. StarKist Foods,*

23  *Inc.*, 812 F.2d 538 (9th Cir. 1987), in which the plaintiffs had not been targeted by

24  defendants.  *See id.* at 1511.

25        *American Ad Management* involved a third party plaintiff who facilitated the

26  purchase of yellow pages advertising space from the defendant for consumers at a

27  price that was lower than that which the consumers could obtain on their own.  *See*

28  190 F.3d at 1053.  For this service, the plaintiff received a commission based on the

-25-

Blecher Collins
Pepperman & Joye

1   savings obtained.  *See id.*  The defendant terminated these discounts, which resulted

2   in the raising of prices for consumers.  *See id.*  The Ninth Circuit held that the

3   plaintiff was a participant in the relevant market and had suffered antitrust injury.

4   *See id.*  Despite being neither a traditional competitor nor consumer, the plaintiff

5   and defendants were participants in the same market, and the plaintiff had lost out

6   on commissions "[a]s a broker for the advertisements whose prices [were] allegedly

7   restrained."  *Id.* at 1053-57; *see also Pac. Telesis Grp. v. Int'l Telesis Commc'ns*,

8   994 F.2d 1364, 1369 (9th Cir. 1993).

9        In *Yellow Pages* and this case, ███████████████████████████

10  ████████████████████████████  *Compare* PSUF at Nos. 3-7 *with*

11  951 F.2d at 1159-60.  ████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████  *Compare* PSUF at

14  Nos. 3, 7 *with Yellow Pages*, 951 F.2d at 1159-60.  ████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████  *Compare* PSUF at Nos. 1-2 *with Yellow*

17  *Pages*, 951 F.2d at 1159-60.  And, lastly, these cases both involve concerted efforts

18  made by the defendants to target a particular type of third party which resulted in a

19  loss of business for those targeted and an increase in prices for consumers.

20  *Compare* PSUF at Nos. 42-45, 47, 55-56, 64-65 *with Am. Ad Mgmt.*, 190 F.3d at

21  1053, *Amarel*, 102 F.3d at 1511, *and Yellow Pages*, 951 F.2d at 1162-64.

22       Given the striking similarities between these three cases and the current case,

23  it seems incredulous that FedEx and UPS dispute that AFMS has suffered antitrust

24  injury.  In contrast, UPS's comparison of this case to *Legal Economic Evaluations*,

25  (*see* UMSJ at 28:8-19), is misplaced.  In that case, the plaintiff alleged that there

26  was a conspiracy "to reduce the cost of structured settlements below the cash value

27  of tort claims."  *Legal Econ.*, 39 F.3d at 953.  There, the Ninth Circuit held:

28            the  alleged  harm  to  competition--decreased  annuity

-26-

PLAINTIFF AFMS LLC'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Blecher Collins
Pepperman & Joye

1    benefits to tort plaintiffs and increased annuity costs to

2    liability carriers--nevertheless occurs in markets in which

3    Weil does not compete.  Weil is neither a liability carrier

4    nor a tort plaintiff.  Thus, even if price fixing of structured

5    settlements injures tort plaintiffs, and restriction on output

6    increases the cost of annuities and thereby injures Life

7    Carriers, Weil's injury does not flow from these

8    competitive harms.

9  *Id.* at 955.  The bottom line is that in *Legal Economic Evaluations*, the plaintiff

10  could not establish that its claimed injury flowed from a reduction of competition in

11  a market in which it was actually a participant.

12      All of the parties in this case advise shippers with regard to FedEx and UPS's

13  services and prices and are participants in the same markets.  *See* PSUF at Nos. 3-7,

14  53-54 .  FedEx and UPS have tried to avoid this truth by misdirection and

15  obfuscation, which is essentially an admission that they advise shippers.[13]



20                    *See id.* at Nos. 3-7.  Whether called "negotiators" or consultants,

21  these are all the things that AFMS and other TPCs do.

22

23

_____

24  [13] FedEx and UPS also appear to want to convert their antitrust standing argument

25  into a market definition argument.  *See, e.g.*, UMSJ at 20:3-12, 21:1-26:4.
    However, as discussed in more detail, *infra* at Section III.D.1, "the definition of the

26  relevant market is a question of fact for the jury" and rarely appropriate for

27  resolution on a motion for summary judgment.  *Theme Promotions, Inc. v. News

28  Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008).

-27-

Blecher Collins
Pepperman & Joye

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 This distinction, however, has no legal significance.  The Ninth Circuit has

4 previously ruled that the quality, content, or bias of the advice being offered is

5 irrelevant when determining whether the parties are participants in the same market.

6 *See Yellow Pages*, 951 F.2d at 1161-62.  Providing reasonably interchangeable

7 consultation services does not mean providing exactly the same advice with the

8 same motivations.  Nor does it mean that consumers cannot have a preference for

9 one provider over another.[14]  *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,

10 140 F.3d 494, 513 (3d Cir. 1998).  "[T]he consumers do not define the boundaries of

11 the market; the products or producers do." *Newcal Indus., Inc. v. Ikon Office*

12 *Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).  ████████████████████

13 █████████████████████████████  *See* PSUF at No. 8. ████

14 ████████████████████████████████████████████████

15 ██████████████████████████  *Id.*

16       Finally, AFMS, as a small parcel consultant, encouraged competition between

17 FedEx and UPS with regard to their delivery services and rates and resulted in lower

18 prices for shippers.  *See id.* at Nos. 11-12, 42-43.  Even if TPCs were not traditional

19 direct competitors of UPS and FedEx, TPCs serve the important function of

20 "imposing 'an essential discipline on'" FedEx and UPS, and a finding of antitrust

21 standing is appropriate.  *See Yellow Pages*, 951 F.2d at 1162 (quoting *Syufy*, 903

22 F.2d at 662-63).  Moreover, Defendants and AFMS indisputably have the "ability to

23 deprive each other of significant levels of business."  *Id.* (quoting *Thurman*, 875

24 F.2d at 1374).  FedEx and UPS successfully put AFMS and other TPCs out of

25 ─────────────────

26 [14] Nor is this something that can be resolved by relying on an expert's report.  *See,*

27 *e.g.*, UMSJ at 19:6-14.  Rather,  this is a question whose resolution requires weighing factual evidence, *see In re Citric Acid Litig.*, 191 F.3d at 1102, and should

28 be decided by the fact-finder.

1  business and also discouraged shippers from using TPCs██████████████

2  ████████████████████████████████████████████████ *See* PSUF at

3  Nos. 44-45, 65.  AFMS and other TPCs reduced the amount FedEx and UPS could

4  charge for their services and even helped shippers switch from one Defendant to

5  another or, when the duopoly was not in place, to an entirely different carrier.  *See*

6  *id.* at Nos. 11-12, 42-43

7         In short, given the overwhelming factual evidence and the close alignment of

8  this case to controlling precedent, whether AFMS is a participant in the same

9  markets as FedEx and UPS and has suffered antitrust injury are factual questions

10 that should be submitted to a jury and which cannot properly be decided as a matter

11 of law on a motion for summary judgment.  *See Theme Promotions*, 546 F.3d at

12 1002.

### 2.   AFMS's Injuries Are Directly Caused by the Elimination of Competition Resulting from Defendants' Illegal Actions

15        AFMS has suffered a direct antitrust injury because its injuries, (lost

16 commissions), flow directly from FedEx and UPS's unlawful, concerted decision to

17 eliminate competition by denying discounts to consumers via their new policy of not

18 dealing with TPCs.  *See* Dkt. No. 74 at 31:20-33:19; *Am. Ad Mgmt.*, 190 F.3d at

19 1056-58; *Yellow Pages*, 951 F.2d at 1160-62.  First, AFMS is itself a market

20 participant and its injury is not a byproduct of an injury suffered by some other

21 market participant.[15]  Rather, FedEx and UPS's refusal to deal with TPCs directly

22

23 _____

24 [15] *Compare* PSUF at Nos. 47, 55-56, 64-65  *with Associated Gen. Contractors*, 459
   U.S. at 540-42 (finding that union plaintiff was not an immediate victim where
25 coercion was directed at injuring specific contractors and subcontractors and not the
   union plaintiff itself), *Eagle*, 812 F.2d at 541-42 (finding that employees and the
26 union suffered derivative injuries compared to employers who were directly injured
27 by the defendants' actions), *and Sw. Suburban Bd. of  Realtors, Inc. v. Beverly Area
   Planning Ass'n*, 830 F.2d 1374, 1379-80 (7th Cir. 1987) (finding that the member

28

*(left margin vertical text)* Blecher Collins Pepperman & Joye

1  affected AFMS because it meant that AFMS could no longer negotiate for shippers

2  directly with Defendants, or advise shippers on their contracts and, consequently,

3  could not collect any commissions on savings achieved for shippers.  *See* PSUF at

4  No. 44.

5          Because AFMS is an immediate victim within the "'identifiable class of

6  persons whose self-interest would normally motivate them to vindicate the public

7  interest in antitrust enforcement,'" they are not a remote party and a direct injury has

8  been suffered.  *Amarel*, 102 F.3d at 1513 (quoting *Lucas v. Bechtel Corp.*, 800 F.2d

9  839, 845 (9th Cir. 1986)); *see also Yellow Pages*, 951 F.2d at 1162-64 ("[F]ailure to

10  allow Consultants standing would raise a serious danger that alleged antitrust

11  violations would go unremedied."); *Am. Ad Mgmt.*, 190 F.3d at 1058-59.  It would

12  be nearly impossible for there to be a closer causal link between FedEx and UPS's

13  refusals to deal with TPCs, like AFMS, and the injury suffered by AFMS.  *See Am.*

14  *Ad Mgmt.*, 190 F.3d at 1058; *Yellow Pages*, 951 F.2d at 1162 (stating that, in the

15  antitrust context, directness means closeness in the chain of causation). ████████

16  ████████████████████████████████████████████████████████████████(*see*

17  PSUF at Nos. 47, 42-45, 55-56, 64-65 ), further "makes antitrust standing

18  appropriate."  *Yellow Pages*, 951 F.2d at 1163.

19              **3.      The Harm Caused by FedEx and UPS's Anticompetitive**

20                        **Conduct Is Not Speculative**

21          The harm suffered by AFMS is actual, not speculative in nature.  *See* Dkt. No.

22  74 at 33:22-34:5; *Amarel*, 102 F.3d at 1507. ████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████

25  ██████████████████████████████████████████████ *See* PSUF

26

27  brokers of the plaintiff organization were being targeted and directly injured by

28  defendants' boycott, not the plaintiff).

Blecher Collins
Pepperman & Joye

1   at No. 52. ████████████████████████████████████

2   ████████████████████████████████████████████

3   ██████████████████████████ *See id.* at Nos, 44, 52.  Defendants' argument

4   that AFMS lacks antitrust standing because its damages are too "speculative" has no

5   merit.  *See Yellow Pages*, 951 F.2d at 1163 (holding that one "'need not negative all

6   possible alternative explanations for his decline in profits'") (quoting *Knutson v.*

7   *Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976)); *Am. Ad Mgmt.*, 190 F.3d at

8   1059.

9             **4.**     **AFMS's Damages Are Not Duplicative**

10        Defendants have conceded that a risk of duplicative damages is not a factor

11   undermining AFMS's antitrust standing.  Although FedEx and UPS's

12   anticompetitive conduct harms shippers and TPCs, the losses suffered by AFMS and

13   other TPCs do not overlap but are distinct and different from those suffered by the

14   shippers for whom they facilitated deals and provided consultation services.  *See*

15   Dkt. No. 55 at 21:25-23:16; *Am. Ad Mgmt.*, 190 F.3d at 1059-60; *Yellow Pages*, 951

16   F.2d at 1163.  Additionally, AFMS is uniquely positioned to bring these antitrust

17   violators to justice as the overall injury proportionally suffered by AFMS is larger

18   than that which is individually suffered by most shippers, shippers who also might

19   fear retaliation from the UPS/FedEx duopoly.[16]  *See Yellow Pages*, 951 F.2d at 1164

20   ("[F]ailure to allow Consultants standing would raise a serious danger that alleged

21   antitrust violations would go unremedied.").

22   ///

23   ///

24

25   [16] In fact, AFMS is unaware of any shipper-based litigation against UPS or FedEx

26   regarding their No TPC Policy.  *See* Decker Decl. ¶ 2.  The absence of any consumer action several years after the commencement of the initial action weighs

27   in favor of a finding that there is no risk of duplicative damages.  *See Am. Ad Mgmt.*,

28   190 F.3d at 1060.

Blecher Collins Pepperman & Joye

### 5.   AFMS's Damages Are Capable of Being Calculated and Apportioned

AFMS's case does not present any unusual apportionment problems and is not overly complicated.[17]   As in most other antitrust conspiracy cases, AFMS's damages are based on revenue lost as a result of the conspiracy and calculated from projected revenue grounded in returns from previous years.  *See, e.g.*, *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 263-64 (1946); *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982) (noting that there is a "liberal proof-of-damages rule in antitrust cases").  Furthermore, it is well-established that damages do not need to be measured with exactness when they are made uncertain by the wrongful acts of Defendants; instead a reasonable estimate is sufficient to provide to a jury.  *See id.* at 264-66 ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").  Additionally, unlike complex cases with multiple plaintiffs, in this case, there is no need to apportion damages between multiple entities nor determine the harm suffered by multiple parties because there is only one plaintiff.  *See Am. Ad Mgmt.*, 190 F.3d at 1060.

As previously discussed, in two cases involving similar fact patterns of a third party plaintiff receiving a percentage of obtained customer savings, the Ninth Circuit has previously found that damages calculations are indeed determinable.  *See id.* (commenting that in a case with a similar fact pattern, that "apportioning damages in this case would require only a determination of the damages suffered by the [plaintiffs] and their customers" and would not be exceedingly complicated to do); *Yellow Pages*, 951 F.2d at 1163 (finding no unusual difficulty in apportioning damages in a case involving a consulting plaintiff).  ███████████████

---

[17] FedEx and UPS appear to hang their entire theory regarding the incalculability of AFMS's damages on a single irrelevant and unpublished Illinois district court decision.  *See* UMSJ at 29:20-30:20; FMSJ at 16:6-15.

Blecher Collins
Pepperman & Joye

1   ██████████████████████████████████████████████

2   ███████████   *See* PSUF at No. 52.  Because the type of damages analysis required in

3   this case is no more complex than that found in most tortious civil litigation matters,

4   this final factor also weighs in favor of AFMS and supports a finding of antitrust

5   standing.

6        **D.    Defendants' Unlawful Actions Have Harmed Competition**

7        First, if this Court finds that this case is appropriate for *per se*, or even quick

8   look, treatment, a detailed inquiry into the alleged market definition and a thorough

9   review of the claimed harm to competition is not required.  *See, e.g.*, *Safeway*, 651

10  F.3d at 1133; *Big Bear Lodging*, 182 F.3d at 1101-02; *Amarel*, 102 F.3d at 1509.

11  Second, as discussed below, when FedEx and UPS took advantage of their duopoly

12  in the market for the time-sensitive delivery of small parcels in the United States and

13  boycotted TPCs, they not only directly and adversely injured AFMS and other TPCs

14  but also reduced competition in the shipping consultation market, which resulted in

15  a substantial increase to FedEx and UPS's revenues and profits while

16  simultaneously causing detriment to shippers who were forced to pay higher prices.

17  *See* PSUF at Nos. 42-45.  This demonstrable injury to competition in two markets

18  negates the need for any elaborate market analysis.  *See, e.g.*, *Thurman*, 875 F.2d at

19  1373; *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988)

20  ("Because market definition and market power are merely tools designed to uncover

21  competitive harm, proof of 'actual detrimental effects, such as a reduction of output,

22  can obviate the need ... [for] elaborate market analysis.'") (quoting *FTC v. Ind.*

23  *Fed'n of Dentists*, 476 U.S. 447, 460 (1986)).  Third, the Ninth Circuit has already

24  decided that a single factual collocation can adversely affect competition in two

25  separate but related relevant product markets.  *See L.A. Mem'l Coliseum v. NFL*, 726

26  F.2d 1381, 1395-97 (9th Cir. 1984).

27       For these reasons, summary judgment on market definition and harm to

28  competition is inappropriate and Defendants' motions should be denied.

-33-

Blecher Collins
Pepperman & Joye

1.   **AFMS's Market Definitions Are Both Factually and Legally Supported**

If the Court decides that detailed market analysis is required, it is well-established that defining the market "is a factual inquiry for the jury." *See, e.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) ("Ultimately what constitutes a relevant market is a factual determination for the jury."); *Am. Ad Mgmt.*, 92 F.3d at 790 (1996); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993); *Thurman*, 875 F.2d at 1374. What constitutes the relevant market is not typically proper for resolution on a motion for summary judgment.  FedEx and UPS's deliberate attempts to misinterpret the alleged market fly in the face of the developed facts and their own well-crafted policies which clearly delineate the market boundaries at issue in this case.

(a)   **The Alleged Consulting Market Is Narrowly Defined**

FedEx and UPS have improperly tried to force every entity that does some type of "consulting" on any aspect of the shipping industry into the alleged market. *See* UMSJ at 32:15-34:16; FMSJ 32:25-34:13.  In contrast, AFMS has alleged a very narrowly defined "market for shipping consultation services, which is composed of those business entities which advise shippers regarding the delivery of time sensitive letters, documents and packages by air or by ground within the United States and to and from the United States to foreign countries." TAC ¶ 6.  The geographic market is the United States.  *Id.*  This market definition is then further explained and limited throughout the TAC and the factual record:

- "Consultants, such as plaintiff AFMS, other third-party consultants, UPS, and FedEx, gather and analyze data, including a shipper's past transactions, to develop a strategy and advice a shipper on how to save money and match that shipper's specific needs to a carrier's delivery services." *Id.* ¶ 11; *see also* PSUF at Nos. 3, 7.

-34-

Blecher Collins
Pepperman & Joye

- "[B]oth UPS and FedEx hold themselves out as either the best positioned party or most qualified expert to provide advice or address a shipper's concerns regarding the various aspects of their respective delivery services."  TAC ¶ 11; *see also* PSUF at No. 4.  FedEx and UPS consider TPCs to be competitors with regard to such advice.  TAC ¶ 11; *see also* PSUF at No. 8.

- "Both UPS and FedEx use complex customer contracts which shippers, even with professional shipping departments, find difficult to understand."  TAC ¶ 10; *see also* PSUF at No. 9.  "UPS and FedEx have created a rating and fee matrix so complex that a significant percentage of shippers must employ specialists to help them understand the nuances of the agreements and how they pertain to the specific parcels that a shipper wishes to deliver."  TAC ¶ 10; *see also* PSUF at No. 9.

- "Consultants, like plaintiff AFMS, typically help shippers negotiate or otherwise obtain the maximum savings for their shipping needs.  They are mainly able to do this by highlighting the hard and soft issues inherent in a very complex contractual and rating environment."  TAC ¶ 12; *see also* PSUF at Nos. 3, 9-11.

These descriptions ███████████████████████████████████ █████████████ explain that entities that solely "consult" on warehousing, inventory management, tracking and other shipping related computer systems, insurance, physical packaging, customs and tariffs, regulations and special services for hazardous or controlled substances, and auditing are **not** part of this alleged market.  *See* PSUF at Nos. 53-54.  While there may be overlap as businesses might offer multiple types of services (like how a law firm might provide civil and criminal

Blecher Collins
Pepperman & Joye

1  litigation services), this case focuses on a particular type of consulting—the advising

2  of "shippers regarding the delivery of time sensitive letters, documents and packages

3  by air or by ground within the United States and to and from the United States to

4  foreign countries"—and the market for this one type of consulting.

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████████████████████████████████████████████

8  *See id.* at Nos. 55-56.  A key example is the No TPC Policy itself.  This policy

9  applies only to TPCs who advise shippers as to FedEx and UPS's services,

10  contracts, and rates.  *See id.* at Nos. 24, 38-39, 55.  ████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ██████████████████████ *See id.* at No. 55.  ████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████ *See id.* at Nos. 56, 64-65.  ████████████

17  ███████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████ *See id.* at No. 56.  This is direct evidence of industry recognition

20  of the existence of the alleged market.

21        Moreover, in the TPC market that AFMS alleged, the services offered by

22  TPCs and Defendants are competitive with each other and there is cross-elasticity of

23  demand.  ██████████████████████████████████████

24  ████████████████████████████████████████████████

25  ██████████████████████████████████ *See* PSUF at Nos. 57, 63.  Nor

26  does it matter that shippers are a captive consumer of Defendants' consulting

27  services which are offered as part of their sales tactics.  *See Cal. v. Sutter Health*

28  *Sys.*, 84 F. Supp. 2d 1057, 1068 (N.D. Cal. 2000) (finding that "captive" consumers

Blecher Collins
Pepperman & Joye



1    should be included within the defined market), *aff'd*, 217 F.3d 846 (9th Cir. 2000).

2    

3

4

5    *See* PSUF at No. 58.

6            **(b)     The Relevant Consulting Market Does Not Include**

7                      **Inadequate In-House Substitutes**

8            The alleged market definition does not include shippers' in-house resources

9    as they are not adequate substitutes.  First, the fact that a minority of shippers hire

10   TPCs instead of relying solely on the advice of FedEx and UPS is not evidence that

11   there are adequate in-house substitutes for TPCs like AFMS.  *See Newcal*, 513 F.3d

12   at 1045 ("The consumers do not define the boundaries of the market; the products or

13   producers do."); *see generally Am. Ad Mgmt.*, 190 F.3d at 1051 (finding a relevant

14   market even when the majority of consumers engaged directly with the defendants

15   instead of utilizing a third party); *Yellow Pages*, 951 F.2d at 1158 (same).  Rather, it

16   is evidence that many consumers utilize UPS and FedEx for advice as to

17   Defendants' services and pricing instead of hiring TPCs.

18           Second, in-house resources should not be included as a matter of law within

19   the defined market participants because a jury could easily find that they are

20   inadequate and not actual substitutes.

21

22

23

24           *See* PSUF at No. 59.

25

26   ///

27   ///

28   ///

Blecher Collins
Pepperman & Joye



1    [18] *See id.* at No. 43, 11.

3    *See id.* at Nos. 10, 60.

5    *See id.* at No. 61.

6    *See id.*

9    *See id.* at No. 62.  This strongly supports the

10   fact that TPCs are not interchangeable with in-house resources.  Lastly, the Ninth

11   Circuit has already upheld a similar consultant-based market that did not include in-

12   house substitutes.  *See generally Yellow Pages*, 951 F.2d at 1161-62.

13              **2.    Competition Within the Consultation Marketplace Has Been**

14                      **Harmed**

15        The best way to look at harm to competition in the defined shipping

16   consultation market is to look at the percentage of the market that has been closed

17   off to TPCs.  This foreclosure is nearly 100%

19   and has resulted in the devastation of the market for shipping

20   consultation services by virtually eliminating every consultant from the market

21   ///

22   ///

23   _____

24   [18]

27   *See* PSUF at Nos. 57, 63.

-38-

Blecher Collins Pepperman & Joye

1    except for Defendants.[19]  *See* PSUF at No. 51.  Moreover, because FedEx and UPS

2    are the only two significant time-sensitive delivery carriers of any consequence in

3    the United States, their agreement and individual efforts to boycott TPCs have not

4    only directly threatened the continued viability of any such consultant but have also

5    resulted in various TPCs going out of business.[20]  *See id.* at Nos. 15-16, 45.  In fact,

6    many TPCs, including AFMS, have suffered losses directly related to Defendants'

7    ───────────────────

8    [19]

9

10

11    *See* UPS's

12    Disputed Facts Nos. 67, 68; FedEx's Disputed Facts No. 134.

13

14    *See* UPS's

15    Disputed Facts Nos. 67, 68; FedEx's Disputed Facts No. 134.

16

17

18

19    *See* PSUF at No. 13.

20

21

22    *See id.* at No. 44; UPS's Disputed Facts Nos. 67, 68; FedEx's Disputed Facts No.

23    134.  As this Court must look at the evidence in the light most favorable to AFMS,

      FedEx and UPS's evidence does nothing more than reveal a factual dispute that

24    should go to a jury for resolution.

25    [20] There can be no dispute that FedEx and UPS enjoy a duopoly in the market for

26    time-sensitive delivery in the United States.  *See* PSUF at No. 15.  This duopoly

      allows them to leverage their market power in that market to control the subsumed

27    market for consulting on time-sensitive delivery in the United States.  *See id.* at No.

28    16.

-39-

Blecher Collins
Pepperman & Joye

1  implementation of the No TPC Policy.[21]  *See id.* at No. 44.

2          All in all, this is not a trivial or temporary foreclosure.  It is a substantial,

3  significant, and long-lasting injury to competition.[22]  It is also a clear decrease in

4  output in the defined shipping consultation market as there are now only two

5  suppliers of advice for consumers—UPS and FedEx—when before there were

6  several dozen.  Furthermore, it is well-established that boycotts, like the one alleged

7  in this case, are typically forbidden, no matter their overall effect on the market.

8  *See, e.g.*, *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-14 (1959).

9          **3.        There Is Injury to Competition in the Delivery Services**

10                    **Market**

11          The second injury to competition revolves around the undisputable fact that

12  shippers have been forced to pay higher prices for the shipping of time-sensitive

13  letters, documents, and packages because of FedEx and UPS's boycott of TPCs.  *See*

14  PSUF at No. 42.  TPCs, such as AFMS, generated more intense competition

15  between FedEx and UPS and reinvigorated price competition that was severely

16  weakened in this undisputed duopoly.  *See id.* at Nos. 11, 15, 17, 42-43, 46.  The

17  higher prices that have resulted from the elimination of the TPCs' ability to secure

18  discounts are a form of price-fixing, which is a paradigmatic example of what the

_____

20  [21] The question of the extent that AFMS's injuries were caused by FedEx and UPS's
21  anticompetitive conduct versus other potentially attributable factors is a damages
   question and unrelated to the issue of whether there has been harm to competition.
22  The Court need only determine at this point if this case is to be governed by a *per se*
23  analysis, which moots this entire argument, or, if not, if there is evidence that
   Defendants' unlawful conduct harmed TPCs, at which point this becomes a question
24  of fact for a jury to decide.

25  [22] Any argument suggesting that there is no injury to competition because the
26  unlawful boycott simply encouraged shippers to use in-house "consultants" is
   without merit.  As previously discussed, in-house resources are not perceived to be
27  or are not in fact an adequate substitute for TPCs, and a jury could easily exclude in-
28  house resources from the relevant market.  *See supra* Section III.D.1(b).

Blecher Collins
Pepperman & Joye

1  Sherman Act was designed to prohibit.  *See NCAA v. Bd. of Regents of Univ. of*

2  *Okla.*, 468 U.S. 85, 107-08 (1984).  In other words, Defendants' actions have

3  negatively impacted consumer welfare, which is the cornerstone of any antitrust

4  injury.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433, 1445-46 (9th

5  Cir. 1995) (holding that injury to consumer welfare is the foundation of antitrust

6  injury and that "[c]onsumer welfare is maximized when economic resources are

7  allocated to their best use, and when consumers are assured competitive price and

8  quality") (internal citations omitted); *NCAA*, 468 U.S. at 107 (stating that the

9  Sherman Act is a "consumer welfare prescription") (citation omitted).

10       **E.**    <u>**AFMS's Second and Third Claims Raise Justiciable Issues**</u>

11       The harm to competition analysis is nearly the same for AFMS's second and

12  third claims.  The only difference is that the foreclosure pertains primarily to

13  consulting with regard to one or the other of the two duopolists' time-sensitive

14  delivery services.  *See* TAC ¶¶ 29-40.  Once again, FedEx and UPS were each

15  individually able to use their market power in the shipping market to control the

16  subsumed shipping consultation market and to foreclose a large percentage of that

17  market to TPCs, in this case, roughly half the market each.  *See* PSUF at Nos. 15-16,

18  51, 64-65. ████████████████████████████████████████████

19  ██████████████████████████████████████████████████████

20  *See id.* at Nos. 47-48, 56, 64. ████████████████████████████

21  ████████████████████████████████████████████████

22  ██████████████████████████████████████████████████

23  ████████████████████████████████████ *See id.* at No.

24  65.  Nor is there an exception to the antitrust law for nondisclosure agreements

25  designed to be anticompetitive.

26                    *     *     *

27       Market definition and harm to competition are intensely factual issues that

28  should be left for a jury to decide, particularly where, as here, there is

Blecher Collins
Pepperman & Joye

1  incontrovertible evidence that supports the non-moving party's claims.

2  Additionally, given that the Court must view the evidence presented in the light

3  most favorable to AFMS, Defendants' motions for summary judgment should be

4  denied.

5  **IV.   <u>CONCLUSION</u>**

6         Like the consultants in *Yellow Pages*, AFMS has suffered antitrust injury that

7  flows directly from FedEx and UPS's unlawful decision to eliminate: (1)

8  competition among and between themselves; and (2) their competitors in the market

9  for shipping consultation services.  Defendants' anticompetitive conduct has

10 resulted in a loss of discounts for shippers, who have been forced to pay higher

11 prices.  This has allowed FedEx and UPS to reap the benefits of increased revenues

12 and profits at the cost of both consumers and TPCs.  In addition, there is substantial

13 and undisputable evidence to support the conspiracy alleged in the TAC.  As FedEx

14 and UPS have committed *per se* violations of the antitrust laws, and AFMS has

15 clearly demonstrated that it has antitrust standing, AFMS respectfully submits that

16 the Court should deny Defendants' motions for summary judgment in their entirety.

17

18 Dated:  June 21, 2013               BLECHER COLLINS

19                                     PEPPERMAN & JOYE, P.C.
                                       MAXWELL M. BLECHER
20                                     COURTNEY A. PALKO
                                       ALYSON C. DECKER
21

22

23                               By:      /s/ Maxwell M. Blecher
24                                     _____
                                          Maxwell M. Blecher
25                                     Attorneys for Plaintiff
                                       AFMS LLC
26 56416.1

27

28
                                     -42-

Blecher Collins
Pepperman & Joye