JS-6          O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| AFMS LLC, | Case No. CV 10-5830 JGB (AJWx) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED PARCEL SERVICE CO.; FEDEX CORPORATION, | |
| Defendants. | |

Before the Court are two motions for summary judgment filed by Defendants United Parcel Service Co. and FedEx Corporation.  After considering all of the papers filed in support of and in opposition to the motions, as well as the arguments presented at the October 2, 2014, hearing, the Court GRANTS the motions.

# I.   BACKGROUND

Plaintiff AFMS LLC ("AFMS") commenced this antitrust action against United Parcel Service Co. ("UPS") and FedEx Corporation ("FedEx") (collectively, "Defendants") on August 5, 2010.  (Doc. No. 1.)  After AFMS filed a First Amended Complaint, ("FAC," Doc. No. 31), Defendants moved to dismiss, and, on May 27, 2011, the Court (Morrow, J.) granted their motions on the grounds that AFMS failed to plead sufficient facts to show that it had antitrust standing and failed to allege the type of anticompetitive conduct that would support a monopolization claim, ("MTD 1 Order," Doc. No. 55).  The FAC alleged that AFMS suffered injury in the relevant market for the business of delivering time sensitive letters, documents, and packages within the United States and to and from foreign countries. (FAC ¶ 16.)  The Court held that AFMS lacked standing because it is not a participant in the alleged market, since it is not "'in the chain of distribution' for shipping and delivery services," "rather it offer[s] advice and assistance to one side of the purchase/sale transaction."  (MTD 1 Order at 17-18 (internal quotation omitted).)  Consequently, the Court found AFMS had not adequately alleged that it suffered antitrust injury and dismissed, with leave to amend,

1  AFMS's claim under Section 1 of the Sherman Act, 15

2  U.S.C. § 1.  (Id. at 23-24.)[1]

3      AFMS filed a Second Amended Complaint on June 24,

4  2011.  ("SAC," Doc. No. 56.)  Defendants again moved

5  to dismiss, and this time, the Court (Morrow, J.)

6  found that AFMS adequately alleged antitrust standing

7  but dismissed the claims under Sections 1 and 2 of the

8  Sherman Act on the grounds that they were conclusory

9  and stated insufficient facts.  ("MTD 2 Order," Doc.

10  No. 74.)  In the SAC, AFMS alleged that the parties

11  are all "participants in the market for shipping

12  consultation services, which is comprised of those

13  business entities which advise shippers regarding the

14  delivery of time sensitive letters, documents and

15  packages by air or by ground within the United States

16  and to and from the United States to foreign

17  countries."  (SAC ¶ 11.)  The Court found that AFMS

18  adequately alleged that it competes with Defendants in

19  this market and that it was directly injured by

20  Defendants' decision to cease dealing with third-party

21  shipping consultants like Plaintiff.  (MTD 2 Order at

22  33-34.)  The Court nonetheless dismissed AFMS's

23  Section 1 claim because its allegations of injury to

24

25      [1] The Court also dismissed AFMS's claim for

26  monopolization under Section 2 of the Sherman Act, 15
    U.S.C. § 2, for failing to allege the type of

27  anticompetitive conduct that will support such a claim.

28  (MTD 1 Order at 29-31.)

competition were "wholly conclusory and [were] unsupported by specific facts." (MTD 2 Order at 34-37.) Once again, the Court granted AFMS leave to amend its pleading. (Id. at 48.)[2]

On December 12, 2011, AFMS filed the operative Third Amended Complaint. ("TAC," Doc. No. 76.) The TAC states three claims under Section 1 of the Sherman Act, 15 U.S.C. § 1. The first claim alleges that, since the fall of 2009, FedEx and UPS "combined and conspired to unreasonably restrain trade and commerce in the market for shipping consultation services for the delivery of time sensitive letters, documents and packages by air or ground." (TAC ¶ 24.) Claim one alleges that Defendants refuse to deal with any third-party consultants ("TPCs") and refuse to negotiate or discuss discounts with shippers who share data with or retain TPCs. (Id.) As a result, the TAC contends that prices for the delivery of time sensitive materials increased, TPCs' businesses suffered, and competition between shipping consultants and Defendants' diminished. (Id. ¶¶ 24-27.) The second and third claims contend that UPS and FedEx, individually, have, "by a series of non-disclosure

_____

[2] For a second time, the Court dismissed AFMS's claim for monopolization or attempted monopolization under Section 2 of the Sherman Act because AFMS failed to allege the existence of viable, single-brand submarkets. (MTD 2 Order at 38-48.) AFMS did not replead this claim in its Third Amended Complaint. (See Doc. No. 76.)

agreements and customer/carrier contracts . . . , unreasonably restrained competition, trade, and commerce in the market for shipping consultation services for the delivery of time sensitive letters, documents and packages by air or ground." (Id. ¶¶ 30, 36.)  According to AFMS, these agreements and contracts restrict or revoke the shippers' ability to share information with TPCs, thereby directly threatening the TPCs' business.  (Id. ¶¶ 31, 37.)  Due to Defendants' conduct, AFMS estimates that its damages are in the range of $15 to $20 million.  (Id. ¶¶ 28, 34, 40.)  Defendants answered the TAC on January 16, 2012.  (Doc. Nos. 81, 82.)

    On May 1, 2013, UPS and FedEx each filed a motion for summary judgment.  (Doc. Nos. 130, 140.)  While the motions were pending, UPS filed two motions in limine to exclude AFMS experts Stuart Brotman ("Brotman") and David Campbell ("Campbell").  (Doc. Nos. 167, 168.)  FedEx joined UPS's motions in limine. (Doc. Nos. 172, 173.)  The Court heard oral argument on the in limine motions on January 27, 2014, and issued an order granting them on February 5, 2014. ("MiL Order," Doc. No. 252.)  The Court held that it would not consider the reports and testimony of Brotman and Campbell in deciding Defendants' motions for summary judgment.  (Id. at 12.)  Accordingly, in

this Order, the Court does not rely on any exhibits or testimony from Brotman or Campbell.

On March 5, 2014, UPS applied for leave to file a supplemental brief addressing the impact of the Court's order excluding Brotman on its pending motion for summary judgment. ("Appl.," Doc. No. 257.) AFMS opposed the application on March 14, 2014. (Doc. No. 258.)  If the Court granted UPS's application, the parties stipulated to allow AFMS to file a ten-page response to UPS's supplemental brief. (Doc. No. 256.) In its proposed supplemental brief, UPS contends that the exclusion of Brotman "further highlights the insufficiency of AFMS's factual showing regarding necessary elements of its claims." (Appl., Exh. A at 1 (emphasis omitted).) Given the enormity of the summary judgment record in this action, the Court cannot fathom why any additional briefing to "further highlight[]" arguments previously made is necessary or useful. Because supplemental briefing pertaining to Brotman's exclusion is not helpful or desirable, the Court DENIES UPS's application. (Doc. No. 257.) In accordance with this ruling, the Court DENIES the parties' stipulation setting a supplemental briefing schedule. (Doc. No. 256.)

The parties initially applied to seal a substantial portion of the summary judgment briefing and evidence. (See Doc. Nos. 139, 142, 146, 150, 161,

186, 197, 199, 203.)  On January 15, 2014, the Court denied the parties' applications and stipulation to file the documents under seal because they failed to identify or meet the compelling reasons standard required for sealing documents connected to a dispositive motion.  (Doc. No. 211.)  The Court permitted the parties to renew their applications to seal.  (Id. at 2-3.)

On February 4 and 5, 2014, the parties refiled their summary judgment documents, redacting significantly less material from their public filings and applying to seal limited portions of the record to prevent prejudice or harm from disclosure.  (Doc. Nos. 217, 228, 235.)  After reviewing the renewed applications to seal, the Court provisionally granted the majority of the parties' proposed redactions. (Doc. No. 263.)  In its sealing order, the Court noted that its rulings were provisional because it "may reconsider its decision to seal in its ruling on summary judgment" in order to preserve the public's right to know the basis for the Court's decision on the merits of the action.  (Id. at 6, 9.)  Because none of the sealed documents were necessary to the Court's decision herein, the Court confirms its decision to seal the parties proposed redactions and removes their provisional status.  The documents remain sealed.

The Court has reviewed and considered all publicly filed and sealed documents submitted in support of and in opposition to the motions.[3]   UPS moves for summary judgment on all claims AFMS brings against it.  ("UMSJ," Doc. No. 246.)   In support of its motion, UPS filed the following documents:

- Statement of Uncontroverted Facts and Conclusions of Law ("USUF," Doc. No. 247);

- Declaration of Sean P. Gates ("Gates Decl.," Doc. No. 246-1), attaching 148 exhibits, (Doc. Nos. 246-2 to -9, 251);[4]

- Declaration of Donald Faby ("Faby Decl.," Doc. No. 246-10), attaching twenty exhibits, (Doc. No. 246-11);

---

[3] Because the sealed versions are not available to the public and do not include any material necessary to this Order, the Court cites to the publicly filed versions of the summary judgment filings.  However, in deciding the motions, the Court has considered all evidence manually filed and submitted under seal. Because the Court denied the parties' initial applications to seal and denied in part the parties' renewed applications to seal, the parties amended and refiled their summary judgment documents several times in an effort to limit the number of redactions from the public record.  For simplicity and ease of location, the Court cites to the most recent version of each document in this Order.

[4] Due to the volume of evidence filed in support of and in opposition to the motions, the Court does not enumerate each attached exhibit, but describes the documents in subsequent evidentiary citations as needed.

- Declaration of Kathleen Gutmann ("Gutmann Decl.," Doc. No. 246-12), attaching twenty-two exhibits, (Doc. No. 246-13 to -14);

- Declaration of Robert Harris ("Harris Decl.," Doc. Nos. 246-15), attaching one exhibit, (Doc. No. 246-16);

- Declaration of Joseph Kalt ("Kalt Decl.," Doc. No. 246-17), attaching one exhibit, (Doc. No. 246-18);

- Declaration of Clifford Kupperberg ("Kupperberg Decl.," Doc. No. 246-19), attaching one exhibit, (Doc. No. 246-20); and

- Declaration of Darrell Williams ("Williams Decl.," Doc. No. 246-21), attaching one exhibit, (Doc. No. 246-22).

FedEx separately moved for summary judgment, asserting its own arguments for dismissal and joining those made by UPS. ("FMSJ," Doc. No. 229.) FedEx attached a Statement of Uncontroverted Facts and Conclusions of Law, ("FSUF," Doc. No. 230), and an Appendix of Exhibits, ("App.," Doc. Nos. 233-234, 236-239, 241), which includes seventy-four exhibits.[5]

---

[5] Several of the exhibits in FedEx's Appendix include numerous, numbered subexhibits. For example, attached to Exhibit 24, the Declaration of Michelle Burtis, are five numbered subexhibits. The Court cites to the subexhibits either by subexhibit number, for example (App., Exh. 24, Subexh. 3), or by page number, as in (App., Exh. 24 at 24-72).

1     AFMS filed an omnibus opposition to Defendants'
2  motions.  (Opp'n, Doc. No. 218.)  AFMS's Statement of
3  Genuine Disputes of Material Fact responds to the
4  facts propounded in the USUF, ("AUSGI," Doc. No. 231
5  at 1-99), and in the FSUF, ("AFSGI," Doc. No. 231 at
6  108-207), and also sets forth its own undisputed
7  material facts, ("ASUF," Doc. No. 231 at 220-261).  In
8  support of the Opposition, AFMS includes ninety-nine
9  exhibits as attachments to the Declaration of Alyson
10  C. Decker.  ("Decker Decl.," Doc. Nos. 219-227, 232.)[6]
11     Defendants filed separate replies.  UPS filed the
12  following documents with its Reply, ("UPS Reply," Doc.
13  No. 248):

- Reply to the AUSGI, ("Reply AUSGI," Doc. No.
  249 at 4-142);

- Statement of Genuine Disputes of Material
  Fact, ("USGI," Doc. No. 249 at 143-243),
  responding to AFMS's undisputed facts;

- Objections to and Requests to Strike Evidence
  Offered in Opposition, ("UPS Obj.," Doc. No.
  250); and

- Reply Declaration of Sean P. Gates, ("Reply
  Gates Decl.," Doc. No. 248-1), attaching
  Exhibits 149 to 187, (Doc. Nos. 248-2 to -3).

---

[6] Just as with FedEx's Appendix, the Decker
Declaration includes numerous subexhibits, which are
cited either by subexhibit number or page number.

FedEx replied, ("FedEx Reply," Doc. No. 242), attaching the following documents:

- Reply to the AFSGI, ("Reply AFSGI," Doc. No. 245 at 4-78);

- Statement of Genuine Disputes of Material Fact, ("FSGI," Doc. No. 245 at 79-187), responding to AFMS's undisputed facts;

- Evidentiary Objections to AFMS's Evidence, ("FedEx Obj.," Doc. No. 244); and

- Supplemental Appendix, ("Supp. App.," Doc. No. 243), including thirty additional exhibits, (Doc. Nos. 243-1 to -30).

Because UPS and FedEx incorporate the arguments made in the other's motion, (UMSJ at 38 n.45; FMSJ at 1), the Court addresses Defendants' motions together.

## II.  LEGAL STANDARD[7]

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of

---

[7] Unless otherwise noted, all references to "Rule" refer to the Federal Rules of Civil Procedure.

11

law.  See Fed. R. Civ. P. 56(c); Tarin v. Cnty. of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The moving party may satisfy its Rule 56(c) burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial.  See id. at 323-24; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Only genuine disputes over facts that might affect the outcome of the suit under the governing law, i.e., "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party," will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248.

Under Local Rules 56-2 and 56-3, these triable issues of fact must be identified in the non-moving party's "Statement of Genuine Issues" and supported by

"declaration or other written evidence."  <u>See</u> <u>also</u> <u>Sullivan v. Dollar Tree Stores, Inc.</u>, 623 F.3d 770, 779 (9th Cir. 2010) ("Federal Rule of Civil Procedure 56(e)(2) requires a party to "set out specific facts showing a genuine issue for trial."). If the non-moving party fails to identify the triable issues of fact, the court may treat the moving party's evidence as uncontroverted, so long as the facts are "adequately supported" by the moving party.  L.R. 56–3; <u>see also</u> <u>Int'l Longshoremen's Ass'n, AFL–CIO v.</u> <u>Davis</u>, 476 U.S. 380, 398 n.14 (1986) ("[I]t is not [the Court's] task <i>sua sponte</i> to search the record for evidence to support the [parties'] claim[s]."). Neither will the Court sua sponte raise legal arguments which were not raised in the parties' summary judgment briefs.  <u>See</u> <u>Cambridge Elecs. Corp. v. MGA Elecs.,</u> <u>Inc.</u>, 227 F.R.D. 313, 336 (C.D. Cal. 2004) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the Parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (quoting <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995)); <u>see also</u> <u>Samica Enters. LLC v.</u> <u>Mail Boxes Etc., Inc.</u>, 460 F. App'x 664, 666 (9th Cir.

2011) ("Arguments not raised in opposition to summary judgment . . . are waived.").

### III. FACTS

**A. Evidentiary Issues**

The Court has already remarked upon the volume of evidence submitted in conjunction with these motions. Given the breadth of the record, a well-organized record with clear and specific citations is paramount.[8] The Court's Standing Order directs parties to "cite to specific page and line numbers" when offering evidence to support or oppose summary judgment. ("Standing Order" at 5, Doc. No. 127.) The Order also warns that, "If either party fails to provide a pincite to the supporting evidence, the Court will deem the proffered fact (or dispute) unsupported." (Id. at 8.)

Despite these clear instructions, the evidence cited in AFMS's Statements of Genuine Disputes (AUSGI; AFSGI) and Statement of Undisputed Facts (ASUF) consists of unwieldy string cites omitting crucial information necessary to locate the purported evidence.

---

[8] AFMS submitted nine volumes of evidence in support of its omnibus opposition, consisting of 3,831 pages of exhibits. These figures undervalue the enormity of the record because AFMS prints four pages of a deposition transcript on each 8 1/2 by 11 sheet, in violation of Local Rules 11-3.1.1 and 11-3.2.

For example, instead of separately tabbing each
exhibit, as required by page 5 of the Standing Order,
AFMS includes entire deposition transcripts as well as
all deposition exhibits within a single exhibit tab.[9]
(See, e.g., Decker Decl., Exh. 45 (including the
Deposition of Mike Moriarty and twenty-nine non-
consecutively numbered subexhibits used at the
deposition).)   Further compounding the disorder, the
AUSGI, AFSGI, and ASUF cite to whole subexhibits
without page numbers or pincites.   (See, e.g., ASUF
¶¶ 2, 3, 6, 8.)   Insofar as it is able, the Court
relies on the exhibits and subexhibits cited by AFMS.
However, where AFMS provides no pincite, the Court
deems the proffered fact or dispute unsupported.
See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 774-75
(9th Cir. 2002) ("Orr's Statement of Undisputed Facts
fails to cite the page and line numbers when referring
to the deposition contained in Exhibit D.   [footnote
omitted]   This defect alone warrants exclusion of the
evidence.").   (Standing Order at 8.)

     FedEx objects to numerous subexhibits offered by
AFMS due to lack of authentication.   (See FedEx Obj.
¶¶ 8, 15, 31, 34, 42, 44, 47, 62.)   These objections

---

[9] The Court notes that FedEx similarly did not
separately tab each subexhibit.   However, all
subexhibits were consecutively numbered or lettered in
accordance with the authenticating declaration and
included a footer on each page indicating its tab
number or letter.   Thus, the Court was able to easily
locate subexhibits in FedEx's filings.

15

1  pertain to exhibits attached to deposition transcripts
2  offered in support of the Opposition.  In many
3  instances, the deposition testimony authenticates the
4  exhibit because it provides testimony from a person
5  with knowledge that the document is what AFMS claims it
6  to be.  (See, e.g., Decker Decl., Exh. 42 14:1-15
7  (testimony from deponent sufficient to authenticate
8  Subexhibit 2198).)  Moreover, most of the objected-to
9  exhibits were produced by Defendants in discovery and
10 are deemed authentic when offered by AFMS.  See Orr,
11 285 F.3d at 777 n.20; Maljack Prods., Inc. v. GoodTimes
12 Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996)
13 (documents produced by a party in discovery were deemed
14 authentic when offered by the party-opponent).  Thus,
15 the Court OVERRULES FedEx's authentication objections.
16      Defendants also submit several hearsay objections
17 to AFMS's evidence.  First, UPS and FedEx object to
18 several articles from online and print industry
19 journals and publications as hearsay.  (FedEx Obj.
20 ¶¶ 42, 46; UPS Obj. ¶¶ 9, 12, 42-43, 46 (objecting to
21 Decker Decl., Exhs. 78, 82-83, 85-89).)  "It is
22 axiomatic to state that newspaper articles are by their
23 very nature hearsay evidence and are thus inadmissible
24 if offered to prove the truth of the matter
25 asserted[.]"  In re Dual-Deck Video Cassette Recorder
26 Antitrust Litig., No. MDL 765, 1990 WL 126500, at *3
27 (D. Ariz. July 25, 1990); see also Larez v. City of Los
28

1  <u>Angeles</u>, 946 F.2d 630, 642 (9th Cir. 1991); <u>Sacramento</u>

2  <u>Cnty. Retired Employees Ass'n v. Cnty. of Sacramento</u>,

3  975 F. Supp. 2d 1150, 1154 (E.D. Cal. 2013).  Here,

4  Plaintiff offers these articles and surveys to prove

5  the content contained therein, namely, that Defendants

6  raised their prices and increased their revenues.

7  Accordingly, the exhibits constitute hearsay, and the

8  Court SUSTAINS the objections and will not consider

9  them as evidence when deciding this Motion.[10]

10  <u>See</u> <u>Vannatta v. Keisling</u>, 899 F. Supp. 488, 491 (D. Or.

11  1995) <u>aff'd</u>, 151 F.3d 1215 (9th Cir. 1998) (striking

12  newspaper articles as inadmissible hearsay and refusing

13  to consider them on a motion for summary judgment where

14  "[t]he articles discuss the amounts and effects of

15  special interest contributions, and were offered by

16  Defendants to show that out-of-district donors in fact

17  pose a real threat to the campaign system.").

18      FedEx makes a hearsay objection to five exhibits,

19  all of which contain the same email between several

20  FedEx employees concerning a conference call involving

21  several FedEx vice presidents.  (FedEx Obj. ¶ 34;

22

23  _____

24      [10] However, the Court finds that several portions of
the surveys (Decker Decl., Exhs. 86-88) are admissible
25  under the hearsay exceptions in Federal Rules of
Evidence 803(1), 803(3) and 807.  <u>See</u> <u>Potts v. Zettel</u>,
26  220 F. App'x 559, 561 (9th Cir. 2007); <u>Schering Corp.</u>
<u>v. Pfizer, Inc.</u>, 189 F.3d 218, 225-238 (2d Cir. 1999)
27  (Sotomayor, J.).  Notably, all parties rely on the
undisputed survey results.  (<u>See</u> ASUF ¶ 9; USGI ¶ 9;
28  FSGI ¶ 9.)

Decker Decl., Exh. 39, Subexh. 2030; Exh. 41, Subexh.
2138; Exh. 42, Subexh. 2218; Exh. 45, Subexh. 2177;
Exh. 46, Subexh. 2277.)   The email is admissible as a
statement of a party opponent under Federal Rule of
Evidence 801(d)(2).   Moreover, at the summary judgment
stage, the Court does "not focus on the admissibility
of the evidence's form," but rather on the
admissibility of its contents.   See Fraser v. Goodale,
342 F.3d 1032, 1036 (9th Cir. 2003).   Because the email
could be presented in an admissible form at trial, the
Court may consider it in deciding the summary judgment
motions.   Id. at 1037.   The Court OVERRULES FedEx's
objections to Subexhibits 2030, 2138, 2218, 2177, and
2277.

Finally, UPS argues that the Court should disregard
a Reply Expert Report of Robert Wunderlich offered by
AFMS.   (UPS Obj. ¶ 67; Decker Decl., Exh. 59.)   The
Report is attached to the declaration of counsel, and,
although it is signed, it is not sworn under penalty of
perjury to be true and correct.   "[It] is well
established, that an unsworn expert report is
inadmissible" under Rule 56(e) to support or oppose
summary judgment.   Shuffle Master, Inc. v. MP Games
LLC, 553 F. Supp. 2d 1202, 1210 (D. Nev. 2008) (citing
cases); see Harris v. Extendicare Homes, Inc., 829 F.
Supp. 2d 1023, 1027 (W.D. Wash. 2011) (striking expert
reports because they were attached to a declaration of

counsel, who "is not competent to testify about the matters therein," and were unsworn).  The Court therefore SUSTAINS UPS's objections to the Wunderlich Reply Report and does not consider it on summary judgment.

The Court previously ruled that all testimony and reports of experts Campbell and Brotman are excluded from the Court's consideration of the summary judgment motions.  (See MiL Order.)  Therefore, the parties' objections to this evidence are SUSTAINED.

The Court addresses any remaining evidentiary objections in footnotes, as needed.

**B. Disputed and Undisputed Facts**

Contrary to the responses offered in the SGIs, after inspection of the cited evidence, the majority of material facts are undisputed.  Rather than offering conflicting evidence, the parties merely dispute the characterization of the facts as presented in the SUFs and SGIs.  In deciding the motions for summary judgment, the Court examines the underlying evidence, not the summary statements or, in Plaintiff's case, compound paragraphs[11] offered in the parties' statements

_____

[11] In violation of Paragraph 11(a) of the Court's Standing Order, a majority of the "facts" offered in Plaintiff's ASUF are compound and include numerous factual statements, making it nearly impossible for the

1    of undisputed facts.  See Dalton v. Straumann Co. USA

2    Inc., No. C-99-4579 VRW, 2001 WL 590038, at *4 (N.D.

3    Cal. May 18, 2001) ("Statements of undisputed facts, as

4    in this case, are generally unhelpful.  It is on the

5    underlying declarations, depositions and exhibits that

6    the court will rely.").

7         Unless specifically noted, the following material

8    facts are sufficiently supported by admissible evidence

9    and are uncontroverted; they are "admitted to exist

10   without controversy" for purposes of the motions.  L.R.

11   56-3.  All disputed facts are explicitly noted.

12

13        **1. Defendants**

14

15        Defendants UPS and FedEx are in the business of

16   transporting and delivering packages.  The parties

17   refer to Defendants as "carriers" and their customers

18   as "shippers."  Defendants enter into complex term

19   contracts with shippers.  They charge shippers for

20   their services, including any tailored supply chain

21   services, via structured package delivery rates and

22   other accessorial charges.

23        Defendants sell their services to customers through

24   thousands of sales employees.  The sales staff may

25   attract new customers by responding to a Request for

26   Proposals ("RFP") or approaching the shipper directly.

27   _____

     Court to locate Plaintiff's supporting evidence.  (See,

28   e.g., ASUF ¶¶ 1, 3, 8-9.)

                              20

The sales staff will also work with existing customers to retain the business when the shipper's contract expires or terminates.  First, the sales staff gathers and analyzes data from the shipper or the carrier's internal records regarding their shipping history, including, for example, the volume of packages, types of products, destinations, timeliness of delivery, and dimensional weights.  Next, they provide shippers with information regarding their carrier's delivery services and prices and offer the customer carrier-specific solutions and products to meet the customer's needs. Before signing a contract with a shipper, the carrier may negotiate price discounts on a customer-by-customer basis, based on the shipper's volume, types of packages, and market conditions.  Once finalized, the carrier presents the contract to the shipper, explaining the services, rates, prices, and discounts. In its presentation to the customer, the carrier occasionally compares its rates and services to those of competing carriers, but only if the shipper provides the sales representative with the competitor's offer.

In their communications and negotiations with customers, FedEx and UPS do not recommend that shippers use the services of another carrier for their shipping needs.[12]  (FSUF ¶ 119; AFSGI ¶ 119.)

_____

[12] The only identified exception is that, when the carrier does not offer a specific service requested or

In conjunction with their package delivery
services, Defendants provide shippers with supply chain
services to help customers increase efficiency and
profitability.  These services, which are tailed to the
shipper's needs, can include flexible pick up times,
technology integration, electronic billing, customized
reports, network optimization, and parcel insurance.
Defendants do not charge separately for these services;
instead, the cost is included in the shipper's package
delivery rates.  Defendants prefer to work directly
with their shipping customers in order to better
understand their supply chain needs and develop
customized solutions.

## 2. Plaintiff

Plaintiff is a third-party consultant ("TPC")[13] who
advises shippers regarding their delivery needs and
represents shippers in negotiating competitive small
parcel and freight contracts.  (TAC ¶ 3; USUF ¶ 1;
AUSGI ¶ 1.)  Most of AFMS's employees are former
employees of carriers, including Defendants and DHL.
Although AFMS provides other services to shippers,
approximately ninety-five percent of its revenue comes

_____

needed by the shipper, the carrier may suggest another
entity to provide that service.
    [13] Defendants also refer to Plaintiff as a third-
party negotiator, shortened to "TPN" or "3PN", or as a
transportation consultant.

22

from its price negotiation services for shippers trying
to lower their shipping costs.

In the first step of its parcel contract
optimization services, AFMS gathers the customer's
historical shipping data, including invoices, parcel
dimensions, weights and destinations, prior agreements
with shippers, and rate charts.  Next, AFMS analyzes
this data to identify opportunities for savings.  AFMS
creates a shipper profile breaking down the shipment
characteristics and associated charges and presents the
customer with a distribution and opportunity analysis.
The analysis primarily highlights savings in the form
of potential rate discounts the shipper may be able to
achieve through negotiations with carriers, also known
as "targets."  In addition to identifying targeted
discounts from FedEx and UPS, AFMS also determines if
the shipper could save money by using alternate
carriers, such as the Unites States Postal Service
("USPS"), specialized carriers, or regional carriers.
AFMS may also make recommendations to the shipper
regarding parcel insurance, customs procedures and
compliance, tariff payments, site location, which
involves identifying the prime warehouse from which to
ship goods, mode optimization, for example,
transitioning from express to ground shipments,
regulations covering the shipping of hazardous
materials, and selecting packaging for products.

1    AFMS then develops a negotiation strategy based on
2    its analysis and identified targets.  At this point,
3    AFMS may act as the shipper's representative in
4    negotiations with the carrier, or it may provide advice
5    and analysis behind the scenes.  In conjunction with
6    the shipper, AFMS may create an RFP, inviting the
7    carriers to bid on the shipper's business.[14]  The RFP
8    package includes the target incentives sought via the
9    RFP process, which a carrier should meet to stay
10   competitive in the process.  AFMS sets a timeline for
11   the carrier's bids and the negotiation process.  AFMS
12   and/or the shipper may meet with the carrier to present
13   the RFP and negotiate discounts and rates.  The
14   carriers then submit bids for the customer's shipping
15   business.

16       Subsequently, AFMS analyzes the proposals submitted
17   by the carriers and provides the shipper with a
18   comparison of the rates, incentives, products, and
19   service-levels offered by the carriers and a
20   juxtaposition of the proposals with the customer's
21   existing carrier contract.  Further rounds of
22   negotiations and bidding are held, as necessary.  The
23   shipper selects its preferred carrier and signs a new
24   carrier contract.

25       Once the final agreement is in place, AFMS assists
26   with implementation by verifying that invoices reflect

27   _____

28   [14] In select circumstances, a shipper may not issue
     an RFP and instead may negotiate with only one carrier.

24

1  the new contract rates and that the shipper is meeting

2  volume requirements, by monitoring carrier pricing

3  trends and new service offerings, and by annually

4  measuring the savings realized from the new contract.

5      Shippers generally compensate AFMS for its contract

6  optimization services via a gain share arrangement,

7  whereby the customer pays AFMS a percentage of the

8  package delivery rate savings achieved by negotiating a

9  new carrier contract.  In the majority of its

10 agreements, AFMS's fee is forty to fifty percent of the

11 savings achieved for the shipper for a term of three

12 years.  Occasionally, AFMS enters into a fixed fee

13 arrangement for its contract optimization services or

14 portions thereof.

15     AFMS also offers shippers other post-contract

16 services.  For example, R.A.D.A.R., AFMS's proprietary

17 software, provides auditing tools which monitor

18 contract compliance and track shipments to compare

19 actual delivery time with the carrier's guaranteed

20 delivery time.  The technology also assists shippers

21 with recovering and obtaining refunds for lost,

22 delayed, or nonexistent packages.  AFMS also can assist

23 the shipper with running various reports to monitor

24 shipping costs and develop cost avoidance strategies.

25 Shippers generally pay AFMS for post-agreement audit,

26 contract compliance, and reporting services at a flat

27 rate outside of the agreement for contract optimization

28

services.  These services represent a small share of AFMS's revenues.

### 3. Third Party Consultants

Third Party Consultants include numerous entities which provide consulting services to shippers to assist them with their delivery needs.  Like AFMS, these entities provide various services to shippers, including carrier contract negotiation, bill auditing, mode optimization, warehouse advice, and parcel insurance.  Other TPCs provide advice regarding additional delivery issues such as inventory management, technology integration, tariff and customs issues, product returns, hazardous materials, packaging, and obtaining service refunds when carriers deliver packages late.  TPCs mix and match these consulting services depending on a shipper's needs.

From 2006 to 2008, eleven percent of surveyed shippers reported that they used TPCs to negotiate rates with their parcel carrier.  The same survey conducted in October 2011 reports that twelve percent of shippers used TPCs to assist with carrier negotiations, while eighty-five percent approached carriers on their own.

Shippers that do not use TPCs to negotiate their shipping contracts rely on in-house personnel and

resources to engage in negotiations with carriers.
Plaintiff does not provide any evidence to dispute this
fact, but argues that in-house negotiators are "not
adequate substitutes" for TPCs.  (See AFSGI ¶ 127.)

### 4. TPC Policy

In general, the parties agree that Defendants
changed their policies with regard to interacting with
select TPCs in 2009 and 2010.  As is usually the case
in antitrust cases, there is a fundamental disagreement
as to whether the TPC Policy was adopted jointly or
independently, but the Court need not reach these facts
to dispose of the present motions.  There is also
substantial dispute regarding the timeline of enactment
of Defendants' policy changes regarding TPCs.  These
disputes are similarly immaterial to the outcome of
these motions and are not discussed.

For about seventeen years prior to 2009, Defendants
generally permitted TPCs to participate directly in the
negotiation of shipper contracts and to have access to
shipper parcel data and carrier contracts.  Between
2009 and 2010, Defendants reconsidered their
relationship with TPCs who assist with negotiations and
took steps to refuse to deal with these entities.

The minutes of a FedEx VP conference call on
December 20, 2009, indicate that there was a "decision

. . . for all of Sales to adopt the . . . hard line on not engaging with third party consultants negotiating [RFPs] for customers.  Each VP will be responsible for exceptions in their region." ("Dec. 20, 2009, Mins.," Decker Decl., Exh. 45, Subexh. 2177.)  A FedEx document entitled "Third Party Consultant Rules of Engagement for Field Sales," dated April 23, 2010, makes clear that in all three sales divisions the new TPC approach applied only to third parties that "focus strictly on rate negotiations"; in other words, entities which help shippers negotiate the pricing contained in their contracts with FedEx.  ("Field Sales ROE," App., Exh. 26, Subexh. E at 7.)  Excluded from the TPC policy were third party firms providing shippers with supply chain services, including warehouse and distribution improvements, fulfillment services, inventory and order management, and transportation management.  (Id. at 8.)  Also excluded were third parties that performed invoice auditing services, mode or network optimization services, advice on customs and international shipments, and contract negotiation services for freight, truckload, and ocean transport shipments. (Decker Decl., Exh. 40 at 210:11 to 211:15.)  As to TPCs engaged solely in price negotiation, VPs had the "ability to exercise limited exceptions" to the TPC policy.  (Field Sales ROE at 4.)  VPs in each division addressed exceptions individually.  (FSUF ¶ 166.)

1    UPS sent an email to "Managers" on September 17,
2    2009, which "introduced some new contractual terms and
3    conditions . . . on a case by case basis" to "avoid
4    improper Third Party interference with our customer
5    relationships." (Faby Decl., Exh. 4 at 1.)  The
6    changes included (1) issuing a thirty-day cancellation
7    notice once UPS is notified of a shipper's "intent to
8    authorize a Third party to act on behalf of the
9    customer in the negotiations of their existing UPS
10   agreement" and (2) including language in new contracts
11   negotiated by a third party that allows UPS to assess a
12   fee in the event a shipper terminated the agreement
13   early or fails to meet minimum volume or revenue
14   requirements.  (Id.)  UPS provided updated procedures
15   to its sales force in an April 23, 2010, newsletter.
16   (Gutmann Decl., Exh. 22.)  If a sales representative
17   has a customer that is "going to use a [Third Party
18   Negotiator] in any capacity," the representative "MUST
19   notify" the Strategy Room "to discuss next steps before
20   taking any other action with the customer related to
21   the [Third Party Negotiator]." (Decker Decl., Exh. 24,
22   Subexh. 2573; Gutmann Decl. ¶ 46.)  The Strategy Room
23   decides how to proceed with the customer on a case-by-
24   case basis, but UPS "generally say[s] 'NO' to [Third
25   Party Negotiators] unless there is an unusual
26   circumstance." (Decker Decl., Exh. 24, Subexh. 2576 at
27   1376.)  In most cases, the Strategy Room advised the
28

sales representative to not engage in negotiations with anyone other than the customer.  (Decker Decl., Exh. 24, Subexh. 2596 at 1392; cf. Kalt Decl., Exh. 1 ¶ 136 (stating that UPS proceeded with the negotiator involved with the customer in between six and thirty-eight percent of interactions from April 2010 to April 2012).)  Other options offered by the Strategy Room included presenting the shipper who has engaged a negotiator with a nonnegotiable proposal to do business, known as a "last-best-and-final offer." (USUF ¶ 54; AUSGI ¶ 54.)

Prior to the TPC Policy, Defendants used 2-way or 3-way nondisclosure agreements ("NDA") with shippers. The former is a contract between the shipper and carrier in which the parties agree not to share pricing information or contract terms with third parties.  The latter, 3-way NDA permits a third-party to access pricing and contract information and binds the third-party to the confidentiality terms.

As part of the TPC Policy, FedEx implemented a more robust 3-way NDA for use with all TPCs, which included a $100,000 liquidated damages provision and gave FedEx the right to audit the third-party's use of the data. (AFSGI ¶¶ 48, 64; Declaration of Jimmy Russell Phillips, Jr. ¶¶ 11-12, App., Ex. 43.)  UPS also modified its NDA policy.  At times, the Strategy Room required a shipper to sign a strict 2-way NDA, which

"require[d] that the information shared between UPS and
[the shipper] is treated as confidential and may not be
shared outside of our two companies."  (Decker Decl.,
Exh. 22, Subexh. 2634 at 1149; USUF ¶ 52.)  Another
form of the 2-way NDA utilized by UPS had a limited
exception which permitted TPCs to use UPS's
confidential information to conduct contract analytics
or bill auditing, but not to engage in negotiations.
(USUF ¶ 53; AUSGI ¶ 53.)  UPS also permitted 3-way NDAs
in some circumstances, which allowed negotiators to
access confidential pricing information.  (USUF ¶ 55;
USGI ¶ 55.)

     Defendants offered several reasons for modifying
their policies toward TPCs.  Due to the recession,
Defendants noted an increase in the number of TPCs and
the number of shippers engaging TPCs in 2008 and 2009.
During the same period, Defendants noticed that TPCs
increasingly encouraged shippers to renegotiate their
carrier contracts before the end of the contract term,
costing Defendants money and time to renegotiate and
undermining their ability to recover the cost of their
services.  Both Defendants state that TPCs interfered
with their ability to provide specialized supply chain,
also known as "value-added," services to shippers.
(USUF ¶¶ 25-27; FSUF ¶ 30.)  Numerous witnesses
testified that TPCs obstructed Defendants'
relationships with their customers and prevented them

from working directly with the shippers, insisting that all communications go through the TPC.  Defendants also sought to prevent TPCs from violating shipper NDAs by engaging in "benchmarking,"[15] a practice whereby a TPC uses confidential shipping rate information from one shipper to assess and negotiate the rates of another. (AUSUF ¶¶ 29-30; FSUF ¶ 37.)  FedEx was uniquely concerned that the TPCs had a bias in favor of UPS and frequently lost or failed to gain new business when the RFP process was run by a TPC.

Plaintiff contends that Defendants' modified approach toward TPCs, which was allegedly created after DHL departed from the market in 2009, was implemented in order to strengthen their purported duopoly in the delivery services market and to increase their revenues by forcing TPCs out of the market.  (ASUF ¶ 43; AUSGI ¶ 36.)

---

[15] It is undisputed that some TPCs engaged in benchmarking and improperly used confidential shipping rates.  (AUSGI ¶ 29.)

# IV.  DISCUSSION

Plaintiff cannot survive summary judgment because it fails to provide any evidence of the existence and boundaries of a legally cognizable relevant market for "shipping consultation services."  (Opp'n at 3.) Because Plaintiff has not presented evidence to support crucial elements of its case, the Court finds summary judgment is proper.

## 1. Relevant Market

The "validity of the 'relevant market'" is "subject to factual testing by summary judgment or trial." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008).  In a Section 1 claim, "[t]he plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'" Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.") (citing Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1105 (9th Cir. 1999)).  The existence of a relevant market is crucial to ensure that Plaintiff possesses antitrust standing and an essential element of each of Plaintiff's causes of action.

1   See Associated Gen. Contractors of Cal., Inc. v. Cal.

2   State Council of Carpenters, 459 U.S. 519, 538 (1983)

3   (emphasizing, for purposes of antitrust standing, the

4   "central interest in protecting the economic freedom of

5   participants in the relevant market"); Bhan v. NME

6   Hosps., Inc., 929 F.2d 1404, 1413 (9th Cir. 1991) ("To

7   meet his initial burden in establishing that the

8   practice is an unreasonable restraint of trade,

9   plaintiff must . . . delineate a relevant market and

10  show that the defendant plays enough of a role in that

11  market to impair competition significantly."); Los

12  Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,

13  726 F.2d 1381, 1392 (9th Cir. 1984) ("The relevant

14  market provides the basis on which to balance

15  competitive harms and benefits of the restraint at

16  issue. [citations omitted]  Such evidence is essential

17  in a section 1 case.").  When a plaintiff produces

18  "insufficient evidence to show either the geographic or

19  the product market," summary judgment is appropriate.

20  Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924

21  F.2d 1484, 1489 (9th Cir. 1991).

22       Plaintiff defines the relevant market as one for

23  "shipping consultation services," which includes those

24  business entities which advise shippers regarding the

25  delivery of time sensitive letters, documents, and

26  packages by air or by ground within the United States

27  and to and from the United States to foreign countries.

28

1  (Opp'n at 23; ASUF ¶ 53.)  Defendants define the
2  relevant market as the market for contract price
3  negotiation services.  (UMSJ at 16; FMSJ at 14-15.)
4  The Court need not determine which characterization of
5  the market is proper, as Plaintiff has not produced any
6  evidence to demonstrate that its purported market is
7  legally cognizable.

8      Plaintiff provides no expert evidence to support
9  its market definition.  The Court previously excluded
10  Mr. Brotman's testimony under Federal Rule of Evidence
11  702 and does not consider it here.  (See generally MiL
12  Order.)  Without any expert testimony to opine on the
13  scope of the relevant market, it is difficult to see
14  how Plaintiff could meet its evidentiary burden.  See
15  Plush Lounge Las Vegas LLC v. Hotspur Resorts Nev.
16  Inc., 371 F. App'x 719, 721 (9th Cir. 2010) ("With
17  large portions of the Katavic and Pressman declarations
18  stricken, Plush had insufficient evidence to sustain a
19  jury verdict on its proposed market definition."); In
20  re Live Concert Antitrust Litig., 863 F. Supp. 2d 966,
21  1000 (C.D. Cal. 2012) (concluding that there is an
22  "[in]adequate evidentiary basis in the record, absent
23  Dr. Phillips' testimony, for a jury to find that
24  Plaintiffs have defined an economically significant
25  product market"); Hynix Semiconductor Inc. v. Rambus
26  Inc., No. CV-00-20905 RMW, 2008 WL 73689, at *10 (N.D.
27  Cal. Jan. 5, 2008) ("Establishing market definition in

28

this case likely requires expert testimony. . . .
Given the complexity of the task, a jury likely cannot
conclude that two technologies are 'close substitutes'
and hence comprise a relevant technology market without
expert testimony.").

### a. Services

A relevant market "must encompass the product at
issue as well as all economic substitutes for the
product." Newcal Indus., 513 F.3d at 1045. "As the
Supreme Court has instructed, 'The outer boundaries of
a product market are determined by the reasonable
interchangeability of use or the cross-elasticity of
demand between the product itself and substitutes for
it.'" Id. (quoting Brown Shoe v. United States, 370
U.S. 294, 325 (1962)).

Plaintiff evasively and confusingly avoids stating
exactly what services are sold in the relevant market.
Initially, Plaintiff contended that its market was
simply for shipping advice. (ASUF ¶ 53.) It is
unclear to the Court exactly what "advice" Plaintiff
intended to include in the market. Perhaps recognizing
the vagueness of its market definition, Plaintiff
further contends that the market for shipping
consultation services primarily includes gathering and
analyzing a shipper's past shipping history and

developing a strategy to help a shipper match its needs to a carrier's services and obtain maximum profit. (ASUF ¶ 3.)  Even with this narrowing, the Court cannot define the products or services Plaintiff seeks to include in its selected market, which is fatal to Plaintiff's claims.  See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177–78 (1965) ("Without a definition of [the] market, there is no way to measure [Defendants'] ability to lessen or destroy competition."); Kaplan v. Burroughs Corp., 611 F.2d 286, 295 (9th Cir. 1979) (affirming judgment notwithstanding the verdict because plaintiff presented only "vague references to the overall data processing market" and "the record [was] silent" as to the "question of market definition").

As best as it can be understood by the Court, Plaintiff's market definition represents only a subset of the services Plaintiff offers.  Plaintiff admits its primary service is representing shippers in negotiating competitive shipping contracts with carriers, which represents ninety-five percent of its business.  (USUF ¶ 1; AUSGI ¶ 1.)  Plaintiff also analyzes carrier proposals, implements new agreements, and does an ongoing review of carrier pricing trends to monitor savings and contract compliance.  (Gates Decl., Exh. 5 at 74.)  However, these services are noticeably absent

from Plaintiff's description of the shipping consultation services market.

The Court must "properly follow[] precedent in this area by restricting the relevant market to one in wherein commercial reality exists." Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1299 (9th Cir. 1982). Plaintiff has produced no evidence to demonstrate that the arbitrary subset of Plaintiff's services selected for inclusion in the "shipping consultation services" market is a commercially cognizable market. In fact, Plaintiff has provided no evidence that its customers purchase only the "advice" component of its services. Defendants' evidence – the only evidence on this point in the record – demonstrates that the standalone "advice" component of Plaintiff's services represents approximately 0.51% of Plaintiff's revenue. (Harris Decl., Exh. 1 ¶ 21.) There is no evidence as to which additional TPCs, if any, sell this "advice," that Defendants sell this advice, or that there are any consumers who are in the market to buy this advice and what they will pay. Despite a requirement to do so, Plaintiff has not produced "market data, figures or other relevant material adequately describing the nature, cost, usage, or other features of competing products" to determine the bounds of the relevant market. Bhan v. NME Hosps., Inc., 669 F. Supp. 998,

1  1018 (E.D. Cal. 1987), aff'd, 929 F.2d 1404 (9th Cir.

2  1991).  Plaintiff has not demonstrated that there is a

3  market for this marginal subset of Plaintiff's services

4  or that there are any other participants in this

5  market, let alone that there is a "relationship between

6  changes in price and responsive changes in demand."

7  United States v. LSL Biotechnologies, 379 F.3d 672, 697

8  (9th Cir. 2004) (defining "elasticity of demand").

9  Plaintiff's failure to produce such evidence prevents

10  it from defining the relevant service market and

11  precludes it, as a matter of law, from establishing its

12  claims.

13      Further, Plaintiff admits that trade was only

14  restrained in the market for negotiation services.

15  (ASUF ¶¶ 54-55; AUSGI ¶ 86; Opp'n at 2 (defining the

16  TPC Policy as Defendants' agreement "not to deal with a

17  TPC that the other had declined to allow[] to

18  participate in negotiations").)  Yet, contrary to

19  established Ninth Circuit precedent, Plaintiff's

20  definition of the relevant market includes services far

21  beyond those it admits were restrained, including any

22  advice based on a shipper's past history that helps it

23  select carrier services and maximize profit.  (ASUF

24  ¶ 53.)  See Exhibitors' Serv., Inc. v. Am. Multi-

25  Cinema, Inc., 788 F.2d 574, 579 (9th Cir. 1986) ("[T]he

26  requirement laid down in Associated General Contractors

27  is that the plaintiff and conspirators compete in the

28

'market in which trade was *restrained*.'") (emphasis in original) (quoting <u>Associated Gen. Contractors</u>, 459 U.S. at 539).  Plaintiff has not demonstrated that the additional services included in the market beyond those restrained are reasonably interchangeable therewith. <u>See</u> <u>In re Air Passenger Computer Reservations Sys.</u> <u>Antitrust Litig.</u>, 694 F. Supp. 1443, 1457 (C.D. Cal. 1988), <u>aff'd sub nom.</u> <u>Alaska Airlines, Inc. v. United</u> <u>Airlines, Inc.</u>, 948 F.2d 536 (9th Cir. 1991) ("[P]roducts and services which are 'reasonably interchangeable' for the same or similar uses normally should be included in the same product market for antitrust purposes.") (citing <u>Kaplan</u>, 611 F.2d at 291).

### b. Participants

The relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." <u>Thurman Indus., Inc. v. Pay 'N</u> <u>Pak Stores, Inc.</u>, 875 F.2d 1369, 1374 (9th Cir. 1989). Plaintiff contends that itself, Defendants, and "other similar TPCs" are participants in the market for shipping consultation services.  (Opp'n at 23.) Plaintiff seeks to further define these "other TPCs" as entities which gather and analyze data, including shippers' past transactions, to develop a strategy, to

1  advise and help a shipper negotiate or otherwise obtain

2  maximum savings for their shipping needs, and to match

3  the shipper's needs to a carrier's delivery services.

4  (Opp'n at 3.)

5      "[M]arket definition must look at all relevant

6  sources of supply, either actual rivals or eager

7  potential entrants to the market." Kaplan, 611 F.2d at

8  292 (citations omitted).  As Defendants point out,

9  there are numerous other consultants that provide

10  advice to shippers to help them select carrier services

11  and save money on shipping costs, including entities

12  that assist with warehouse location, inventory

13  management, technology solutions, product returns,

14  packaging, and auditing carrier bills.  (USUF ¶¶ 70-

15  81.)  Plaintiff contends that none of these entities or

16  services is included in its market.  (Opp'n at 34-36.)

17  Plaintiff provides no factual basis for excluding the

18  services provided by these shipping consultants from

19  its alleged market and engages in no analysis to

20  determine whether these services are substitutes for

21  the services Plaintiff includes in its market.  See

22  Newcal Indus., 513 F.3d at 1045 (stating that field of

23  competition is not limited to producers of particular

24  "product at issue" but also includes producers of "all

25  economic substitutes for the product").  Instead,

26  Plaintiff offers an entirely circular argument,

27  asserting that these services must be excluded from the

28

market because the TPC Policy was not targeted at them. (See ASUF ¶¶ 54-55; Opp'n at 36.)  Limiting the market solely based on Defendants' policies is erroneous. Rather, the market must be defined by looking at the "goods and services that sellers or producers offer." Thurman Indus., 875 F.2d at 1374.  In other words, the services that were allegedly restrained must comprise a legally and commercially cognizable market.  Plaintiff has produced no evidence tending to support the boundaries of its selected market.

In addition, Plaintiff arbitrarily excludes shippers' in-house employees who similarly gather and analyze shipper data to advise a shipper on methods of saving money on its carrier contracts.  (See USUF ¶¶ 83-84; Opp'n at 37-38.)  "[A] product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand."  Thurman Indus., 875 F.2d at 1374.  Supreme Court precedent indicates that the demands of all consumers must be analyzed and the relevant market must include all suppliers and consumers of the particular product.  See United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 393-95 (1956).  Over eighty percent of shippers do not hire TPCs to advise them on their shipping needs, yet they enter shipping contracts with carriers.  Plaintiff

provides no evidence or explanation for why these in-house advisors are not economic substitutes for TPCs. Plaintiff instead argues that TPCs are better at providing advice than in-house employees, thus in-house employees must be excluded. (See Opp'n at 37.)  This is not a proper basis for exclusion.  See In re Super Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances.  Such distinctions are economically meaningless where the differences are actually a *spectrum* of price and quality differences.").  Plaintiff also argues that Defendants, not shippers' in-house employees, provide advice when a TPC is not hired.  (Opp'n at 37.) However, Plaintiff provides no evidence to support this asserted fact.[16]  (AUSGI ¶¶ 83-84.)  See Morgan, Strand, Wheeler & Biggs, 924 F.2d at 1489 (granting summary judgment where there was "insufficient evidence for a jury to conclude that University and osteopathic radiologists cannot compete with private medical radiologists").  The Court finds it implausible that there would be no cross-elasticity between in-house

---

[16] Even if Defendants supplied advice in the absence of a TPC, there is no explanation for why a shipper's in-house employees could not also do so.  There are no facts from which one can draw a reasonable inference that the advice offered by shippers' employees may be excluded from the market, assuming one exists.

43

employees providing shipping advice and negotiation services and the same services provided by TPCs.

Without factual support, Plaintiff excludes USPS and regional carriers from its "shipping consultation services market." There is undisputed evidence in the record that TPCs provide advice regarding carriers other than UPS and FedEx. (Reply Gates Decl., Exh. 175 at 188:6-23; Exh. 176 at 30:13-22; Exh. 183 at 71:20 to 72:9; Exh. 157.) Plaintiff provides no explanation for excluding these alternate participants from the market. Plaintiff appears to argue that USPS and regional carrier should be excluded because they do not provide "time sensitive" delivery services. (ASUF ¶ 15.) However, Plaintiff presents no evidence to support this fact. In fact, the evidence in the record supports the conclusion that USPS and regional carriers actually do offer time-sensitive delivery services. (USGI ¶ 15.) Once again, and without analysis, explanation, or evidence, Plaintiff illogically excludes carriers from the market about which it uncontrovertedly supplies advice.

Plaintiff attempts to construct a market for "shipping consultation services" that includes only Defendants, Plaintiff, and TPCs affected by the TPC Policy. The primary problem with Plaintiff's market is that there is no evidence that such a market exists or that it includes the participants or services Plaintiff

identifies.  "Plaintiff cannot artificially create antitrust claims by narrowly defining the market to create the appearance of an antitrust injury." Smalley & Co. v. Emerson & Cuming, Inc., 808 F. Supp. 1503, 1512 (D. Colo. 1992), aff'd, 13 F.3d 366 (10th Cir. 1993); see also Gough v. Rossmoor Corp., 585 F.2d 381, 389 (9th Cir. 1978) ("[I]n determining the relevant market the courts are not free to accept whatever market is suggested by the plaintiff as fitting most persuasively with his contention that his power to compete effectively has suffered injury.").  Plaintiff has ignored its own business model and the realities of the services it provides.  Plaintiff cannot avoid summary judgment by declaring that the "defining the market 'is a factual inquiry for the jury.'" (Opp'n at 34 (citation omitted).)  It remains Plaintiff's burden to present a factual question as to the relevant market in order to survive summary judgment. See Int'l Healthcare Mgmt. v. Haw. Coal. for Health, 332 F.3d 600, 604 (9th Cir. 2003) ("Although antitrust cases are sometimes difficult to resolve on summary judgment because of their factual complexity, summary judgment is still appropriate in certain cases.") (internal quotation omitted); Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1435 (9th Cir. 1995) ("If Rebel's evidence cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate.").

1   Plaintiff has not done so; therefore summary judgment

2   is appropriate.[17]

3       Plaintiff relies heavily on the cases of Amarel v.

4   Connell, 102 F.3d 1494 (9th Cir. 1997), and Yellow

5   Pages Cost Consultants, Inc. v. GTE Directories Corp.,

6   951 F.2d 1158 (9th Cir. 1991).  (Opp'n at 23-26.)  Both

7   cases address the question of standing where the

8   plaintiff offered evidence of a clearly defined

9   cognizable market.  See Amarel, 102 F.3d at 1509

10  ("Plaintiffs introduced evidence that they are

11  'competitors' in the market for milled rice because

12  they tender paddy rice to the independent mills under

13  'participation contracts' which entitle them to a share

14  of profits from the sale of milled rice."); Yellow

15  Pages, 951 F.2d at 1161 ("Consultants offer

16

17      [17] In opposition to summary judgment, Plaintiff
18  alleges an alternative market for "delivery services."
    (Opp'n at 23.)  The Court previously ruled that
19  Plaintiff is not "a participant in the market for
    shipping services," and thus it "cannot have suffered
20  antitrust injury" in that market.  (MTD 1 Order at 17-
    18.)  Moreover, Plaintiff did not reallege the delivery
21  services market in the TAC.  (See TAC ¶ 6 (alleging
    only a market for "shipping consultation services").)
22  Plaintiff "may not effectively amend its Complaint by
    raising a new theory of standing in its response to a
23  motion for summary judgment."  La Asociacion de
    Trabajadores de Lake Forest v. City of Lake Forest, 624
24  F.3d 1083, 1089 (9th Cir. 2010); see also Coleman v.
    Quaker Oats Co., 232 F.3d 1271, 1292-93 (9th Cir. 2000)
25  (refusing to allow plaintiff to raise a new theory in
    opposition to summary judgment which was not pled in
26  the complaint).  The Court therefore does not consider
    Plaintiff's arguments regarding the "delivery services"
27  market.
28

1  considerable evidence that they compete in the service

2  market of advising advertisers regarding the form,

3  cost, content and location of yellow pages

4  advertisements . . . .").  Here, Plaintiff has not

5  surpassed the crucial hurdle of presenting evidence

6  that Plaintiff and Defendants offer services within a

7  commercially cognizable relevant market where the

8  services are reasonably interchangeable and where there

9  is cross-elasticity of demand.  See Rebel Oil, 51 F.3d

10 at 1436.  Without a clear understanding of the services

11 or participants in the alleged market, Amarel and

12 Yellow Pages cannot help Plaintiff avoid summary

13 judgment.

14

15     **2. _Per Se_**

16

17     In order to avoid having to put forth a rational

18 and supported market definition, Plaintiff argues that

19 the Court should find that Defendants have committed

20 _per se_ violations of the Sherman Act.  (Opp'n at 7-8

21 (citing Big Bear Lodging Ass'n v. Snow Summit, Inc.,

22 182 F.3d 1096, 1101-02 (9th Cir. 1999) ("Elaborate

23 market analysis and case-by-case evaluation are

24 unnecessary in cases involving _per se_ antitrust

25 violations because the anticompetitive effects of the

26 practice are presumed.").)  "Resort to _per se_ rules is

27 confined to restraints . . . that would always or

28

almost always tend to restrict competition and decrease
output.   To justify a *per se* prohibition a restraint
must have manifestly anticompetitive effects, and lack
. . . any redeeming virtue." <u>Leegin Creative Leather
Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 886 (2007)
(second alteration in original) (internal citations and
quotations omitted).

 Fatal to Plaintiff's argument is the clear
requirement that "the *per se* rule is appropriate only
after courts have had considerable experience with the
type of restraint at issue, and only if courts can
predict with confidence that it would be invalidated in
all or almost all instances under the rule of reason."
<u>Id.</u> at 886-87 (internal citations omitted).   In order
to fit it within *per se* treatment, Plaintiff
characterizes the TPC Policy as an "illegal boycott."
(Opp'n at 8.)   However, Plaintiff has not pointed to a
single case applying *per se* treatment which resembles
the factual scenario here or characterizes facts
similar to these as a group boycott.

 The Supreme Court in <u>FTC v. Indiana Federation of
Dentists</u>, 476 U.S. 447 (1986), refused to apply the *per
se* designation to an agreement by competing dentists to
deny patient X-rays to insurance companies.   The
dentists did not want to share the X-rays because they
wanted to prevent the insurance companies from
reviewing the propriety of the dentists' charges.   <u>Id.</u>

at 455.   The Court declined to invoke the *per se* rule,
reasoning that "the category of restraints classed as
group boycotts is not to be expanded indiscriminately,
and the *per se* approach has generally been limited to
cases in which firms with market power boycott
*suppliers or customers* in order to discourage them from
doing business with a competitor."   Id. at 458
(emphasis added).   This definition does not fit the
facts presented here.   Plaintiff contends that
Defendants "refus[ed] to deal with TPCs," but there is
no dispute that Plaintiff and other TPCs are not
"suppliers or customers" of Defendants.   (Opp'n at 7.)
Thus, the factual scenario presented here does not
satisfy the Supreme Court's definition of a boycott
that merits *per se* treatment.

The Ninth Circuit's test for the applicability of
the *per se* standard to a group boycott confirms this
conclusion.   Three characteristics indicate the
existence of a *per se* illegal boycott:

> (1) the boycott cuts off access to a
> supply, facility, or market necessary
> to enable the victim firm to compete;
> (2) the boycotting firm possesses a
> dominant market position; and (3) the
> practices are not justified by
> plausible arguments that they enhanced
> overall efficiency or competition.

49

1   Adaptive Power Solutions, LLC v. Hughes Missile Sys.
2   Co., 141 F.3d 947, 950 (9th Cir. 1998) (quoting Hahn v.
3   Or. Physicians' Serv., 868 F.2d 1022, 1030 (9th Cir.
4   1988)).

5      Plaintiff has produced no evidence as to the second
6   element.  The record is devoid of proof that FedEx and
7   UPS possess a dominant position in the market for
8   "shipping consultation services."  Moreover, although
9   the Court does not evaluate the propriety of the TPC
10  Policy, Defendants present a plausible argument that it
11  is procompetitive because it allowed them to deal
12  directly with their shipping customers, thereby
13  increasing efficiency.  (Williams Decl., Exh. 1 ¶¶ 96-
14  97.)  Accordingly, the TPC Policy does not trigger the
15  *per se* rule of a group boycott, and Plaintiff must
16  prove the existence of the relevant market and
17  anticompetitive effects.

18
19  **3. Quick Look**

20
21     In a footnote, Plaintiff also argues that "quick
22  look" analysis should apply.  (Opp'n at 8 n.5.)
23  "[T]his truncated rule of reason or 'quick look'
24  antitrust analysis may be appropriately used where an
25  observer with even a rudimentary understanding of
26  economics could conclude that the arrangements in
27  question would have an anticompetitive effect on

28

customers and markets." <u>California ex rel. Harris v. Safeway, Inc.</u>, 651 F.3d 1118, 1134 (9th Cir. 2011) (internal quotation omitted).  "Full rule of reason treatment is unnecessary where the anticompetitive effects are clear even in the absence of a detailed market analysis.  But if an arrangement might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition, then a 'quick look' form of analysis is inappropriate."  <u>Id.</u> (internal citation and quotation omitted).  As noted above, Plaintiff has presented a plausible procompetitive justification for the TPC Policy, thus a quick look will not suffice.  <u>See id.</u> at 1138 ("Because we cannot reach a confident conclusion that the principal tendency of the [provision] is to restrict competition, truncated review is inappropriate."); <u>Texaco Inc. v. Dagher</u>, 547 U.S. 1, 7 (2006) ("But for the same reasons that *per se* liability is unwarranted here, we conclude that petitioners cannot be held liable under the quick look doctrine.").

　　　Under rule of reason analysis, "the plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market."  <u>Tanaka</u>, 252 F.3d at 1063.  Plaintiff has produced no evidence from which a reasonable jury could find that its market for "shipping consultation services" is the relevant market.  <u>See, e.g.</u>, <u>Pacifica</u>

1  Kidney Ctr., Inc. v. Nat'l Med. Care, Inc., 995 F.2d

2  232 (9th Cir. 1993) (granting summary judgment to

3  defendant because "Pacifica has not adequately defined

4  the relevant geographic market"); Morgan, Strand,

5  Wheeler & Biggs, 924 F.2d at 1489 (granting summary

6  judgment in favor of defendants based on plaintiffs'

7  failure to "show the relevant market" because "[o]ne

8  simply cannot conclude from the evidence who competes

9  to supply radiology services to patients").

10 Accordingly, summary judgment is appropriate.

11

12                    **V.   CONCLUSION**

13

14      For the foregoing reasons, the Court GRANTS

15 Defendants' motions for summary judgment, (Doc. Nos.

16 130, 140, 229, 246), and DISMISSES all causes of action

17 in the Third Amended Complaint WITH PREJUDICE.

18      As stated above, UPS's application for leave to

19 file a supplemental brief is DENIED.  (Doc. No. 257.)

20

21

22

23

24 Dated: April 30, 2015      _____

25                                 Jesus G. Bernal
                            United States District Judge
26

27

28